UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 09-22302-CIV-UNGARO

UNITED STATES OF AMERICA, *et al.*,
*ex rel*. MICHAEL KEELER,

      Plaintiffs,

v.

EISAI, INC.,

      Defendant.
                                 /

**ORDER ON MOTION TO DISMISS**

THIS CAUSE is before the Court upon Defendant's Motion to Dismiss.  (D.E. 46.)

THIS COURT has considered the Motion and the pertinent portions of the record and is otherwise fully advised in the premises.

**I. Background**

Plaintiff, Michael Keeler, brings this *qui tam* action under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") to recover damages and civil penalties arising out of Defendant, Eisai, Inc's, conduct.[1]  Defendant is a United States pharmaceutical subsidiary of Tokyo-based Eisai Co., Ltd.  (Am. Compl., D.E. 19, ¶ 14.)  Defendant owns the right to the drug Ontak, which is used to treat patients with persistent or recurrent cutaneous T-cell lymphoma ("CTCL").  (*Id*. ¶¶ 17, 25.)  Plaintiff was a sales representative for Defendant from 2006 to April 2009.  (*Id*. ¶ 11.)  Plaintiff marketed and sold Ontak on behalf of Defendant.  (*Id*.)

---

[1] On August 4, 2009, Plaintiff filed a sealed complaint under the FCA.   (D.E. 1.) On July 8, 2010, Plaintiff filed an Amended Complaint.  (D.E. 19.)  On February 24, 2011, the United States notified the Court that it would not intervene in the action.  (D.E. 23.)

1

Defendant marketed and promoted Ontak for off-label use. (*Id.* ¶ 31.) Off-label marketing is a practice whereby a pharmaceutical company promotes a drug for treatments of symptoms and conditions other than those approved by the Food and Drug Administration ("FDA"). (*Id.* ¶ 31.) Although physicians may prescribe drugs for off-label use, the FDA prohibits pharmaceutical companies from marketing or promoting a drug for a use that the FDA has not approved. *See* 21 U.S.C. § 331(d) (prohibiting distribution of drug for unapproved use); *Id.* § 331(a) (prohibiting distribution of "misbranded" drug). Defendant's off-label promotion and marketing disregarded an October 2006 warning letter that the FDA sent to Ontak's previous licensee. (*Id.* ¶ 33.) The letter accused Ontak's previous licensee of promoting Ontak in a way that overstated its effectiveness, broadened its indication, minimized its risks, and "misbrand[ed]" the drug. (*Id.* ¶¶ 22–23.) Defendant directed its sales representatives to off-label promote Ontak for a variety of other cancers, including but not limited to, ovarian cancer, melanoma, and B-cell non-Hodgkin's lymphoma. (*Id.* ¶ 30.)[2] Through a system of bonuses and performance evaluations, Defendant encouraged its sales representatives to off-label market Ontak. (*Id.* ¶¶ 52– 58.) Plaintiff and other Ontak representatives complained to management about the pressure to "sell [Ontak] off label based on the quotas provided to them by [Defendant]" but their complaints were met with hostility and condescension. (*Id.* ¶ 60–62.) Defendant attempted to prevent detection of its off-label marketing conduct by instructing sales representatives to use their cell phones rather than the company's phone lines when conducting business or approaching management relating to Ontak. (*Id.* ¶ 64.)

Defendant directed its sales representatives to highlight and market the discounts on

---

[2]Defendant also off-label promoted the drug Dacogen. (*Id.* 92–97.)

Ontak that Defendant was required to provide to hospitals that serve a disproportionate share of needy and low-income patients ("Disproportionate Share Hospitals")[3] in an effort to incentivize those hospitals to purchase Ontak for off-label use ("340B Program"). (*Id.* ¶¶ 71–76.) Defendant also marketed others drugs, Aloxi and Fragmin, to Disproportionate Share Hospitals in the same manner. (*Id.* ¶¶ 98–108.) Although the use of Ontak to treat cancers other than CTCL did not qualify for reimbursement under several states' Medicaid and Medicare programs, Defendant induced physicians to order the drug for off-label use through its Oncology Reimbursement Assistance Program ("OAR Program") and Ontak Credit Program ("OCP Program"). (*Id.* ¶¶ 77–80.) The purpose of these programs was to assure purchasers that in the event that a third party payor did not reimburse them for Ontak's off-label use, Defendant would cover the cost. (*Id.* ¶ 80.) Defendant also induced physicians to order the drugs Aloxi and Fragmin for off-label use through the OAR Program. (*Id.* ¶¶ 98–108.)

Defendant hired several medical professionals to speak at teaching hospitals and medical conferences about the off-label uses of Ontak. (*Id.* ¶¶ 81–91.) Although Defendant advertised many of the speaker programs as being focused on Ontak's use for treating CTCL, the medical professionals spoke mainly about Ontak's off-label uses. (*Id.*)

Defendant knew that off-label prescriptions for Ontak were ineligible for reimbursement by Medicare, Medicaid, and other federally-funded government health care programs (collectively "Government Health Care Programs"), that its marketing activities would cause providers to submit numerous ineligible prescriptions to Government Health Care Programs, and

---

[3]Drug manufacturers are required to provide outpatient drugs to covered entities, including Disproportionate Share Hospitals at a reduced price. (*Id.* ¶ 71.); *See* 42 U.S.C. §§ 256b(a)(1), (a)(4)(L).

3

that Government Health Care Programs would not have reimbursed the providers had they known about the Defendant's marketing practices. (*Id.* ¶ 109–110.) Defendant foresaw that doctors, hospitals, and pharmacists would submit false claims to Government Health Care Programs and intended the submission of such false claims. (*Id.* ¶ 110–111.)

Plaintiff has a brought a thirty-four count[4] complaint, alleging, *inter alia*, that Defendant (a) violated the FCA, 31 U.S.C. § 3729(a)(1) and (a)(2), by promoting and marketing Ontak, Dacogen, Fragmin, and Aloxi for off-label uses (Count I), (b) violated 31 U.S.C. § 3730(h) by retaliating against, harassing and threatening Plaintiff, and terminating his employment (Count II), (c) violated the FCA, 31 U.S.C. § 3729, by avoiding price controls imposed by 21 C.F.R. § 312.7 on investigational new drugs (Count III), and (d) violated the FCA, 31 U.S.C. § 3729, by establishing a system of kickbacks to physicians that are illegal under the Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b)(2).[5]

Defendant moves to dismiss Counts I, II, III, and IV of the Amended Complaint, arguing that Plaintiff is precluded from bringing any claims against Defendant because he entered into a written settlement and release ("Release") that released all claims arising out of his employment with Defendant. Alternatively, Defendant moves to dismiss the four counts for failure to state a claim pursuant to Fed. R. Civ. P. ("Rule") 12(b)(6) and failure to plead facts with sufficient particularity pursuant to Rule 9(b).

---

[4] Counts V through XXXIV allege violations of state and municipal false claims statutes.

[5] The Court notes that although Counts III and IV are labeled "Avoiding Federal Price Controls/Experimental Use of a Drug" and "Illegal Kickbacks," respectively, both counts allege different theories of liability for the violation of the FCA.

## II. Legal Standard

In order to state a claim, Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." While a court, at this stage of the litigation, must consider the allegations contained in the plaintiff's complaint as true, such rule "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). In addition, the complaint's allegations must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

In practice, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* (citation omitted). The plausibility standard requires more than a sheer possibility that a defendant has acted unlawfully. *Id.* (citation omitted). Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Id.* (internal quotations and citation omitted). Determining whether a complaint states a plausible claim for relief is a context specific undertaking that requires the court to draw on its judicial experience and common sense. *Id.* (citation omitted).

Fraud claims are subject to Rule 9(b)'s heightened pleading requirements. Rule 9(b) provides that "[i]n allegations of fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake" but "[m]alice, intent, knowledge, and other condition of mind of a person shall be averred generally." Fed. R. Civ. P. 9(b). The Eleventh Circuit has stated that Rule 9(b)'s fraud particularity requirement is met as long as the complaint sets forth  (1) precisely what representations were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal citation omitted).

### III. Discussion

**A. The Release**

Defendant states that approximately nine months after Plaintiff filed the instant action, he filed another action against Defendant, seeking relief under the Florida Whistleblower's Protection Act, which the parties agreed to dismiss after entering into the Release. (*See* D.E. 46-1.) Defendant argues that the Release precludes Plaintiff from bringing both his personal statutory claim for retaliation in Count II and his *qui tam* claims in Counts I, III and IV.

By signing the Release, both sides agreed to "forever release and discharge" each other from "any and all claims, demands, causes of action and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, federal, state, local, or otherwise)." (D.E. 46-1¶ 4.) Plaintiff agreed that the payments he received under the Release would be "in full discharge of *any and all* of [Plaintiff's] claims which [Plaintiff] had, has, or can, shall or may have against [Defendant] or any of its past, present, or future parent corporations, subsidiaries, divisions, [or] affiliates." ( *Id*. ¶ 3.) Plaintiff agreed that the payments

would "fully and completely settle[] all of" his claims against Defendant, including "any and all claims, demands, causes of action, fees and liabilities of any kind whatsoever, whether known or unknown, which [Plaintiff] ever had, now has, or may have against" Defendant due to "any act, omission, transaction, practice, plan, policy, procedure, conduct, occurrence, or other matter, up to and including the date" of the Release. (*Id*.)  Plaintiff also waived "personal statutory claims" based on "retaliation." (*Id*.)

In Count II, Plaintiff brings a claim for retaliation under 31 U.S.C. § 3730(h). Section 3730 creates a private cause of action for an individual retaliated against by his employer for assisting a False Claims Act investigation or proceeding. *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 412 (2005). Pursuant to the language of the Release, Plaintiff is barred from bringing the retaliation claim in Count II. *See Coleson v. Inspector Gen.of Dep't of Def*., 721 F.Supp. 763, 769 (E.D. Va. 1989) (barring False Claims Act retaliation claim based on a release).

Although the release bars the retaliation claim, it does not bar the *qui tam* claims in Counts I, III, and IV.  Subsection 3730(b)(1) of Title 31, United States Code, states that:

> A person may bring a civil action for a violation of section 3729 for person and for the United States Government.  The action shall be brought in the name of the Government. *The action may be dismissed only if the court and the Attorney General give written consent to the dismissal* and their reasons for consenting.

31 U.S.C. § 3730(b)(1) (emphasis added).  Pursuant to the plain meaning of the statute, the Court cannot dismiss Counts I, III, and IV unless the Attorney General has provided written consent to the dismissal.  Here, the Attorney General has not provided written consent. Defendant cites several cases in support of its argument that the Release should bar the *qui tam*

7

claims, however, those cases are inapposite because the parties in those cases executed a release *before* the plaintiff filed the *qui tam* claims. *See, e.g., U.S. ex rel. Ritche v. Lockheed Martin Corp.*, 558 F.3d 1161, 1169 (10th Cir. 2009) ("When there is a release preceding the filing of the [*qui tam*] action, as in this case, no action has been filed, so there is neither an action to dismiss nor a judge to consent to the agreement. As a consequence, [31 U.S.C. § 3730(b)(1)] only governs the enforceability of settlement agreements made after the filing of a [*qui tam*] claim."). Here, the parties entered into the Release *after* Plaintiff filed his *qui tam* claims. Federal courts across the country have held that general releases that are entered into after the filing of a *qui tam* action are unenforceable. *See, e.g., U.S. v. Purdue Pharma. L.P.*, 600 F.3d 319, 326 (4th Cir. 2010)(holding that the FCA clearly provides that once a *qui tam* action is filed, the relator and the defendant may not settle or at least may not voluntarily dismiss the action); *U.S. v. Health Possibilities, P.S.C.*, 207 F.3d 335, 339 (6th Cir. 2000) ("The government's status as the real-party-in-interest renders a relator's unilateral attempt to settle akin to impermissibly bargaining away the rights of a third party."); *Searcy v. Philips Elec. N. Am. Corp., et al.*, 117 F.3d 154, 159 (5th Cir. 1997) ("[W]e find nothing in § 3730 to negate the plain import of this language.").

Defendant argues that the Government's extended investigation, and subsequent decision to decline to intervene can be inferred as the Attorney General giving his consent or waiving the Government's interest in the outcome of the action. Defendant's argument is misplaced. The Government's decision not to intervene is not dispositive of its written consent to the settlement and release. *See U.S. v. R&F Prop. Of Lake Cnty., Inc.*, 433 F.3d 1349, 1359 (11th Cir. 2005) ("The United States is the real party in interest in a *qui tam* action under the FCA even if it is not controlling the litigation."); *Searcy*, 117 F.3d at 157 (holding that the Government has the right

8

to approve settlement even when it has decided not to intervene in the *qui tam* action). Defendant also argues that public policy favors the enforcement of the Release, because the Government knew about the relator's action for several months prior to the execution of the Release and had plenty of time to investigate the claims.  The Court disagrees.  Enforcement of a release that the plaintiff entered into during the investigatory period would lead to undue interference in the Government's right to evaluate whether or not to join the *qui tam* action and frustrate the financial incentives designed to encourage relator participation.  *U.S. ex rel. Longhi v. Lithium Power Tech., Inc.*, 481 F.Supp. 2d 815, 820 (S.D. Tex. 2007) (holding that release was unenforceable as a matter of public policy because it would "disincentivize" prospective relators from coming forward to report and prosecute violations of the Act and "encourage" wrongdoers "to insulate themselves from the reach of the FCA by simply forcing potential relators to sign general releases." ); *U.S. ex rel. El-Amin v. George Washington University*, 2007 WL 1302597, at * 7–8 (D.D.C. 2007) (holding that policy favoring enforcement of release is outweighed by interest in ensuring relator participation which would not occur if release is enforced).  In other words, the interest of protecting the Government's rights outweighs the interest of enforcing the Release.

   In sum, the Release bars the retaliation claim in Count II, however, it does not bar the three *qui tam* claims in Counts I, III, and IV.  Accordingly, the Court will address Defendant's alternative grounds for dismissal.

**B. Count I**

**1.  Rule 12(b)(6)**

   In Count I, Plaintiff alleges that through the off-label promotion of Ontak and other

wrongful marketing schemes, Defendant caused the submission of false or fraudulent claims to be paid by the government in violation of 31 U.S.C. § 3729(a)(1) and (a)(2). Defendant argues that Plaintiff fails to state a claim under both subsections (a)(1) and (a)(2).

Subsection (a)(1) imposes liability on any person who presents, or causes to be presented, a false or fraudulent claim. 31 U.S.C. § 3729(a)(1); *U.S. ex rel. Hopper v. Solvay Pharm. Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009). Under subsection (a)(1), "[t]he FCA imposes liability upon persons who (1) presents or causes to be presented to the United States government, a claim for approval or payment, where (2) that claim is false or fraudulent, and (3) the action was undertaken 'knowingly', in other words, with actual knowledge of the falsity of the information contained in the claim, or in deliberate ignorance or reckless disregard of the truth or falsity of the information." *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 225 (1st Cir. 2004). Defendant first argues that Plaintiff fails to allege that Defendant was knowingly involved in the submission of false claims. Defendant is incorrect. Plaintiff's complaint describes in detail how Defendant promoted and marketed drugs for off-label use and alleges that Defendant promoted and marketed the drugs "knowing" that its conduct would "lead to submission of a myriad of claims for the Subject Drugs by Medicare and Medicaid-participating providers, when by law these claims were not reimbursable." (D.E. 19 ¶ 109.) Plaintiff also states that Defendant "knew that off-label prescriptions for Ontak were ineligible for reimbursement by the Government Health Care Programs and that this conduct and its other marketing activities would, in fact, cause numerous ineligible prescriptions to be submitted to the Government Health Care Programs." (*Id.* ¶ 110.) Defendant next argues that Plaintiff fails to allege that Defendant's conduct proximately caused prescribing physicians to write prescriptions

10

and the government to pay for alleged improper off-label use. Defendant is once again mistaken. Plaintiff states that it was "foreseeable" that its conduct would cause the submission of false claims and that Government Health Care Programs would not have reimbursed providers for their claims "had the truth about [Defendant's] illegal marketing practices been known." (*Id*. ¶¶ 109–110); *See Ironworkers Local Union 68 v. Astra Zeneca Pharm.*, *LP*, 634 F.3d 1352, 1359 n. 19 (11th Cir. 2011) (noting that " a common test for proximate causation...is foreseeability—i.e., whether the harm was a foreseeable consequence of the misrepresentation."). In sum, Plaintiff's complaint contains sufficient factual allegations to state a claim for relief under § 3729(a)(1) that is plausible on its face.[6]

Subsection (a)(2) makes liable any person who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved. 31 U.S.C. § 3729(a)(1); *U.S. ex rel. Hopper*, 588 F.3d at 1324. Defendant argues that Plaintiff fails to state a claim under subsection (a)(2). To state a claim under subsection (a)(2), a plaintiff must allege that (1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the

---

[6] Defendant also argues that Plaintiff fails to allege that Defendant intended its communication about the drug to influence the government's decision to pay claims submitted by physicians or states. First, subsection (a)(2) does not incorporate an element of specific intent. *See U.S. ex. rel Penter v. Abbott Labs.*, 723 F.Supp. 2d 395, 403 (D. Mass. 2010) ('"[S]ubsection (a)(1) has never been interpreted to incorporate an element of specific intent"). Second, even if specific intent was an element, Plaintiff sufficiently alleges it. Plaintiff alleges that Defendant foresaw that its marketing practices would cause doctors, hospitals, and pharmacists to submit false claims to Government Health Care Programs and this was an "intended consequence of [Defendant's] scheme." (D.E. 19 ¶ 110.) Plaintiff also alleges that Defendant "intended for its off-label promotional campaigns to improperly increase the submission of off-label Ontak and Dacogen prescriptions, including such prescriptions reimbursed by the Government Health Care Programs." (*Id*. ¶ 111.)

government to actually pay a false claim, either to the defendant itself, or to a third party. *Id.* Additionally, the Supreme Court has imposed a specific intent requirement on suits brought under subsection (a)(2). *Allison Engine Co.v. U.S. ex rel. Sanders*, 553 U.S. 662, 665 (2008). The complaint satisfies the first requirement because it contains allegations that Defendant "caus[ed] states to submit false claims to the United States Government in Form CMS-64 " for the purpose of obtaining "federal reimbursement." (D.E. 19 ¶ 116.) It satisfies the second element because it alleges that the "United States, its fiscal intermediaries and state Medicaid programs...have paid and continue to pay Government Health Care Programs reimbursements that they would not otherwise have paid." (*Id.* ¶ 117.) Moreover, Plaintiff alleges that Defendant "intended" for the false records to be submitted. (*Id.* ¶ 110.) Accordingly, Plaintiff's complaint contains sufficient factual allegations to state a claim for relief under § 3729(a)(2).

**2. Rule 9(b)**

Defendant argues that Plaintiff's claims under subsections (a)(1) and (a)(2) are not plead with requisite Rule 9(b) particularity. A complaint under the FCA must meet the heightened pleading standard of Rule 9(b). *See U.S. ex rel. Clausen v. Lab Corp. of Am.*, 290 F.3d 1301, 1309–10 (11th Cir. 2002) (noting that it is well-settled and self evident that the FCA is a fraud statute for the purposes of Rule 9(b)). Claims brought under the FCA satisfy Rule 9(b) if the complaint sets forth "facts as to time, place, and substance of the defendant's alleged fraud" and "the details of the [defendant's] allegedly fraudulent acts, when they occurred, and who engaged in them." *Id.* at 1310.

Plaintiff's (a)(1) allegations are deficient under Rule 9(b). The "central question" under subsection (a)(1) "is whether the defendant ever presented [or caused to be presented] a 'false or

fraudulent claim' to the government." *Id*. at 1311.  Therefore, Rule 9(b) requires that the actual presentment of a claim be pled with particularity.  *Id.*  Here, Plaintiff fails to identify with particularity a false claim that was presented to the government as a result of Defendant's conduct.  Plaintiff fails to identify who presented the claim, what it was for, when it was presented, and what specific conduct on the part of the Defendant caused the presentment of the claim.

Plaintiff's (a)(2) allegations are also deficient under Rule 9(b).  Plaintiff alleges that Defendant's conduct caused "states" to submit false claims to the United States government on a "Form CMS-64," however, Plaintiff fails to allege which states submitted these claims, when they were submitted, and what specific conduct on the part of Defendant caused the submission of the claims.  Plaintiff cites to *U.S. ex rel. Duxbury v. Ortho Biotech Prod., L.P.*, 579 F.3d 13 (1st Cir. 2009) to argue that the Court should evaluate fraud pleaded under subsection (a)(2) pursuant to a more relaxed pleading standard.  In *Duxbury*, the court held that a relaxed pleading standard should be applied to subsection (a)(2) such that the plaintiff is able to allege fraud with particularity without having to identify each specific claim that was submitted.  *Id*. at 29–30.  The court, however, held that even under this relaxed standard, the plaintiff was required to and did allege the names of the specific health care providers responsible for submission of the claims, when the claims were submitted, and the specific conduct on the part of the defendant that caused the submission of the claims.  *Id*.  Plaintiff's (a)(2) allegations fail to meet both the heightened and relaxed pleading standards.

### C. Count III

In Count III, Plaintiff alleges that Defendant violated the FCA by avoiding federal price

controls under 21 C.F.R. § 312.7. Specifically, Plaintiff alleges that Defendant violated price controls by encouraging physicians to "experiment with Ontak for off-label usage." (D.E. 19 ¶ 131.) According to Plaintiff, Defendant's avoidance of price controls induced "federal payments" and constituted "false claims within the meaning of 31 U.S.C. § 3729." (*Id.* ¶ 136.) Defendant argues that Plaintiff fails to state a claim that Defendant violated price controls and thus the FCA.

> Section 312.7 of Title 21, Code of Federal Regulations, states in pertinent part:
>
> (a) Promotion of an investigational new drug. A sponsor or investigator, or any person acting on behalf of a sponsor or investigator, shall not represent in a promotional context that an investigational new drug is safe or effective for the purposes for which it is under investigation or otherwise promote the drug....
>
> (b) Commercial distribution of an investigational new drug. A sponsor or investigator shall not commercially distribute or test market an investigational new drug.

21 C.F.R. § 312.7. Plaintiff fails to state a claim under this regulation. Plaintiff cannot allege facts or cite authority that supports his statement that Ontak is "investigational," particularly in light of his own statement that the FDA has approved Ontak. (*See* D.E. 19 ¶ 17.) In his Response, Plaintiff argues that the use of Ontak in an off-label context as part of a "nationwide program of experimentation sponsored by [Defendant]" that is "akin to a clinical trial" renders it "investigational." (*See* D.E. 57 at 13.) Plaintiff's complaint, however, fails to state any factual detail or cite any regulatory authority explaining how the "nationwide program of experimentation" is "akin to" a clinical trial. In fact, Plaintiff's complaint does not even compare Defendant's alleged program of experimentation to a clinical trial. Plaintiff also fails to allege sufficient facts or cite authority explaining how off-label promotion of a drug renders it

"investigational" under the regulation. Accordingly, Plaintiff fails to assert a violation of 21 C.F.R. § 312.7. Plaintiff also fails to allege facts sufficient to establish a nexus between Defendant's alleged regulatory violation and submission of a false claim, thus Plaintiff fails to state a claim under the FCA based on Defendant's avoidance of price controls.

**D. Count IV**

In Count VI, Plaintiff alleges that Defendant violated the FCA by violating the Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b)(2). Plaintiff alleges that Defendant violated the Anti-Kickback Act by establishing a system of kickbacks whereby Defendant would assure physicians full payment of their prescription as part of the OAR Program and offer discounts to eligible hospitals under the 340B Program. Plaintiff alleges that the kickbacks induced "federal payments" and constituted "false claims within the meaning of 31 U.S.C. § 3729." ( D.E. 19 ¶143.) Defendant argues that Plaintiff fails to state a claim for violation of the Anti-Kickback Act and thus the FCA.

> The Anti-Kickback Act provides that it is a felony to
>
> knowingly or willfully offer or pay any remuneration... directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person... to purchase, lease, order, or arrange for or recommend purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part under a Federal health program...

42 U.S.C. § 1320a-7b(b)(2).

Plaintiff alleges that Defendant's conduct of assuring physicians full payment of their prescription as part of the OAR Program "induced" physicians into purchasing Ontak for off-label use in violation of the Anti-Kickback Act. Plaintiff also alleges that Defendant's conduct of marketing the discounts that it was required to provide to Disproportionate Share Hospitals as

part of the 340B Program was in violation of the Anti-Kickback Act.

Plaintiffs fails to state a claim for violation of the FCA based on Defendant's alleged violation of the Anti-Kickback Act.  First, Plaintiff fails to demonstrate that Defendant's 340B Program violates the Anti-Kickback Act.  As Defendant correctly points out, pharmaceutical manufacturers are required to charge certain enumerated covered entities, including Disproportionate Share Hospitals, no more than a statutorily defined discounted price for drugs, thus Defendant's conduct of promoting the discounted drug prices is not illegal.  *See* 42 U.S.C. §§ 256b(a)(1) and (a)(4)(L).  Contrary to Plaintiff's arguments, he b otherwise fails to allege sufficient facts which, if proven, would demonstrate how Defendant's conduct of promoting and offering reduced prices crossed the line from legal conduct in compliance with federal statutes to illegal kickbacks.  Second, Plaintiff fails to allege facts sufficient to establish a nexus between Defendant's alleged violation of the Anti-Kickback Act and the submission of a false claim.  Accordingly, Plaintiff fails to state a claim for violation of the FCA based on Defendant's alleged offering of kickbacks.

For the foregoing reasons, it is hereby

ORDERED AND ADJUDGED that Defendant's Motion to Dismiss (D.E. 46)  is GRANTED.  Counts I is DISMISSED WITHOUT PREJUDICE and Counts III and IV are DISMISSED.  If Plaintiff chooses to file an Amended Complaint as to Count I, he must do so within 10 days of entry of this Order.  Count II is DISMISSED WITH PREJUDICE.

DONE AND ORDERED in Chambers, in Miami, Florida this  21st   day of June, 2011.

*/s/ Ursula Ungaro*
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

cc: Counsel of Record