# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, :
STATE OF CALIFORNIA, STATE OF :
DELAWARE,        DISTRICT     OF :      **CIVIL ACTION NO.   09-22302**
COLUMBIA, STATE OF FLORIDA, :
STATE OF HAWAII, STATE OF :
ILLINOIS, STATE OF LOUISIANA, :
COMMONWEALTH               OF :
MASSACHUSETTS,        STATE   OF :      *JURY TRIAL DEMANDED*
NEVADA, STATE OF TENNESSEE, :
STATE         OF        TEXAS, :
COMMONWEALTH OF VIRGINIA, :
STATE OF GEORGIA, STATE OF :
INDIANA, STATE OF MICHIGAN, :
STATE OF MONTANA, STATE OF :
NEW HAMPSHIRE, STATE OF NEW :
MEXICO, STATE OF NEW YORK, :
STATE OF NEW JERSEY, STATE :
OF    OKLAHOMA,       STATE   OF :
RHODE     ISLAND,      STATE   OF :
WISCONSIN,          STATE     OF :
CONNECTICUT,          STATE   OF :
MINNESOTA, STATE OF NORTH :
CAROLINA,           STATE     OF :
COLORADO,           STATE     OF :
MARYLAND, CITY OF NEW YORK, :
CITY   OF   CHICAGO,    EX   REL. :
MICHAEL KEELER                  :
     Plaintiff,      :

   v.

EISAI, INC.
100 TICE BLVD.
WOODCLIFF LAKE,  NEW JERSEY
    Defendant.


## SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER
## THE *QUI TAM* PROVISIONS OF THE FEDERAL FALSE CLAIMS ACT AND
## SIMILAR STATE PROVISIONS

## I.      JURISDICTION AND VENUE

1.     This is an action to recover damages and civil penalties on behalf of the United States of America and individual states and cities arising from Defendant Eisai, Inc.'s ("Eisai") conduct in causing the filing of false claims to be presented under the Medicare, Medicaid, TRICARE and other federally-funded government health care programs (collectively "Government Health Care Programs").

2.     Medicare is a government financial health insurance program administered by the Social Security Administration of the United States.  Medicare was promulgated to provide payment for medical services, durable medical equipment and other related health items for individuals 65 and over.  Medicare also makes payment for certain health services provided to additional classes of certain individual healthcare patients pursuant to federal regulations.

3.     The federal government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide health care to low-income individuals.  The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through the Center for Medicare and Medicaid Services ("CMS").  See 42 U.S.C. §§ 1396a(a)-(b).  States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates.  See 42 U.S.C. §§ 1396b(a)(l), 1903(a)(1).  The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan ..."  See 42 U.S.C. § 1396b(a)(l).  This federal-to-state payment is known as federal financial participation ("FFP").

070111.1

4.      TRICARE is the component agency of the U.S. Department of Defense that administers and supervises the health care program for certain military personnel and their dependents.  TRICARE contracts with a fiscal intermediary that receives, adjudicates, processes and pays health care claims submitted to it by TRICARE beneficiaries or providers.  The funds used to pay the TRICARE claims are federal government funds.  In addition to Medicare, Medicaid and TRICARE, the federal government also reimburses for the cost of prescription drugs under several other Government Health Care Programs, including the Railroad Retirement Medicare Program, the Federal Employee Health Benefit Plans, the Veterans Administration, the Indian Health Service and State Legal Immigrant Assistance Grants.

5.      These *Qui Tam* claims arise under the provisions of the False Claims Act, 31 U.S.C. § 3729, *et. seq* ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 & 3730.

6.      Personal jurisdiction and venue for this action are predicated on 31 U.S.C. § 3732(a), which provides:  "any action brought under § 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants any one defendant, can be found, resides, transacts business or in which any act proscribed by § 3729 occurred."  Defendant Eisai transacts substantial business in the Southern District of Florida.

3

7.     This Court also has supplemental jurisdiction over the claims brought pursuant to the California, Delaware, District of Columbia, Florida, Hawaii, Illinois, Louisiana, Massachusetts, Nevada, Tennessee, Texas, Virginia, Georgia, Indiana, Michigan, Montana, New Hampshire, New Mexico, New York, New Jersey, Oklahoma, Rhode Island, Wisconsin, Connecticut, Minnesota, North Carolina, Colorado, Maryland, Chicago and New York City *Qui Tam* statutes pursuant to 28 U.S.C. § 1367, which provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

8.     Under the FCA, this Complaint was originally filed *in camera* and under seal.

## II.    PARTIES

9.     *Qui Tam* Relator Michael Keeler ("Relator") is a citizen and resident of Pompano Beach, Florida.  The Relator brings this action on behalf of the United States of America and the states referenced herein.

10.     Relator brings this action based on his direct knowledge and also on information and belief.  None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4).  Notwithstanding same, Relator is an original source of the facts alleged in this Complaint.  As a former employee, he has direct and independent information of the allegations in this Complaint.  As a sales representative, he attended meetings and was privy to numerous

internal communications and discussions regarding the marketing of the drugs referenced herein.

11.     The Relator was a sales representative for Eisai from at least 2006 until April 2009.  Relator had been employed to market and sell Eisai's cancer drug, Ontak.  He was an employee of Eisai at all times relevant to this Complaint.  As an Eisai employee, the Relator has both personal and inside knowledge of the illegal means and methods utilized by Eisai in the sale of **Ontak**, as well as its drugs, **Fragmin, Aloxi and Dacogen** (hereinafter collectively **"Subject Drugs"**).

12.     Relator has both personal and inside knowledge of Eisai's corporate endorsement of its national off-label Ontak marketing scheme and other illegal conduct regarding the Subject Drugs.

13.     Defendant's off-label marketing of the Subject Drugs, and furnishing of illegal kickbacks relating to their purchase and use, renders false and invalidates the claims that have been submitted by health care providers to Medicare and Medicaid, concerning the administration of the Subject Drugs, and the hospital, outpatient, physician, and other related services rendered along with the administration of the drugs, for which Defendant is liable under the False Claims Act.

14.     For **Ontak**, most recently, Medicare reimbursement for the physician office setting was $1,589.534 per 300 mcg, and for the hospital outpatient setting was $1,574.54 per 300 mcg.  These rates have varied somewhat over the last 5 years.  The most common ICD-9 diagnosis codes used are 202.1—202.18 (mycosis fungoides) and 202.20-202.8 (Sezary's disease).  Medicaid reimbursement for Ontak administered in the physician office setting varies from state to state.  Many Medicaid

programs base reimbursement on the average sales price, plus 4%. Others base reimbursement on a percentage mark-up or mark-down of average wholesale price or wholesale acquisition cost. With respect to CMS claim form 1450 (UB-04), for hospital outpatient departments, code 0636 is used to designate pharmacy billing, HCPCS code J9160, for designation of injection of 300 mcg of Ontak, is used, and CPT codes, such as 96413 for designation of chemotherapy administration (intravenous infusion technique, up to 1 hour, single or initial substance/drug), are used. Revenue codes such as 0250 (general pharmacy), are often used in addition to 0636. Additional codes and rates may also have been used, depending on the particular circumstances.

15. For **Aloxi**, most recently, Medicare reimbursement for the physician office setting was $18.868 per 25 mcg, and for the hospital outpatient setting was $18.69 per 25 mcg. These rates have varied somewhat over the last 5 years. The most common ICD-9 diagnosis codes used are 787.01 (symptoms involving digestive system; nausea and vomiting), 787.02 (symptoms involving digestive system; nausea alone), and 787.03 (symptoms involving digestive system; vomiting alone). Medicaid reimbursement for Aloxi administered in the physician office setting varies from state to state. Many Medicaid programs base reimbursement on the average sales price, plus 4%. Others base reimbursement on a percentage mark-up or mark-down of average wholesale price or wholesale acquisition cost. With respect to CMS claim form 1500 (Medicare Part B), for physician office/ambulatory surgical center billing, HCPCS code J2469, for designation of injection of 250 mcg, is used, and CPT codes, such as 96375 for designation of therapeutic, prophylactic, or diagnostic injection (intravenous push,

single or initial substance/drug), are used.  Additional codes and rates may also have been used, depending on the particular circumstances.

16.     For **Fragmin**, most recently, Medicare reimbursement for the physician office setting was $11.830 per 2500 IU, and is not to be separately reimbursed in the hospital outpatient setting.  These rates have varied somewhat over the last 5 years.  The most common ICD-9 diagnosis codes used are 453_ (other venous embolism and thrombosis), 410_ (acute myocardial infarction), 411_ (other acute and subacute forms of ischemic heart disease) and 413_ (angina pectoris).  ICD-9-CM supplementary codes include V12.51 (venous thrombosis and embolism), V43.64 (hip), and V58.61 (long-term current use of anticoagulants).  Medicaid reimbursement for Fragmin administered in the physician office setting varies from state to state.  Many Medicaid programs base reimbursement on the average sales price, plus 4%.  Others base reimbursement on a percentage mark-up or mark-down of average wholesale price or wholesale acquisition cost.  With respect to CMS claim form 1500 (Medicare Part B), for physician office billing, HCPCS code J1645, for designation of injection per 2500 IU, is used, and CPT codes, such as 96372 for designation of therapeutic, prophylactic, or diagnostic injection, subcutaneous or intramuscular), are used.  For CMS form 1450 (also Medicare Part B), pharmacies often use code 0636, HCPCS codes like J1645 (described above), and CPT code 96372 (described above).  Revenue codes such as 0250 (general pharmacy), are often used in addition to 0636.  Additional codes and rates may also have been used, depending on the particular circumstances.

17.     For **Dacogen**, most recently, Medicare reimbursement for the physician office setting was $31.304 per 1 mg, and in the hospital outpatient setting was

070111.1

$31.01 per 1 mg.  These rates have varied somewhat over the last 5 years.  The most common ICD-9 diagnosis codes used are 238.72 (low-grade myelodysplastic syndrome lesions), 238.73 (high-grade myelodysplastic syndrome lesions), 238.74 (myelodysplastic syndrome with 5q deletion), and 238.75 (myelodysplastic syndrome, unspecified).  Medicaid reimbursement for Dacogen administered in the physician office setting varies from state to state.  Many Medicaid programs base reimbursement on the average sales price, plus 4%.  Others base reimbursement on a percentage mark-up or mark-down of average wholesale price or wholesale acquisition cost.  With respect to CMS claim form 1500 (Medicare Part B), for physician office billing, HCPCS code J0894, for designation of injection of 1mg, is used, and CPT codes, such as 96413 and 96415, for designation of chemotherapy administration (up to 1 hour) and same for each additional hour, respectively, are used.  For CMS form 1450 (also Medicare Part B), pharmacies often use code 0636, HCPCS codes like J0894 (described above), and CPT codes 96413 and 96415 (described above).  Revenue codes such as 0250 (general pharmacy), are often used in addition to 0636.  Additional codes and rates may also have been used, depending on the particular circumstances.

18.     Through his position as a sales representative for Defendant for approximately three years, Relator attained and possesses extensive personal and inside knowledge of the unlawful acts that are detailed herein, including, but not limited to, the identities of client health care providers that billed Medicare and Medicaid.  Notwithstanding this fact, Defendant closely guarded information concerning clients' billing of drug therapies and related services, in order to conceal the fraudulent nature of Defendant's activities.  Numerous details concerning the fraud are within the exclusive,

collective knowledge of Eisai, and may only be utilized in this litigation through the taking of discovery.

19.     Defendant's fraudulent acts were committed on a nationwide basis; the hundreds of examples provided herein constitute a large subset of the whole. Relator knows that the fraudulent acts detailed herein caused all health care providers who were clients of Defendant to submit false claims, because the off-label marketing and other acts set forth herein were conducted nationally and systematically—as confirmed by Relator throughout the course of his employment--having been learned from local, regional, and national training, sales, and strategy meetings and sessions, as well as various phone calls with sales managers, and with other sales representatives.

20.     All known facts point to the endemic nature of these violations by Eisai.

21.     There are thousands of hospitals in America that treat patients for cancer.  Indeed, *U.S. News and World Report* has evaluated nearly 5,000 hospitals in America in order to rank what it describes as the 897 best hospitals for cancer treatment (and to ranking them for other specialties).

22.     Relator *conservatively* estimates that that Defendant caused false claims submissions by approximately 1,000 hospitals in America, through the acts and omissions described herein, and by approximately another 1,000 oncology offices and pharmacies in America.  Approximately 20% of all cancer treatment hospitals in America have administered Ontak to patients, for example.  It is impossible to state an exact number because—as set forth above--Defendant closely guarded information concerning clients' billing of drug therapies and related services, in order to conceal the

070111.1

fraudulent nature of Defendant's activities, and because of the extremely widespread nature of the fraud.  Precious few individuals who have worked for Defendant would ever be in a position to specifically identify, at the pleadings stage of a lawsuit, every single health care provider that Eisai caused to submit false claims.  Moreover, those individuals normally would be very high-ranking officers within the company.

23.     However, as suggested above, Relator can precisely identify a large subset of these 2,000 hospitals, oncology offices and pharmacies that are specifically known to have been caused to submit false claims through Defendant's acts and omissions.   The COERS report [attached hereto and incorporated herein by reference as **Exhibit "G"**], for the period of April 2008 through April 2009, reflects the identities and addresses of 188 health care providers—active accounts during that period—that were purchasing Defendants' drug products and billing Medicare and Medicaid for administration of the drugs and related services.  Approximately 80% of these providers continued to be active accounts for the next 1-year period, and approximately 80% of these providers were active accounts for the previous 1-year period.  However, because Defendant also had accounts that were not active, the active providers listed in the COERS report constitute, conservatively, only about 10% to 20% of the providers that Defendant caused to submit false claims.

24.     Relator was informed by managers that the providers listed in the COERS report routinely bill Medicare and Medicaid.  Hence, there can be no question that false claims were submitted to the Medicare and Medicaid Programs by the 188 providers listed in the report, as a result of Eisai's fraudulent acts.  Notably, the COERS report, which was created by Eisai, lists not only the providers, but also their addresses,

reporting dates, supplier names, and quantities.   The COERS report is described in further detail below.

25.     Simultaneously with the filing of the Complaint, as required under the FCA, Relator provided to the Attorney General of the United States, the United States Attorney for the Southern District of Florida and the State Attorneys General identified in the Complaint, a confidential statement of all material evidence and information related to this Complaint.   This disclosure statement supports the existence of false claims by Eisai in the Government Health Care Programs.

26.     Defendant Eisai (hereinafter "Eisai" or "Defendant") is a United States pharmaceutical subsidiary of Tokyo-based Eisai Co., Ltd.  It is headquartered in Woodcliff Lakes, New Jersey, and is incorporated under the laws of Delaware.

27.     At all times relevant hereto, Eisai acted through its agents and employees, and the acts of Eisai's agents and employees were within the scope of their agency and employment.  The policies and practices alleged in this complaint were, on information and belief, established and/or ratified at the highest corporate levels of Eisai.

## III.   FACTUAL ALLEGATIONS

### A.     Eisai's Acquisition of All Rights To The Drug, Ontak, Two Days After The FDA Issued a Warning To The Drug's Previous Owner, Ligand, That Was Extremely Critical of Sales Promotions That Minimized the Safety Risks and Exaggerated the Effectiveness of Ontak

28.     Ontak is the trade name for the drug, Denileuken Diflitox.

29.     On February 5, 1999, Seragen, Inc. ("Seragen") was granted a license to introduce Ontak into interstate commerce solely for the treatment of patients with persistent or recurrent cutaneous T-cell lymphoma ("CTCL") whose malignant cells express the CD25 component of the IL-2 receptor.  See License [attached hereto

11

and incorporated by reference as **Exhibit "A"**].  The License specified that "[a]ll promotional claims must be consistent with and not contrary to approved labeling."  See Id. at 4.

30.     Seragen's approval for Ontak was obtained as an orphan "drug" under the Accelerated Approval of Biological Products regulations, 21 C.F.R. 601.40-46.

31.     Seragen's approval from the Food and Drug Administration ("FDA") warned that, "no comparative promotional claim or claim of superiority over other similar products should be made unless data to support such claims are submitted to and approved by the Center for Biologics Evaluation and Research."

32.     Seragen was granted permission to manufacture Ontak and it licensed Ligand Pharmaceutical ("Ligand") of San Diego, California, to distribute the drug.

33.     On October 23, 2006, the FDA issued a warning letter to Ligand after review of Ligand's use of a cutaneous T-cell lymphoma study as a promotional item for Ontak.  See FDA warning letter [attached hereto and incorporated herein by reference as **Exhibit "B"**].

34.     The FDA found that Ligand had been: 1) overstating the effectiveness of Ontak; 2) broadening its indication; and 3) minimizing its risks.

35.     The FDA warning letter specifically accused Ligand of using a case study to market Ontak that "misbrands" the drug in violation of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 351(a) and 321(n).

070111.1

36.    The FDA Warning Letter not only emphasized the restricted permissible use of Ontak, but also accused Ligand of omitting and minimizing the dangerous side effects of the drug for even permissible use.  The Warning Letter stated, in relevant part, as follows (with off-label portions underlined for emphasis):

**WARNING LETTER**

The Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed a professional Cutaneous T-Cell Lymphoma Case Study [ONT212-LIG] for ONTAK…submitted by Ligand..under cover of Form 2253….DDMAC has concluded that the promotional piece is false or misleading because it omits and minimizes risks for Ontak…, overstates the effectiveness of Ontak…, and broadens the indication for [the] drug[].  The case study thus misbrands the drug in violation of the Federal Food, Drug, and Cosmetic Act (Act), 21 U.S.C. §§ 352(a) and 321(n)….This promotional material raises significant public health and safety concerns because it suggests that Ontak…[is] safer and more effective than has been demonstrated by substantial evidence or substantial clinical experience, and that Ontak is superior to other treatments for cutaneous T-cell lymphoma….

Ontak  was approved under Subpart E (accelerated approval) regulations in accordance with 21 CFR 601.41.  According to the Indications section of the PI [product labeling], "Ontak is indicated for the treatment of patients with persistent or recurrent cutaneous T-cell lymphoma whose malignant cells express the CD25 component of the IL-2 receptor. The safety and efficacy of [Ontak] in patients with CTCL whose malignant cells do not express the CD25 component of the IL-2 receptor have not been examined."…

**Omission and Minimization of Risk Information**

[T]he piece fails to include any risk information for Ontak…Therefore, the case study misleadingly suggests that Ontak…[is] safer than has been demonstrated by substantial evidence or substantial clinical experience.

Not only does the piece fail to communicate any risks associated with Ontak therapy, but it also presents claims that minimize the risks associated with Ontak use.  For example, the case study states, ""for this patient, [Ontak] was chosen particularly for its lack of myelosuppression…," and "[Ontak] is generally well tolerated…"  This first claim is particularly problematic as myelosuppression is a type of hematologic adverse event…Moreover, the term "generally well tolerated" is not appropriate for drugs associated with frequent and serious adverse events, such as this product….Given these risks associated with therapy, the claims of a "lack of myelosuppression," and that the drug is "generally well tolerated," are misleading….

**Overstatement of Effectiveness**

The piece overstates the demonstrated effectiveness of Ontak therapy. Specifically, the piece claims, "Symptomatic relief is seen in about 60% of patients." The reference cited, however, does not demonstrate that 60% of patients studied experienced symptomatic relief…[T]he cited reference does not substantiate the claim….

**Broadening of Indication**

The case study fails to present a major limitation to the use of Ontak—that it is only indicated for patients whose malignant cells express the CD-25 component of the IL-2 receptor—suggesting it is safe and effective for use in a broader population of patients….

**Conclusion and Requested Action**

For the reasons discussed above, the promotional piece is false or misleading in that it minimizes risks for Ontak…, overstates the effectiveness of Ontak…, and broadens the indications for [the] drug[]. Therefore, it misbrands the drug in violation of the Act. See §§ 21 U.S.C. 352(a) & 321(n)….DDMAC requests that Ligand immediately cease the dissemination of violative promotional material for Ontak…such as that described above….Because the violations described above are serious, we request, further, that your submission include a comprehensive plan of action to disseminate truthful, non-misleading, and complete corrective messages about the issues discussed in this letter to the audience(s) that received the violative promotional materials…

Letter from Thomas Abrams, RPh, MBA, Director of Drug, Marketing, Advertising, and Communications, FDA, to Henry Blissenbach, President & CEO, Ligand Pharmaceuticals Inc. [**Exhibit "B"**] (emphasis added).

      37.     The sale to Eisai of the rights to Ontak was first announced on September 7, 2006, more than a month before the issuance of the FDA warning letter to Ligand.

      38.     On October 25, 2006, a mere two days after the issuance of the FDA warning letter, Eisai finalized and closed on its agreement with Ligand to purchase all rights to Ontak as well as the drug, Targretin, for approximately $200 million dollars.

      39.     Upon information and belief, at or about the time of its purchase of the rights to Ontak, Eisai had knowledge of the FDA warning letter issued to Ligand.

40.     In the intervening time since the issuance of the warning letter, FDA records reveal no evidence that Eisai submitted any additional clinical studies or data that would support a broadened indication for Ontak.

41.     Ontak is not listed on any drug compendium for any indication other than CTCL.

**B.     Eisai Distributes Ontak, Making a Variety of Off-Label Claims**

42.     The National Cancer Institute ("NCI") estimates the number of new cases of CTCL each year to be about 1500, thus qualifying Ontak as an "orphan drug".

43.     From the day Eisai acquired all rights to sell Ontak, it has ignored the limitations of Ontak's narrow indication and directed its sales people to off-label promote Ontak for a variety of much more commonly occurring cancers, including, but not limited to:  ovarian cancer; melanoma; B-cell non-Hodgkin's lymphoma and Graft versus Host disease.

44.     Off-label marketing is a practice whereby a pharmaceutical company promotes a drug for the treatment of symptoms and conditions, other than those in its FDA-approved indication.

45.     A drug achieves an approved indication only after rigorous FDA review of tests and studies demonstrating the drug's safety and efficacy.  Restrictions can also be placed on patient populations so that the use is limited to those for whom the drug is considered safe and effective.

46.     Eisai's off-label marketing of Ontak has taken place in complete disregard of the FDA warning letter issued on October 23, 2006.

070111.1

47.    As noted by the FDA, Ontak is an extremely toxic cancer treatment.

a.    Nearly all patients taking Ontak experience adverse events. Of those adverse events, 8% were grade 3 and 1% were grade 4.  Grades 3 and 4 are the most serious side effects reported in cancer trials.

b.    The adverse event profile for Ontak treatment is far more serious and potentially more harmful than other available treatments.

c.    Among the serious disorders associated with Ontak treatment are:  infections; hypoalbuminemia; liver disorders; asthenia; vasodilatation; pneumonia and pulmonary edema.  <u>See</u> FDA Clinical Summary Basis of Approval for Ontak[attached hereto and incorporated herein by reference as **Exhibit "C"**].

48.    Relator was in Eisai's first Ontak sales training class held during November 2006.  It was under the direction of Ms. Darbi James.  Relator was one of three trainees.

49.    Relator's training materials included off-label studies to be used in his forthcoming presentation to physicians.

50.    The off-label case studies were for disorders including: (1) Follicular non-Hodgkin's lymphoma; (2) chronic lymphocytic lymphoma ("CLL"); (3) Relapsed/Refractory B-cell non-Hodgkin's lymphoma; (4) adult T cell leukemia lymphoma ("ATLL"); (5) peripheral T cell lymphoma ("PTCL"); (6) Graft versus Host disease; and (7) melanoma.

51.    There was substantial time spent in training on how to prompt or induce off-label discussions with physicians.The training materials used by Eisai were

the Ligand training materials which were never revised by Eisai.  Similarly, many of the other Ontak documents used by Eisai in both training and promotion were Ligand documents.

52.     Relator received no training on the FDA prohibitions against off-label marketing.   In addition, there was minimal or no training or even discussion of compliance issues.  At Eisai, no one appeared to take compliance seriously.

53.     Eisai sales representatives were frequently provided off-label marketing materials to distribute to physicians that were never cleared or reviewed by compliance or the legal department.

54.     Dr. Peter Heald was compensated by Eisai to speak and write articles on off-label uses of Ontak.  Following one of Dr. Heald's talks, Heather Pierce, an Eisai District Manager, distributed Dr. Heald's off-label paper to the sales representatives without clearing the paper or the distribution with compliance.

55.     During Relator's training, there was no mention of the FDA warning letter (**Exhibit "B"**) and no training regarding the proscriptions set forth in the warning letter.

56.     The FDA warning letter (**Exhibit "B"**) to Ligand specifically noted that Ligand failed to "present a major limitation to the use of Ontak that it is indicated only for patients whose malignant cells express the CD-25 component of the IL-2 receptor – suggesting it is safe and effective for use in the broader population of patients."

57.     Despite the FDA warning letter, Relator was directed to tell physicians, contrary to the FDA warning, that there were studies showing that CD-25

17

positive/negative made no difference in the treatment of patients, which was known to be untrue.

58.     It was Relator's experience that, as a result of this misrepresentation, physicians often failed to check for CD-25 expression through the use of flow cytometry or immunohistochemistry testing.

59.     According to the NCI, Ontak is a treatment of last resort even for its approved CTCL indication.   The NCI deems bone marrow and stem cell transplantation as being preferable to treatment with Ontak, even for the most mildly afflicted CTCL patients.

60.     Despite the FDA warning letter and the extremely narrow indication for Ontak, Relator and other Eisai sales representatives were often supplied with numerous articles of dubious scientific stature, touting various off-label uses of Ontak which were to be distributed to physicians and referred to during sales visits to physicians.

61.     No restrictions were ever placed on Eisai's sales representatives in securing off-label articles from Eisai or its managers.   Eisai sales representatives routinely left these materials in physician's offices.   This practice was actively encouraged by Eisai management.

62.     Eisai's Director of Research, Mark Acosta, routinely provided Eisai sales representatives updates and information on studies, events, and use of Ontak for various off-label uses for the sales representatives to use in their marketing and promotion of Ontak.

070111.1

63.    Unlike some promotional materials that might have been reviewed by the FDA, there is no agency oversight of the studies touted by the Ontak sales force to physicians.

**C.    Eisai's Upper Management Activity Promotes Off-Label Marketing Through a System of Incentive Bonuses and Sales Representative Evaluations**

64.    Eisai sales representatives are each evaluated based upon the prior year's production, regardless of the overwhelming percentage of off-label sales.

65.    Although Ontak was approved as an orphan drug, it was not marketed and sold as a house account, thereby preventing it from being included in each sales representative's quotas.  Instead, Ontak was a central component of each Eisai sales representative's quota and impacted each sales representative's sales performance evaluation.   For instance, Ontak was weighted for seventy percent of Relator's commissions despite its orphan drug status.

66.    The 2007 sales quotas assigned to each sales representative were based on Ligand's 2006 sales, much of which was found to be off-label and abetted by the use of the offending promotional materials which gave rise to the October 23, 2006 warning letter.  See e-mail indicating 2007 sales quotas based on 2006 sales [attached hereto and incorporated herein by reference as **Exhibit "D"**].

67.    The 2008 sales quotas assigned to each sales representative were based on 2007 sales, much of which was also off-label.

68.    Sales representatives, who managed to sell large quantities of Ontak for such off-label and unsupported treatments as ovarian cancer and melanoma, were given trips to resort locations and other rewards.

19

69.     Sales people could only hope to meet their sales quotas by selling the drug off-label.

70.     Prior to when Relator began resisting his off-label sales quotas, he was often touted by Eisai management to other Eisai sales representatives for his off-label promotion and success.  His off-label techniques and practices were used as positive examples by Eisai management.

71.     Other Eisai oncology sales representatives often complained to Relator regarding Eisai's pressure to sell off-label and their inferior evaluations based on their failure to meet sales quotas, which were based on off-label sales.

72.     On various occasions, the twenty-four Eisai sales representatives ultimately assigned to Ontak's promotion, including Relator, complained to their supervisor, David Trexler, about the pressures and risks they were experiencing in trying to achieve the company's required sales quotas which were inflated because they included a high percentage of off-label sales.

73.     After Leslie Morani became Eisai's Vice President of Oncology Institutions, she called a meeting in early October 2008 of the Eisai oncology sales representatives, due to complaints raised by the oncology sales representatives during a conference call a week earlier.

74.     During that meeting in early October 2008, the oncology sales representatives' complaints were uniformly focused on the pressure and Eisai's requirement to sell off-label based on the quotas provided to them by Eisai, as well as the off-label information and data constantly distributed by Eisai.  Sales information which was compiled and presented by the oncology sales representatives at the meeting

070111.1

revealed that off-label sales comprised between 50% and 70% of total Ontak sales. Vice President Morani was combative and condescending during the meeting and denied there was any pressure or instruction to sell off-label.

75.    One week later, at a national Eisai meeting at which Eisai's attorneys were present, there was no mention of the prior week's meeting nor any reference to any of the off-label issues which were raised.

**D.    Eisai's Efforts to Prevent Detection of its Off-label Promotion**

76.    In an effort to avoid detection of its off-label marketing and promotion, Eisai advised and instructed its sales personnel to use their cell phones, rather than the company's phone lines, when conducting business or reaching out to Eisai management for direction.

77.    This "cell phone" instruction was made frequently at meetings by Eisai management, including David Trexlar, Director of Oncology, Steve Vickers, Vice President of Sales, and Randy Lawson, an Eisai District Manager.

78.    Relator recalls at least one occasion where Steve Vickers complained to him about an Eisai employee leaving Vickers a voice mail message on Eisai's phone system regarding an off-label marketing issue.

79.    Eisai sales representatives routinely entered actual call notes from their sales encounters into the Eisai computer system. These call notes frequently showed extensive off-label discussions and attempts to elicit off-label discussions. Later, the Eisai computer system was reprogrammed to eliminate the possibility of the extensive details regarding off-label marketing discussions. The new system used

designated drop-down categories to describe the sales calls, thereby precluding any reference to the off-label discussions that actually took place.

80.     One of the services routinely provided by Eisai's sales representatives to physicians using Eisai products was, up until early 2009, to assist physicians in the "administration" of the Subject Drugs, including Ontak-- regardless of the nature of the treatment being provided.  That is, there was no concern as to whether Ontak was being used on or off-label.  By "administration" of the drugs, it is meant that Eisai sales representatives taught physicians, nurses, billing staff, and other assistants, in their own offices and in hospitals and other settings, how to use and bill Medicare and Medicaid for the drugs in an off-label manner.  In a nutshell, these were regular Eisai-led tutorials, across the country, on both the clinical and billing sides of off-label uses and revenue generation.  Of course, Eisai managers trained Eisai sales representatives on how to do this before the sales representatives entered customer workplaces, and prior to that, Eisai superiors created the business plans for this off-label push.  In early 2009, there was a change in Eisai policy.  The sales representatives were advised that they could no longer assist in administration of Ontak if it was being used off-label due to a fear it would expose Eisai to an off-label charge.  This is not to say that the off-label marketing ended, however.  On the contrary, it continued, but in a slightly less flagrant way.

81.     In late 2008, Eisai management "announced" that off-label studies should no longer be distributed on sales calls to physicians.   Shortly after the announcement, Relator's district manager, Randy Lawson, accompanied him on his

sales calls.  Lawson noticed that Relator had the off-label articles in his car.  He told Relator "you know you are not supposed to be using those – but I did not see you."

82.    Eisai sales representatives were also advised that if an account was extensively using Ontak off-label, that sales calls to that account should not be input into the Eisai system.  For example, Dr. Chesney, at the University of Louisville, used Ontak to treat melanoma.  The Eisai sales representative for that territory was advised by Eisai District Manager, Randy Lawson, not to submit his overnight expenses for his trips to Louisville.

E.    **Eisai Directs Its Sales People to Compensate for Ontak's Medical Risks and Limited Indication in Their Sales Presentation by Offering Significant <u>Discounts to Hospitals Qualifying for DSH Benefits</u>**

83.    Section 602 of the Veterans' Health Care Act of 1992, 42 U.S.C., § 340B(a)(4) ("§ 340B") requires drug manufacturers to provide outpatient drugs to covered entities including Disproportionate Share Hospitals ("DSH") at a reduced price.

84.    Eisai sales representatives were directed by Eisai management to "market the spread" between standard pricing and the discounts that they are permitted to offer to DSH hospitals pursuant to § 340B.

85.    The Relator and the other sales representatives were given flash cards to be used in their physician visits.  The flash cards showed the difference between discounted price and what could be charged to third parties for reimbursement for the off-label use.  The flash cards were ordered in quantity to be left at physicians' offices.  <u>See</u> Sales Materials Order Form [attached hereto and incorporated herein by reference as **Exhibit "E"**].  The practice was referred to within Eisai as "marketing the spread."  The Sales Material Order Form also reflects, in detail, the myriad off-label promotional

23

materials that Eisai sales representatives were required to distribute, and did distribute, routinely, to physicians and other health professionals.

86.     The University of Louisville Cancer Center was an institution persuaded to purchase Ontak for the off-label treatment of melanoma due to the "spread".

87.     More recently, Eisai management expressed concern due to the fact that the University of Louisville registers every patient undergoing Ontak therapy.

88.     It was the Relator's experience that during the time period between 2006 and the present, the usual DSH hospital acquisition cost for a single dose/single patient vial has been in a range of between $600.00 and $650.00.  The allowable reimbursement as displayed on the flash card was in a range between $1300.00 and $1400.00 per dose.  Patients usually required two doses a week, two times a month.

**F.     Eisai's "OAR" and "OCP" Programs Provided Additional Incentives to Induce Off-Label Use.**

89.     Pursuant to federal statute 42 U.S.C. § 1396 r – 8, states are required to establish formularies that identify those drugs for which a state agency will make reimbursement under their Medicaid/Medicare Programs.

90.     Ontak's off-label use for cancers other than CTCL does not qualify for reimbursement.

91.     In order to induce physicians to order Ontak for off-label use, Eisai continued a credit program, which it named Oncology Reimbursement Assistance Program ("OAR"), that had been initiated by its predecessor distributor, Ligand.  Ligand called its credit program the Ontak Credit Program ("OCP").

24

92.     The purpose of the OCP and OAR credit programs was to assure purchasers that, in the event that a third-party payor did not reimburse for the off-label use of Ontak, Eisai, itself, would cover the cost of Ontak.  The OAR Program would provide invoice credit from the wholesaler equal to the invoice price for Ontak administered to the patient and not reimbursed.

**G.     Eisai's Use of Grant Money to Buy Access to Teaching Hospitals in Order to <u>Make Presentations Promoting the Off-Label Prescription of Ontak</u>**

93.     Eisai routinely made grant funds and other resources available to key teaching hospital administrators in order to gain access for Eisai off-label doctor promoters to make presentations pushing the off-label use of Ontak.

94.     On or about March 6, 2007, the Relator was advised that, as a result of a contract with a Grace Rebuiela at the University of Miami Sylvester Cancer Center, an educational grant was made to that facility in order to facilitate a presentation by Dr. Nam Dang, promoting off-label use of Ontak.   <u>See</u> March 6, 2007 e-mail [attached hereto and incorporated herein by reference as **Exhibit "F"**].  (Relator does not allege herein that any of the physicians who were not employed by Eisai, or who were not on retainer with Eisai, have violated the False Claims Act.  The focus of this *qui tam* Complaint is on Eisai.)

95.     In June 2007, Dr. Dang gave a presentation at the University of Miami's Sylvester Cancer Center.  Dr. Dang's presentation was advertised as being on Ontak's use in treating CTCL.  Instead, Dr. Dang lectured on his off-label use of Ontak.

96.     In July 2007, Eisai sponsored a B cell lymphoma preceptorship at the University of Arizona.  Monies were paid to the University and Dr. Miller, who made a presentation regarding use of Ontak for B cell lymphoma.

97.     Upon information and belief, similar educational grants were paid in return for off-label presentation access to such well-known cancer treatment centers as:  the Dana Farber Cancer Center in Boston, Lurie Cancer Center at Northwestern University in Chicago, and the M.D. Anderson Cancer Center in Houston, Texas.

**H.     Eisai's Payments to Speakers to Promote Off-Label Use of Ontak**

98.     In 2007 and thereafter, Eisai conducted Advisory Board meetings across the United States where doctors were hired by Eisai to speak on various off-label uses for Ontak at weekend conferences at high-end resorts to which other health care professionals were invited to attend.

99.     In October, 2008, Dr. Franine Foss, a long standing paid speaker of Eisai, spoke in south Florida at a dinner program for physicians on the use of Ontak for treating peripheral T cell lymphoma.

100.    Other physicians promoting off-label use of Ontak who received very substantial compensation from Eisai were Dr. Nam Dang, Nevada Cancer Center, Dr. Pinter- Brown, UCLA, Dr. Timothy Kuzel with Northwestern, and Dr. Peter Heald, a dermatology professor.

101.    Many of the speaker programs were advertised as being focused on Ontak's narrow CTCL indication.  The actual presentations were substantially off-label.

102.   Ontak's top ten off-label prescribers were the most frequent speakers retained by Eisai.

103.   A physician in Relator's south Florida territory revealed to Relator that he and another physician were paid by Eisai to attend a program held at a Tampa resort in 2007.  The program was advertised as a CTCL program.  The physician commented to Relator that  instead the program focused on Ontak's use for T-cell lymphoma and other cancers treated by the speaker.  The physician joked with Relator that this was not the first time he had been paid by Eisai to hear that particular speaker.

104.   The payments/kickbacks provided to physicians were all lucrative—far from minimal.

105.   Moreover, the above examples are far from isolated.  Physicians *routinely* were provided all-expenses-paid, free trips to conferences at high-end hotels in which Eisai sponsored off-label speaking programs.  For example (and there would be at least hundreds of examples of this that have occurred), the physician who attended the hotel-based program in Tampa received room, food and other benefits with a total value of approximately $3,000.00.  These amounts were routinely doled out for attendees.  This was Eisai's pattern and practice.

106.   However, it is the *speakers* at the programs who have been provided the most lucrative inducements in exchange for their off-label uses and promotions of the Subject Drugs.  For example, Drs. Dang and Foss benefitted by receiving approximately $50,000.00 per year, plus other covered expenses, in speaking/consulting fees.  Dr. Brown received approximately $25,000.00 per year, plus

other covered expenses, in speaking/consulting fees.  This too was Eisai's pattern and practice.

I.      **Eisai's Off-label Marketing Of Dacogen**

107.    In 2008, Eisai purchased MGI Pharma, Inc. ("MGI") in order to acquire the rights to MGI's drug, Dacogen.

108.    Dacogen is indicated only for the treatment of Myelodysplastic Syndromes ("MDS") with a specific FDA dosage recommendation.

109.    Despite this limited indication, from the outset Eisai made known its intent to off-label market Dacogen for treatment of acute Myelogenous Leukemia ("AML") and at a different dosage than the FDA recommended dosage.

110.    Relator attended sales meetings in 2008 and 2009, where Eisai management advocated and discussed this off-label marketing of Dacogen for AML.

111.    Although Eisai received FDA approval in March 2010 for a different dosage regimen, there is still no FDA approval for Dacogen for the treatment of AML.

112.    From its acquisition of the rights to Dacogen, Eisai has promoted Dacogen off-label for AML.

113.    In the same ways, described above, that Eisai off-label marketed Ontak, Eisai off-label marketed Dacogen:  Among other things, Eisai sales representatives encouraged physicians to use the drug outside its approved paramaeters. They made sales calls to oncologists, hospitals, and their staff members, pushed Dacogen, instructed them on alleged off-label benefit, shared misleading studies with them and promoted its use by Eisai-paid physician speakers, and conducted tutorials on

28

how to bill Medicare for its use.  However, the number of off-label uses that were promoted for Dacogen, and caused by Eisai, pale in comparison to the number for Ontak.

**J.    "Best Price" Violations: <u>Aloxi and Fragmin</u>**

114.    Aloxi (Palenosetron) is a 5-HT3 antagonist used in the prevention and treatment of chemotherapy induced nausea and vomiting ("CINV").

115.    Fragmin is an anticoagulant distributed by Eisai and is used to treat or prevent blood clots caused by cancer or certain heart conditions.

116.    The Medicare Rebate Program is designed to ensure that the reimbursement rate that Medicare and Medicaid pay for prescription drugs is not higher than the prices that pharmaceutical companies offer to other entities.  In effect, the objective is to give Medicare and Medicaid (and thus the taxpayer) the lowest available price on prescription drugs provided under those programs.  See 42 U.S.C. §1396r-8, including §1396r-8(a)(1).

117.    Under the Medicare Rebate Program, pharmaceutical companies are required to provide rebates to states to compensate for any drugs purchased above the manufacturer's Best Price.  Thus, pharmaceutical companies want their drugs available to Medicaid beneficiaries under the Medicaid Program to enter into a Rebate Agreement with the HHS Secretary to provide rebates.  See 42 U.S.C. §1396r-8(a)(1).

118.    The Rebate Agreement requires manufacturers to submit a Quarterly Report (Form CMS-367).  The Quarterly Report includes information concerning each of the manufacturer's "covered" drugs, including such information as its "Average Manufacturer Price" ("AMP"), "Baseline AMP," and "Best Price."

119.    After receiving these Quarterly Reports, and based upon the information contained in them, CMS then informs the states how much rebate the state is entitled to collect with respect to each drug.  For "single source drugs" and "innovator multiple source drugs", manufacturers are required to rebate 15.1%, or the difference between AMP and Best Price at which the manufacturer sells the product to a non-public health service or Veterans Administration customer, whichever is greater.

120.    As noted above, the pharmaceutical company is required to report its Best Price for each prescription drug to the Center for Medicare and Medicaid Services (CMS), which calculates the unit rebate amount and reports that amount to the state Medicare/Medicaid agency, which then calculates the total rebate.

121.    A pharmaceutical company has an enormous financial incentive to falsify its Best Price reporting in order to decrease the overall rebate liability.  Failure to accurately report the Best Price, which is required to include any and all rebates, discounts, grants, coupons, and other incentives offered to purchasers, constitutes pharmaceutical fraud under the FCA.

122.    During all relevant times herein, including the period of 2006 through 2009, Eisai failed to accurately report the Best Price of all of the Subject Drugs, but particularly of Aloxi and Fragmin.

123.    There was a deliberate avoidance of any centralized accounting to monitor whether the discounts afforded to commercial customers exceeded the Best Price allowed to the Government.  Indeed, the opposite was true.

124.    During all relevant times herein, both Aloxi and Fragmin were well known within Eisai as being contract drugs.  To Eisai sales representatives, that

meant that they were given free rein in negotiating whatever discount was necessary to "make the deal", i.e., to secure the sale.

125.   Every steep discount was approved by management.  Because the discounts were so steep, and the drugs were high-volume and so important to the company's profitability, top management, itself, was normally involved in the final negotiations regarding the pricing of these drugs.

126.   Fragmin's chief competitor was Lovenox, which controlled approximately 90% of the market.  Aloxi faced challenges from generic drugs like Zofran, Kytril and Anzemet.

127.   With respect to Aloxi, a drug used to combat the nausea and vomiting associated with chemotherapy, Eisai acquired MGI Pharmaceuticals in 2008. MGI's principal products were Aloxi and Dacogen.  The purchase price of the company was approximately $4 billion.  Eisai's Aloxi sales promptly became approximately $350 million per year.

128.   Florida Cancer Specialists has been a major Eisai account for Aloxi.  It includes approximately 30 oncology offices located on the west coast of Florida.

129.   On one occasion, when Relator visited its office in Fort Myers, Florida, he met with the office manager who, following the instructions of its Medical Director/CEO William Harwin, M.D., demanded of Relator that Florida Cancer Specialists receive discounts on Aloxi, which would make its price for Aloxi substantially less than what was on Eisai's published price list.

130.    Following up on this visit and demand, Relator checked with his own supervisors with Eisai.  He learned that Eisai's best customers were <u>routinely</u> allowed steep discounts not included on all company price lists, which, by definition, meant that they were not included on lists sent to CMS, which means that Best Price violations occurred.  He also learned that Eisai utilized a discount program by which the price of Aloxi was reduced and directly linked to the volume of prescriptions attributable to the physician and/or institution tied to that physician.  The more that was prescribed each quarter, the lower the price was offered.  Effectively, there was an illegal "marketing of the spread", by which prices were lowered in exchange for market share.

131.    He also learned that customer negotiations were managed by Leslie Mirani, Vice President of Institution and Oncology.  Prior to joining Eisai, Ms. Mirani had been a top marketing executive at Amgen.  While at Amgen, she had primary responsibility for the Aranesp marketing campaign that was the subject of a number of state and federal lawsuits in which there were allegations of illegal discounts (Best Price violations) and kickbacks.  Amgen has been investigated by the federal government for its bundling of that company's drugs, Aranesp and Enbrel.  Cynthia Schwalm and Leslie Marani had job responsibilities at Amgen similar to their current title and responsibilities at Eisai and, on information and belief, participated in Amgen's decision to bundle Aranesp and Enbrel.

132.    When Relator attended a large Eisai conference in Orlando in 2008, he and at least hundreds of other sales representatives in attendance learned that Eisai had recently instituted a plan to gradually increase the average sales price of Aloxi

by falsely reporting that the cost of the drug had increased.  The intention was to obtain a higher reimbursement rate from the Medicare and Medicaid Programs.

133.    There was no mistaking that this scheme was being pushed by Eisai:  it was told to everyone in attendance.  If anything, the steep discounts and rebates being offered to physicians and other providers buying and administering Aloxi meant that the average sales price of the drug was really decreasing.

134.    With respect to Fragmin, during all relevant times herein, Jackson Memorial Hospital in Miami, Florida, was Eisai's largest account.  Yearly sales of Fragmin to Jackson were approximately $10 million from 2006 through 2009.

135.    In the fall of 2008, Relator spoke with a senior sales representative, whose name was Frank, at a sales meeting in Orlando, Florida.  Frank admitted and bragged to Relator that he was only able to secure the Jackson account by assuring Jackson, in these or substantially similar words, "Nobody else is getting this price.  We are almost giving it away."

136.    Relator repeatedly heard similar comments, from other Eisai sales representatives, concerning extreme Fragmin discounts.

137.    In a national sales meeting in Chicago in 2008, Gary Woods, Eisai's Directors for Fragmin, and Steve Vickers, Director of Oncology, led a session, speaking to Relator and at least 100 other Eisai sales representatives about Fragmin. The speakers discussed offering steep discounts.  A sales representative in attendance asked Mr. Woods, in front of all attendees, if the Best Price was being provided to the Government.  Mr. Woods responded, in these or substantially similar words: "They have

their own discounts in place.  That is of no concern to sales force."  These directors at least dodged the question.

138.   Another strategy employed by Eisai in the sale of Aloxi and Fragmin was to "bundle" the two drugs together and then offer the two drugs to hospitals at far below the combined Best Price for the two drugs.

139.   In another, related discount scheme, Eisai offered U.S. Oncology, a group purchasing organization, heavily discounted or free Fragmin, Aloxi and Dacogen in return for CTCL 25 patient information.  The information revealed which U.S. Oncology members were treating patients diagnosed with CTCL.  Eisai then used this patient information to target physicians treating CTCL.

140.   Again, the discounted sales prices for these drugs were *not* reported to the federal government.

141.   Florida Cancer Specialists, described above, was indeed soon provided steep discounts on both Aloxi and Fragmin, as was U.S. Oncology in Texas, as was Jackson Memorial Hospital for Fragmin—as were hundreds of health care providers across the country as part of Eisai's deliberate flouting of Best Price requirements.

142.   A purpose of these deep discounts was to gain a formulary position at each institution purchasing them.

143.   This strategy was launched by two upper level Eisai managers, Cynthia Schwalm and Leslie Marani.

144.   Based on all of the foregoing, it is clear that Eisai was systematically, illegally marketing the Subject Drugs, particularly Aloxi and Fragmin, and failing to report their best price to CMS, in violation of 42 U.S.C. § 1396r-8.

145.   The steep discounts on Aloxi and Fragmin, which were not reported to CMS (and hence, not reported to the Medicare and Medicaid Programs) unlawfully permitted physicians, hospitals, and other health care providers to obtain higher profits from treating Medicaid patients, at the expense of the Medicare Rebate Program, 42 U.S.C. §1396r-8, and in violation of the False Claims Act.

**K.**     **Eisai Has Caused the Submission of False Claims and Records**

146.   Eisai  has embarked upon this course of unlawful conduct knowing it would lead to the submission of myriad claims for the Subject Drugs by Medicare and Medicaid-participating providers, when by law these claims were not reimbursable and would not have been reimbursed by Government Health Care Programs had the truth about Eisai's illegal marketing practices been known.

147.   Eisai knew that off-label prescriptions for Ontak were ineligible for reimbursement by the Government Health Care Programs and that this conduct and its other marketing activities would, in fact, cause numerous ineligible prescriptions to be submitted to the Government Health Care Programs.  Hence the participation of doctors, hospitals and pharmacists in the submission of the false claims was not only foreseeable; it was an intended consequence of Eisai's scheme.

148.   When pharmaceutical companies illegally encourage off-label uses for their drugs, the number of prescriptions rises, thereby causing the Government Health Care Programs to pay out more for prescriptions that are not eligible for payment.  Eisai intended for its off-label promotional campaigns to improperly increase the submissions of off-label Ontak and Dacogen prescriptions, including such prescriptions reimbursed by the Government Health Care Programs.

149.    Any claim submitted for a drug when the drug was prescribed for an off-label use not only violates Government Health Care Program payment rules but also constitutes a false claim under the federal FCA and the analogous laws of the States named herein.  Eisai marketed Ontak and Dacogen, for off-label uses in violation of the FCA and the analogous state statutes.  Eisai's off-label marketing practices and other wrongful conduct knowingly caused doctors, hospitals and pharmacists to file false reimbursement requests in violation of the FCA.

150.    From 2006 through 2009, Defendant sold at least $150 million dollars worth of Ontak.  Defendant caused physicians, hospitals and other medical providers (their "Accounts"), to submit false or fraudulent claims for Medicare reimbursement of off-label claims for Ontak.  Defendant, maintained sales reports and other documents which reflect the sales of Ontak, including off-label sales data.  Defendant maintained a sales report known as a COERS report, which reflects Ontak sales broken down by Account.  These COERS reports were available to Defendant's sales representatives, including Keeler.  Attached hereto and incorporated herein by reference as **Exhibit "G"** is a true and correct copy of a COERS report which reflects Ontak sales from April 2008 through April 2009.

151.    John Schillo, a reimbursement specialist employed by Defendant, maintained COERS reports and other reports on behalf of Defendant which reflect the off-label condition for which Ontak was prescribed, whether Medicare was the source of reimbursement, and detailed information on whether Medicare reimbursed the claim at the full rate.

070111.1

152.    As noted above, the COERS report, for the period of April 2008 through April 2009, reflects the identities and addresses of 188 health care providers—active accounts during that period—that were purchasing Defendants' drug products and billing Medicare and Medicaid for administration of the drugs and related services. Approximately 80% of these providers continued to be active accounts for the next 1-year period, and approximately 80% of these providers were active accounts for the previous 1-year period.  However, because Defendant also had accounts that were not active, the active providers listed in the COERS report constitute, conservatively, only about 10% to 20% of the providers that Defendant caused to submit false claims.

Relator was informed by managers that the providers listed in the COERS report routinely bill Medicare and Medicaid.  Hence, there can be no question that false claims were submitted to the Medicare and Medicaid Programs by the 188 providers listed in the report, as a result of Eisai's fraudulent acts.  Notably, the COERS report, which was created by Eisai, lists not only the providers, but also their addresses, reporting dates, supplier names, and quantities.

To be specific, the COERS report lists the following 188 providers:

ALLEN MEMORIAL HOSPITAL
ALTA BATES MED CENTER PHCY
ALTA BATES MED
ALLEN MEMORIAL HOSPITAL
ALVES, DR NEY R F, PA
AMER ONCOLOGIC HOSPITAL PHARMACYRM
ANNISTON ONCOLOGY, P.C.
ARTHUR G JAMES CANC HOSPITAL
ASAMAN INCORPORATED
AUERBACH HEM-ONC ASSOCIATES, PC
BAGI JANA
BAPTIST HOSPITAL OF MIAMI, INC
BARNES JEWISH HOSPITAL
BARR, FREDERICK G MD, PC

BAYLOR ALL SAINTS MEDICAL CENTER
BAYSTATE CENTER FOR CANCER PHS
BEND MEMORIAL CLINIC
BERKSHIRE HEM/ONC
BETH ISRAEL DEACONESS MED CENTER
BIG SKY ONCOLOGY, PC
BIMC PACC - PHS
BIOSCRIP PHARMACY NY, INC
BLACK ROCK TURNPIKE MED GROUP
BOCA RATON COMMUNITY
BOCA RATON COMMUNITY-DELRAY
BOSTON CANCER GRP/UT CANCER INSTITU
BOSTON MED-HARRISON INPATIENT
BRASWELL'S DRUGS, INC
BRET A COOK MD
BRIDGEPORT HOSPITAL
BRIGHAM & WOMEN'S HOSPITAL
BROWN CANCER CENTER
BROWN CANCER CENTER PHCY
BRUCE LYMAN MD
BUX-MONT ONC/HEM ASSOC-ALDEN, MITCH
CAMPBELL COUNTY MEM HOSPITAL
CANCER CARE & HEMATOLOGY
CANCER CARE CENTER -NEW ALBANY
CANCER CARE NW, PS SOUTH
CANCER CENTER OF KANSAS PA
CANCER HEALTHCARE ASSOCIATES
CANCER SPECIALISTS OF OKLAHOMA-SHAW
CARITAS FOXBORO
CAROLINA BIO-ONCOLOGY INST-75DAY
CAROLINAS CANCER CARE -HAUCH
CASCADE MEDICAL GROUP
CASCADE PHYSICIAN BUSINESS SERVICES
CATAWBA VALLEY MEDICAL CENTER
CCNST-LYONS
CEDAR VALLEY MED SPECIALISTS, PC
CENTER FOR CANCER & BLOOD DISORDERS
CENTRAL MAINE MEDICAL
CENTRAL PA HEM/ONC - LEMOYNE
CITY OF HOPE NATIONAL MED CENTER
CLARIAN HEALTH PARTNERS, INC
CLEVELAND CLINIC HOSPITAL
COLUMBIA PRESBYTERIAN
COMMONWEALTH CANCER CENTER-DANVILLE
COMMONWEALTH CANCER CENTER - LONDON
COMMONWEALTH CANCER CENTER - RUSSELL

COMMONWEALTH CANCER CENTER - SOMERSET
COMMONWEALTH HEM-ONC, P.C.
COMPREHENSIVE CANCER & HEMATOLOGY
CONEMAUGH CANCER CARE CENTER
CONEMAUGH VALLEY MEM HOSPITAL
CONNECTICUT MULTISPECIALTY GROUP
COSTAS L CONSTANTINOU MD PC
COVENANT MEDICAL CENTER-LAKESIDE
CROZER-CHESTER M.C.PHARMACYRM
CENTER FOR CANCER AND BLOOD DISORDERS
DANA FARBER CANCER INSTITUTE
DEACONESS MEDICAL CENTER
DRS SHAH, GIANGIULIO & AHMED
DUKE UNIVERSITY HOSPITAL NORTH
DUKE UNIVERSITY RAINBOW CLINIC
EAST JEFFERSON GEN HOSPITAL
EASTERN CONNECTICUT HEM & ONCOLOGY
EDWARD OTTENHEIMER III MD
EDWIN C KINGSLEY MD
EMORY INFUSION PHS
EXPRESS SCRIPTS
FAIRFAX NORTHERN VA HEM ONC
FLETCHER ALLEN HEALTHCARE
FLORIDA CANCER - CORNERSTONE
FLORIDA CANCER -BONITA
FLORIDA CANCER- MANATEE
FLORIDA CANCER -SARASOTA
FLORIDA CANCER SPECIALISTS-BRADEN
FLORIDA CANCER SPEC-NAPLES PINE
FLORIDA HOSPITAL MEDICAL CENTER
FLORIDA HOSPITAL WATERMAN
FLORIDA HOSPITAL-ALTAMONTE
FORT WAYNE MEDICAL ONC/HEM-JEFF
FRANWIN PHARMACY
FREDERICK G BARR MD PC
FROEDTERT MEM LUTHERAN HOSPITAL
GA CANCER SPECIALISTS - PHARMACY
GARBO, DR CHARLES
GASTRO & ONC ASSOC/KAMATH,GEETHA J MD
GEISINGER MEDICAL CENTER (P)
GREEN BAY ONCOLOGY
GREG GORDON MD
GULF COAST ONC ASSOC-BARDMOOR
H C PHARMACY CENTRAL INC
H LEE MOFFITT CANCER HOSPITAL
H.C. PHARMACY CENTRAL, INC,

HACKENSACK MEDICAL CENTER
HAHNEMANN UNIVERSITY HOSPITAL 0855
HALIFAX MEDICAL CENTER(103)
HARRISON MEM HOSPITAL
HARRY STASZEWSKI MD
HEM - ONC CENTERS-NORTHERN ROCKIES
HEM & ONC OF DAYTON-CENTERVILLE
HEM/ONC ASSOC OF FREDERICKSBURG INC
HEM/ONC OF NE GA CANCER CARE, LLC
HEMATOLOGY ONC CONSULTANT - NAPERVI
HENRY FORD HOSPITAL
HENRY FORD WEST BLOOMFIELD HOSPITAL
HIGHLANDS ONCOLOGY GROUP PA
HOPE- THE CENTER FOR CANCER CARE
HOSPITAL OF UNIVERSITY OF PENN PHCY
HUNTSMAN CANCER HOSPITAL PHARMACY
HUTCHINSON CLINIC PA
I BRODSKY HEMONC ASSOC
IMA, INC
INDIANA ONC HEM CONSULTANTS-NORTH
INDIANA ONC HEM CONSULTANTS-SOUTH
INOSHITA, DR TSUYOSHI
INTERLAKES ONCOLOGY HEMATOLOGY
IOH CANANDAIGUA
JEFFREY K GIGUERE MD
JESSICA HALS, DO
JEWISH HOSPITAL PHCY
JOHN A HERSMAN MD
JOHN DWYER POWDERLY II MD
JONAH CENTER CANCER CARE, BERNSTEIN MD
JONES, DR C MICHAEL
JORDAN HOSPITAL
JORDON ONCOLOGY
KAISER FDN HOSPITAL PHCY
KAISER FOUNDATION HOSPITAL PHCY 1ST FL
KAISER HOSPITAL #2099
KAISER PERMANENTE PHARMACY #019
KAISER PERMENTE PHARMACY #387
KAISER SAN MARCOS ONCOLOGY 247
KANSAS CITY CANCER CENTER-SOUTH
KAPOOR, ROHIT MD
KARMANOS CANCER CENTER 340B
KENNESTONE HOSPITAL
KIRKLIN CLINIC ONCOLOGY
LAKELAND REGIONAL MEDICAL CENTER
LANCASTER HEM/ONC CARE

LEBANON COMM HOSPITAL
LEE MEMORIAL HOSPTIAL
LEWIS GALE MEDICAL CENTER PHARMACY
LITTLE ROCK HEM/ONC ASSOCIATES, PA
LOMA LINDA –PHS
LUTHERAN GENERAL HOSPITAL
LYMPHOMA CLINIC OF MICHIGAN
MADIGAN ARMY MEDICAL CENTER
MARSLAND, SULLIVAN, & SYLVESTER
MARY HITCHCOCK HOSPITAL
MARY WASHINGTON HOSPITAL
MASS GENERAL BLAKE BSMT PHCY
MD ANDERSON HOSPITAL PHARMACY
MECK MED GRP MMP,BRICK MD
MECKLENBURG MED GRP-MOREHEAD
MED CENTER OF DELAWARE/CHRIST (P)
MEMORIAL HOSPITAL OF BURLINGTON
MEMORIAL HOSPITAL-SOUTH BROWARD
METHODIST HOSPITAL PHARMACY
METROPLEX-ARLINGTON CANCER
MICHAEL ALAN SAVIN MD
MICHIANA HEMATOLOGY ONC -PLYMOUTH
MID-SOUTH CANCER CENTER PC
MITRA ONCOLOGY ASSOC., PC
MONTEFIORE MED CENTER PHARMACY
MONTGOMERY CANCER CENTER
MORTON PLANT HOSPITAL
MOUNT SINAI MEDICAL CENTER
MOUNT VERNON HOSPITAL
MT KISCO MEDICAL GROUP
MURAWSKI PHARMACY
MUSC HCC TAX EXEMPT PHS
N CAROLINA BAP PHCY118-04
NATIONAL INSTITUTE OF HEALTH
NCBH ONCOLOGY 118-04
NCBH STOCK WINDOW 118-04
NE GEORGIA CANCER CARE, LLC
NEVADA CANCER INSTITUTE MED GROUP
NEW YORK & PRESBYTERIAN HOSPITAL
NEW YORK HOSPITAL
NEWARK BETH ISRAEL MED CENTER
NEWLAND MEDICAL ASSOCIATES, P.C.
NMFF DIVISION OF HEM ONCOLOGY
NORTH FLORIDA HEM/ONC
NORTHSIDE HOSPITAL PHCY
NORTHSIDE HSP-CHEMO PHCY

NORTHSIDE HSP-TWR INFUS
NORTHWEST GEORGIA HEM/ONC -AUSTELL
NORTHWEST GEORGIA HEM/ONC -DOUGLAS
NORTHWESTERN MEMORIAL HOSPITAL
NORWALK MEDICAL GROUP/CANCER CENTER
NWMS PHARMACY
NYACK HOSPITAL
OCALA ONC CENTER
OCHSNER CHEMO PHARMACY
OCONEE MEMORIAL
OHSU CHH INFUSION PHARMACY PHS
ONCOLOGY ASSOCIATES OF MONROE
ONCOLOGY/HEMATOLOGY CARE PHARM-KPH
ONE WORLD
ORANGE REGIONAL MEDICAL CENTER
OREGON UNIVERSITY HEALTH SER.
ORH ONCOLOGY PHCY PHS
OU MED CENTER/EVERETT TOWER
OU PHYSICIANS
OUR LADY OF THE LAKE REGIONAL
P/SL MEDICAL CENTER
PENN MEDICINE DIVISION OF HEM/ONC
PRESBYTERIAN HOSPITAL OF NYC
PRESBYTERIAN HOSPITAL HUNTERSVILLE
PROFESSIONAL OFFICE BUILDING - PHS
PROVIDENCE HOME SERVICES
QUEENS MEDICAL ASSOCIATES, PC
QUEENS MEDICAL CENTER
RAJEEV MALIK, MD
RAUL CASTILLO MD
REGIONAL CANCER CENTER PHCY
RICHARD K ROSENBERG MD
RICHARD K ROSENBERG MD
RMCC MIDTOWN
RMCC-BOULDER
ROBERT WOOD JOHNSON UNIVERSITY HOSPITAL
ROCKDALE HOSPITAL
ROSWELL PARK CANCER INST
S BROWARD HOSPITAL DISTRICT PHS
SAINT FRANCIS HOSPITAL
SAMMONS CANCER CENTER-BMT CLINIC
SEATTLE CANCER CARE ALLIANCE
SHANDS JAX MED CENTER/OP PHS
SMITH, FREDERICK P MD, PC
SOMERSET HEM/ONC ASSOC- WU,HEN-VAI
SOMERSET MEDICAL CENTER

SOUTH BROWARD HOSPITAL DISTRICT
SOUTHEAST FLORIDA HEM/ONC GROUP
SPACE COAST -TITUSVILLE
ST FRANCIS HOSPITAL
ST JOHNS MERCY MED CENTER PHCY
ST JOSEPH HOSPITAL - PHS
ST LUKES REG MED CNT PHS
ST MARY'S CANCER CENTER
ST MARYS MEDICAL CENTER-EVA
ST PETERS HOSPITAL TU/F
ST PETERS HOSPITAL PHARMACY
ST. LUKES HOSPITAL OF BEDFORD
STANFORD ONCOLOGY CLINIC
STEVENS HEALTHCARE
SW VERMONT MEDICAL CENTER
SWEDISH AMERICAN
SWEDISH AMERICAN HOSPITAL PHS
TAYLOR HOSPITAL DIV OF CROZER
TEXAS ONCOLOGY
THE MILTON S. HERSHEY MED. CENTER
THERAPY ASSOCIATES
TOWER HEMATOLOGY ONCOLOGY
UCI MEDICAL CENTER
UCLA COMMUNITY ONCOLOGY PRACTICES
UM SYLVESTER AT DEERFIELD
UNIVERSITY OF MASSACHUSETTS
UNIV INT MED-BARRETT CANCER CENTER
UNIVERSITY IOWA HOSPITAL CLINIC PHS
UNIVERSITY OF ARKANSAS FOR MED SCI
UNIVERSITY OF CONN HEALTH CENTER
UNIVERSITY OF MICHIGAN - CGC INF
UNIVERSITY OF MISSISSIPPI MED CENTER
UNIVERSITY OF ARKANSAS FOR MED. SCI
UNIVERSITY OF MIAMI HOSPITAL
UNIVERSITY HOSPITAL & MED CENTER
UNIVERSITY OF COLORADO HOSPITAL
UNIVERSITY OF LOUISVILLE
UNIVERSITY OF MINNESOTA PHYSICIANS
UNIVERSITY OF NEBRASKA
UNIVERSITY ONC/HEM ASSOC.
UT CANCER INST-BOSTON CANCER GROUP
UT MD ANDERSON CANCER CENTER
UT MEDICINE SAN ANTONIO
VA MED CENTER PALO ALTO I/P
VA MEDICAL CENTER/INPAT
VAMC MANCHESTER

070111.1

VANDERBILT VUH ONCOLOGY
WATSON CLINIC LLP
WEST VIRGINIA UNIVERSITY HOSPITAL
WESTERN PENNSYLVANIA HOSPITAL
WILFORD HALL MED CNTR/HSL

153.    From October, 2006 through April, 2009, reimbursement specialists employed by Defendant and the Lash Group, a consultant hired by Defendant, coached and provided comprehensive instructions to Accounts on how to present off-label Ontak claims to Medicare and Medicaid and how to maximize the reimbursement of these claims.  For example, Defendant instructed their Accounts to provide off-label secondary diagnosis codes, such as diabetes, on HCFA 1500s or their electronic equivalent, to ensure the approval and payment of off-label Ontak claims made to Medicare.

154.    Defendant's reimbursement specialists and those employed by LASH group, provided telephone support to Defendant's Accounts to facilitate the presentment of false claims to Medicare and Medicaid by Defendant's accounts.

155.    Defendant intended that, as a direct result of the instruction and support on off-label billing provided by their reimbursement specialists to Accounts, that these Accounts would make false or fraudulent claims to Medicare and Medicaid for off-label use of Ontak.

156.    As a direct result of the work by Defendant's and Lash Group's reimbursement specialists, Accounts presented false or fraudulent claims for Medicare and Medicaid reimbursement of off-label claims for Ontak.  Many of these false or fraudulent claims were approved and paid by Medicare and Medicaid.

070111.1

157.   As a direct result of Defendant's policies and procedures for providing comprehensive instruction and support to their Accounts for billing off-label Ontak claims, Accounts utilized secondary diagnosis codes, such as diabetes, on claim forms and otherwise made false or fraudulent claims to Medicare and Medicaid for off-label use of Ontak.

158.   From October, 2006 through April, 2009, Defendant's reimbursement specialists and personnel at Lash Group implemented Defendant's OCP and OAR credit programs by identifying off-label Ontak claims that had been denied by Medicare or Medicaid to John Schillo.

159.   Schillo processed these denied off-label claims, through the OCP and OAR credit programs, so that the Accounts received an invoice credit from the wholesaler which was equal to the invoice price for Ontak paid by the Account and not reimbursed by Medicare or Medicaid.

**L.     Consultant Nam Dang, M.D. Promotes Off-Label Claims**

160.   From October 2006 through April 2009, Defendant employed Nam Dang, M.D. as a consultant to promote the off-label use of Ontak by Accounts. During this period, Defendant's Ontak sales representatives were armed with business cards which depicted an Ontak vial on one side and Dr. Dang's personal contact information on the other.  Defendant's national Ontak sales policy directed Ontak sales representatives to distribute these cards to Accounts as a means of promoting the off-label use of Ontak.  Sales representatives advised Accounts to call Dr. Dang directly with questions about the suitability of Ontak for off-label uses.  Defendant paid Dang to author clinical studies related to the off-label use of Ontak for unapproved conditions,

45

including B-cell lymphoma and PTCL.  These clinical studies were not approved by the FDA and were not intended to broaden Ontak's indication through FDA approval. Defendant paid Dr. Dang on several occasions to speak with physicians about promoting the off-label use of Ontak and effective means of submitting false or fraudulent claims to Medicare or Medicaid for reimbursement of these off-label claims. As part of these presentations, Dr. Dang would promote the support that Defendant provides to Accounts in presenting false or fraudulent claims to Medicare and Medicaid and procuring reimbursement.  On one such occasion, in July, 2007, Dr. Dang was paid by Defendant to speak at the University of Miami to a group of physicians about off-label use of Ontak and making claims to Medicare and Medicaid.  The purpose of Dr. Dang's presentation was to cause these physicians to prescribe Ontak off-label and to make false or fraudulent claims to Medicare and Medicaid.  Defendant paid Dang at least $50,000  of so-called "consulting fees" annually during this period, which Defendant intended to be and was in fact not  "consulting fees" but a "kickback" for Dr. Dang having made off-label Ontak claims to Medicare and Medicaid.

**M.     Consultant Lauren Pinter-Brown, M.D. Promotes Off-Label Claims**

161.    From October 2006 through April 2009, Defendant employed Lauren Pinter-Brown, M.D. as a consultant to promote the off-label use of Ontak by Accounts.   Defendant paid Dr. Pinter-Brown on several occassions to speak with physicians about promoting the off-label use of Ontak and effective means of submitting false or fraudulent claims to Medicare and Medicaid for reimbursement of these off-label claims.  As part of these presentations, Dr. Pinter-Brown would promote the support that Defendant provides to Accounts in presenting false or fraudulent claims to Medicare and

46

Medicaid and procuring reimbursement.  In March, 2008, Dr. Pinter-Brown spoke to a group of physicians in South Florida about promoting off-label use of Ontak and presenting claims to Medicare and Medicaid.  Dr. Pinter-Brown advised the South Florida physicians that reimbursement from Medicare and Medicaid for off-label Ontak claims could generate significant revenue.  Defendant paid Dr. Pinter-Brown at least $20,000 of so-called "consulting fees" annually during this period, which Defendant intended to be and was in fact not  "consulting fees" but a "kickback" for Dr. Pinter-Brown having made off-label Ontak claims to Medicare and Medicaid.

162.    From October 2006 through April 2009, Defendant's sales representatives followed a national sales policy and procedure to promote Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant's sales representatives utilized these unreliable and unapproved clinical studies to promote off-label use of Ontak. Defendant directed their sales representatives to intentionally misstate or overstate the findings of these unreliable studies to support specific claims of Ontak's efficacy for off-label.  Defendant intended that these unapproved clinical studies and marketing materials would cause Accounts to prescribe Ontak for off-label use and would result in Accounts presenting false and fraudulent claims to Medicare and Medicaid.

163.    Relator was a pharmaceutical sales representative, working for Eisai at all times relevant to this Complaint up to and until April 24, 2009.

164.   From time to time during the period between October, 2006 and April 24, 2009, Relator complained to his superiors concerning the illegal, off-label selling and marketing of the drug, Ontak.

165.   Sometime immediately after an Eisai sales meeting in Boston, Massachusetts in early Autumn 2008, Relator contacted his superior, Leslie Mirani, and complained to her regarding Eisai's off-label sales and marketing of Ontak to various physicians and hospitals.

166.   From October 2006 through April 2009, Defendant's Ontak sales representatives followed a national sales policy and procedure which directed them to distribute "selling the spread" reimbursement cards to Accounts which highlighted the profit margin or "spread" between an Account's wholesale cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would induce Accounts to prescribe Ontak for off-label use and to submit false and fraudulent claims to Medicare and Medicaid.

167.   From 2006 through 2009, Relator Keeler sold $5.5 million dollars worth of Ontak on behalf of the defendant.  Relator Keeler has specific knowledge that approximately 25% percent of the Ontak sales that he generated were submitted by his accounts as false or fraudulent claims for Medicare reimbursement and 2% were submitted by his accounts as false or fraudulent claims for Medicaid reimbursement. This knowledge is based on his personal knowledge, observation, direct communications with the accounts he developed and maintained during his employment, direct communications with Defendant's personnel, and is supported by the documents maintained by Relator Keeler and/or Defendant during the term of his employment.

48

168.    Defendant intended that its off-label marketing scheme would result in Accounts submitting false claims to Medicare and Medicaid for reimbursement of off-label Ontak uses.    Defendant pursued this off-label marketing scheme continuously from 2006 through 2009.    As a direct result of Defendant's off-label marketing scheme approximately two hundred hospitals, physicians, oncology practices, and other Accounts nationwide submitted at least hundreds of false claims to Medicare and Medicaid each month seeking reimbursement for off-label Ontak uses.    The submission of these false claims was foreseeable because it was the intended consequence of Defendant's off-label marketing scheme.    As a direct result of Defendant's off-label marketing scheme, including the comprehensive instruction it provided on the submission of off-label claims to Medicare and Medicaid, these false claims were approved and hundreds of Medicare and Medicaid payments were made each month.

For example, the following accounts submitted false claims for Medicare and Medicaid reimbursement:

a.    From October 2006 through April 2009, Yale-New Haven Hospital ("Yale") submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), other various T-cell lymphomas ("other Lymphomas") and Melanoma.    During this period, Defendant's sales representatives, including Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials

not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Yale's submission of false or fraudulent claims to Medicare and Medicaid by providing Yale with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Yale's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Yale to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  Defendant provided so-called "grants" and "speakers bureau fees" to Francine Foss, M.D. at Yale of approximately $50,000 annually, which Defendant intended to be and were in fact not grants or fees for speaking but a financial inducement for the making of off-label claims to Medicare and Medicaid.  During this period Defendant paid Dr. Foss to conduct supposed clinical trials which were not submitted to the FDA to broaden the indication of Ontak nor were the studies submitted for publication, but rather these clinical trials were intended primarily to encourage and reward Dr. Foss and Yale for prescribing Ontak off-label and making false and fraudulent claims to Medicare and Medicaid.  It was foreseeable that based upon Defendant's conduct that Yale would submit false claims to Medicare and Medicaid for reimbursement of off-label uses of Ontak.  During this period, Yale submitted approximately $250,000 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

        b.    From October 2006 through April 2009, Connecticut Multispecialty Group, P.C. ("CMGMDS") in Connecticut submitted off-label claims for Ontak to Medicare for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease

("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted CMGMDS's submission of false or fraudulent claims to Medicare by providing CMGMDS with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between CMGMDS's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause CMGMDS to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, CMGMDS submitted approximately $50,000 of false claims annually to Medicare and Medicaid for off-label use of Ontak as a direct result of Defendant's conduct.

c. From October 2006 through April 2009, Memorial Sloan–Kettering Cancer Center ("Sloan-Kettering") in New York, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), other various T-cell lymphomas ("other Lymphomas") and Melanoma. During this period, Defendant's sales representatives, including Evan Meiskin and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not

approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Sloan-Kettering's submission of false or fraudulent claims to Medicare and Medicaid by providing Sloan-Kettering with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Sloan-Kettering's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Sloan-Kettering to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  Sloan-Kettering submitted approximately $9,500 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

        d.     From October 2006 through April 2009, New York-Presbyterian Hospital/Columbia University Medical Center ("New York-Presbyterian") in New York, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Evan Meiskin and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted New York-Presbyterian's submission of false or fraudulent claims to Medicare and Medicaid by providing New York-Presbyterian with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between New York-Presbyterian's cost for

Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause New York-Presbyterian to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. New York Presbyterian submitted approximately $12,600 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

e.    From October 2006 through April 2009, Monter Cancer Center ("Monter") in Lake Success, New York, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Evan Meiskin and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted Monter's submission of false or fraudulent claims to Medicare and Medicaid by providing Monter with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Monter's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Monter to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. Sloan-Kettering submitted approximately $22,050 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

f.       From October 2006 through April 2009, Kaiser Foundation Hospital ("Kaiser") in Parma, Ohio, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Denise LaPera and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Kaiser's submission of false or fraudulent claims to Medicare and Medicaid by providing Kaiser with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Kaiser's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Kaiser to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Kaiser submitted approximately $11,500 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

g.       From October 2006 through April 2009, Cleveland Clinic in Ohio, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other

various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Denise LaPera and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted Cleveland Clinic's submission of false or fraudulent claims to Medicare and Medicaid by providing Cleveland Clinic with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Cleveland Clinic's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Cleveland Clinic to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Cleveland Clinic submitted approximately $21,000 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

        h.     From October 2006 through April 2009, H.C. Pharmacy Central, Inc. in Pittsburgh, Pennsylvania, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Denise LaPera and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy

of Ontak for off-label conditions.   Defendant promoted H.C. Pharmacy Central's submission of false or fraudulent claims to Medicare and Medicaid by providing H.C. Pharmacy Central with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between H.C. Pharmacy Central's cost for Ontak and the Medicare reimbursement amount.   Defendant intended that these "selling the spread" reimbursement cards would cause H.C. Pharmacy Central to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.   During this period, H.C. Pharmacy Central submitted approximately $119,000 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

i.      From October 2006 through April 2009, Hospital of the University of Pennsylvania ("Penn Medicine"), in Philadelphia, Pennsylvania, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").   During this period, Defendant's sales representatives, including Evan Meiskin and manager Larry Kristoff, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.   Defendant promoted Penn Medicine's submission of false or fraudulent claims to Medicare and Medicaid by providing Penn Medicine with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Penn Medicine's cost for Ontak and the Medicare reimbursement amount.

Defendant intended that these "selling the spread" reimbursement cards would cause Penn Medicine to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Penn Medicine submitted approximately $13,650 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

j.      From October 2006 through April 2009, Lancaster Hematology/Oncology ("Lancaster H/O") in Lancaster, Pennsylvania, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Denise LaPera and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted Lancaster H/O's submission of false or fraudulent claims to Medicare and Medicaid by providing Lancaster H/O with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Lancaster H/O's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Lancaster H/O to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Lancaster H/O

submitted approximately $7,350 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

k.      From October 2006 through April 2009, Central Pennsylvania Hematology & Medical Oncology Associates, P.C. ("Central PA H/O"), in Lemoyne, Pennsylvania, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Denise LaPera and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Central PA H/O's submission of false or fraudulent claims to Medicare and Medicaid by providing Central PA H/O with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Central PA H/O's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Central PA H/O to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Central PA H/O submitted approximately $61,950 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

l.      From October 2006 through April 2009, Arthur G. James Cancer Hospital and Richard J. Solove Research Institute/The Ohio State University

Comprehensive Cancer Center ("OSU Cancer"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Doug King and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted OSU Cancer's submission of false or fraudulent claims to Medicare and Medicaid by providing OSU Cancer with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between OSU Cancer's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause OSU Cancer to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, OSU Cancer submitted approximately $32,550 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

m. From October 2006 through April 2009, Commonwealth Cancer Centers ("Commonwealth Cancer"), in Kentucky, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic

070111.1

Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Doug King and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted Commonwealth Cancer's submission of false or fraudulent claims to Medicare and Medicaid by providing Commonwealth Cancer with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Commonwealth Cancer's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Commonwealth Cancer to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Commonwealth Cancer submitted approximately $40,950 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

n.     From October 2006 through April 2009, Onconlogy/Hematology Care Pharmacy ("O/H Care") in Cincinatti, Ohio, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Doug King and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing

60

materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted O/H Care's submission of false or fraudulent claims to Medicare and Medicaid by providing O/H Care with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between O/H Care's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause O/H Care to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, O/H Care submitted approximately $17,850 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

    o.  From October 2006 through April 2009, Henry Ford Medical Center ("Henry Ford MC") submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Brian Cullins and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Henry Ford MC's submission of false or fraudulent claims to Medicare and Medicaid by providing Henry Ford MC with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Henry Ford MC's cost for Ontak and the Medicare reimbursement amount.  Defendant intended

that these "selling the spread" reimbursement cards would cause Henry Ford MC to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Henry Ford MC submitted approximately $11,550 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

p.      From October 2006 through April 2009, University of Michigan Health System ("U. Michigan"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").   During this period, Defendant's sales representatives, including Brian Cullins and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.   Defendant promoted U. Michigan's submission of false or fraudulent claims to Medicare and Medicaid by providing U. Michigan with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between U. Michigan's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause U. Michigan to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, U. Michigan submitted approximately $57,750 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

q.      From October 2006 through April 2009, Karmanos Cancer Institute ("Karmanos Cancer"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Brian Cullins and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Karmanos Cancer's submission of false or fraudulent claims to Medicare and Medicaid by providing Karmanos Cancer with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Karmanos Cancer's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Karmanos Cancer to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Karmanos Cancer submitted approximately $13,650 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

r.      From October 2006 through April 2009, Brigham and Women's Hospital/Harvard Medical School ("Brigham") , Massachussetts, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression,

Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Brian Cullins and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Brigham's submission of false or fraudulent claims to Medicare and Medicaid by providing Brigham with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Brigham's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Brigham to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Brigham submitted approximately $9,450 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

        s.     From October 2006 through April 2009, St. Lukes's Hospital in Idaho, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Ann Specht and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and

"homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted St. Lukes' submission of false or fraudulent claims to Medicare and Medicaid by providing St. Lukes with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between St. Luke's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause St. Lukes to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, St. Lukes submitted approximately $50,000 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

t.      From October 2006 through April 2009, Massachusetts General Hospital/Harvard Medical School ("Mass General") submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Ann Specht and managers Larry Kristoff and Heather Percy, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Mass General's submission of false or fraudulent claims to Medicare and Medicaid by providing Mass General with "selling the spread" reimbursement cards which highlighted the profit margin or "spread"

between Mass General's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Mass General to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Mass General submitted approximately $29,400 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

u.     From October 2006 through April 2009, Auerbach Hematology Oncology, Inc. ("Auerbach Hematology"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Dwayne Wilcher and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted Auerbach Hematology's submission of false or fraudulent claims to Medicare and Medicaid by providing Auerbach Hematology with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Auerbach Hematology's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Auerbach Hematology to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Auerbach Hematology

66

submitted approximately $44,100 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

v.      From October 2006 through April 2009, James Graham Brown Cancer Center / University of Louisville ("Brown Cancer"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Archie Franklin and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Brown Cancer's submission of false or fraudulent claims to Medicare and Medicaid by providing Brown Cancer with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Brown Cancer's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Brown Cancer to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Brown Cancer submitted approximately $215,250 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

w.      From October 2006 through April 2009, Indiana Hematology/Oncology North and South ("Indiana H/O"), submitted off-label claims for

Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Archie Franklin and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Indiana H/O's submission of false or fraudulent claims to Medicare and Medicaid by providing Indiana H/O with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Indiana H/O's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Indiana H/O to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Indiana H/O submitted approximately $15,750 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

     x. From October 2006 through April 2009, University of Arkansas for Medical Sciences ("UAMS"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Shirley

Delung Hill and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted UAMS's submission of false or fraudulent claims to Medicare and Medicaid by providing UAMS with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between UAMS's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause UAMS to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, UAMS submitted approximately $10,500 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

        y.     From October 2006 through April 2009, The University of Tennessee Medical Center Cancer Institute ("UT Cancer") in Bartlett, Tennessee, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Shirley Delung Hill and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted UT Cancer's submission of false or fraudulent claims to Medicare and Medicaid by providing UT

Cancer with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between UT Cancer's cost for Ontak and the Medicare reimbursement amount.   Defendant intended that these "selling the spread" reimbursement cards would cause UT Cancer to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.   During this period, UT Cancer submitted approximately $111,300 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

        z.     From October 2006 through April 2009, Carolinas Cancer Care in Charlotte, North Carolina, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").   During this period, Defendant's sales representatives, including Rick Gibson and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.   Defendant promoted Carolinas Cancer's submission of false or fraudulent claims to Medicare and Medicaid by providing Carolinas Cancer with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Carolinas Cancer's cost for Ontak and the Medicare reimbursement amount.   Defendant intended that these "selling the spread" reimbursement cards would cause Carolinas Cancer to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.   During this

period, Carolinas Cancer submitted approximately $40,950 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

aa.    From October 2006 through April 2009, Duke University Hospital ("Duke"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Rick Gibson and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.   Defendant promoted Duke's submission of false or fraudulent claims to Medicare and Medicaid by providing Duke with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Duke's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Duke  to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Duke submitted approximately $2,100 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

bb.    From October 2006 through April 2009, North Carolina Baptist Hospital ("NC Baptist"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B

cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Rick Gibson and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted NC Baptist's submission of false or fraudulent claims to Medicare and Medicaid by providing NC Baptist with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between NC Baptist's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause NC Baptist to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, NC Baptist submitted approximately $42,000 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

cc.    From October 2006 through April 2009, University of Mississippi Medical Center ("MS Med Ctr."), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Mark Rosser and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA

72

which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted MS Med Ctr.'s submission of false or fraudulent claims to Medicare and Medicaid by providing MS Med Ctr. with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between MS Med Ctr.'s cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause MS Med Ctr. to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, MS Med Ctr. submitted approximately $18,900 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

        dd.     From October 2006 through April 2009, Georgia Cancer Specialists ("Georgia Cancer"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Mark Rosser and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted Georgia Cancer's submission of false or fraudulent claims to Medicare and Medicaid by providing Georgia Cancer with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Georgia Cancer's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the

73

spread" reimbursement cards would cause Georgia Cancer to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Georgia Cancer submitted approximately $5,250 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

ee.    From October 2006 through April 2009, Northeast Georgia Cancer Care, LLC ("NE Georgia Cancer"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Mark Rosser and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted NE Georgia Cancer's submission of false or fraudulent claims to Medicare and Medicaid by providing NE Georgia Cancer with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between NE Georgia Cancer's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause NE Georgia Cancer to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, NE Georgia Cancer submitted approximately $12,600 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

74

       ff.     From October 2006 through April 2009, Emory University Hospital ("Emory"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Mark Rosser and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.   Defendant promoted Emory's submission of false or fraudulent claims to Medicare and Medicaid by providing Emory with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Emory's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Emory to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Emory submitted approximately $4,200 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

       gg.     From October 2006 through April 2009, H. Lee Moffitt Cancer Center & Research Institute ("Moffitt"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other

Lymphomas"). During this period, Defendant's sales representatives, including Ray Earnest and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted Moffitt's submission of false or fraudulent claims to Medicare and Medicaid by providing Moffitt with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Moffitt's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Moffitt to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Moffitt submitted approximately $26,250 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

        hh. From October 2006 through April 2009, Florida Cancer Specialists & Research Institute ("Florida Cancer"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Ray Ernest and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted Florida Cancer's submission of false or fraudulent

claims to Medicare and Medicaid by providing Florida Cancer with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Florida Cancer's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Florida Cancer to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Florida Cancer submitted approximately $75,600 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

    ii.  From October 2006 through April 2009, Florida Hospital in Orlando, Florida, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Ray Ernest and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Florida Hospital's submission of false or fraudulent claims to Medicare and Medicaid by providing Florida Hospital with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Florida Hospital's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Florida Hospital to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Florida

Hospital submitted approximately $46,200 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

jj.     From October 2006 through April 2009, Shands Jacksonville Medical Center ("Shands Jacksonville") in Jacksonville, Florida, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Ray Ernest and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Shands Jacksonville's submission of false or fraudulent claims to Medicare and Medicaid by providing Shands Jacksonville with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Shands Jacksonville's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Shands Jacksonville to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Shands Jacksonville submitted approximately $1,050 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

kk.     From October 2006 through April 2009, Memorial Regional Hospital ("Memorial") in Hollywood, Florida, submitted off-label claims for

Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Michael Keeler and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Memorial's submission of false or fraudulent claims to Medicare and Medicaid by providing Memorial with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Sloan-Kettering's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Memorial to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Memorial submitted approximately $3,150 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

ll.     From October 2006 through April 2009, Boca Raton Regional Hospital ("Boca Regional"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Michael Keeler and manager

Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Boca Regional's submission of false or fraudulent claims to Medicare and Medicaid by providing Boca Regional with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Boca Regional's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Boca Regional to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Boca Regional submitted approximately $5,250 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

mm.  From October 2006 through April 2009, Northwestern Memorial Hospital ("Northwestern") in Chicago, Illinois, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Jim Galen and Jeff Dewert and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Northwestern's submission of false or fraudulent claims to Medicare and Medicaid by providing Northwestern with

"selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Northwestern's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Northwestern to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Northwestern submitted approximately $6,300 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

nn.    From October 2006 through April 2009, University of Iowa Hospitals & Clinics ("Iowa") in Iowa City, Iowa, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Jim Galen and Jeff Dewert and manager Randy Lawson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted Iowa's submission of false or fraudulent claims to Medicare and Medicaid by providing Iowa with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Iowa's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Iowa to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this

81

period, Iowa submitted approximately $3,150 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

oo.    From October 2006 through April 2009, Hutchinson Clinic ("Hutchinson") in Hutchinson, Kanasa, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Janice Evans and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Hutchinson's submission of false or fraudulent claims to Medicare and Medicaid by providing Hutchinson with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Hutchinson's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Hutchinson to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Hutchinson submitted approximately $219,450 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

pp.    From October 2006 through April 2009, University of Texas MD Anderson Cancer Center ("MD Anderson"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell

lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), other various T-cell lymphomas ("other Lymphomas") and Melanoma.  During this period, Defendant's sales representatives, including Tom Hillberg and Derrick Bratcher and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted MD Anderson's submission of false or fraudulent claims to Medicare and Medicaid by providing MD Anderson with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between MD Anderson's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause MD Anderson to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, MD Anderson submitted approximately $49,350 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

                qq.    From October 2006 through April 2009, Methodist Hospital ("Methodist") in Houston, Texas, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Tom

Hillberg and Derrick Bratcher and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted Methodist's submission of false or fraudulent claims to Medicare and Medicaid by providing Methodist with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Methodist's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Methodist to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Methodist submitted approximately $115,500 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

rr.      From October 2006 through April 2009, UT Health Science Center San Antonio ("UT San Antonio"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Tom Hillberg and Derrick Bratcher and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted UT San Antonio's submission of false or fraudulent claims to Medicare and Medicaid by providing UT San Antonio with

"selling the spread" reimbursement cards which highlighted the profit margin or "spread" between UT San Antonio's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause UT San Antonio to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, UT San Antonio submitted approximately $24,150 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

ss.     From October 2006 through April 2009, Texas Oncology – Southwest Fort Worth ("Texas Oncology"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Tom Hillberg and Derrick Bratcher and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Texas Oncology's submission of false or fraudulent claims to Medicare and Medicaid by providing Texas Oncology with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Texas Oncology's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Texas Oncology to submit false and fraudulent claims to Medicare and Medicaid for off-

label use of Ontak.   During this period, Texas Oncology submitted approximately $33,600 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

tt.      From October 2006 through April 2009, Baylor All Saints Medical Center at Fort Worth ("Baylor"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").   During this period, Defendant's sales representatives, including Tom Hillberg and Derrick Bratcher and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.   Defendant promoted Baylor's submission of false or fraudulent claims to Medicare and Medicaid by providing Baylor with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Baylor's cost for Ontak and the Medicare reimbursement amount.   Defendant intended that these "selling the spread" reimbursement cards would cause Baylor to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.   During this period, Baylor submitted approximately $11,550 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

uu.      From October 2006 through April 2009, Oklahoma University Medical Center ("OU Med"), submitted off-label claims for Ontak to

Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Tom Hillberg and Derrick Bratcher and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted OU Med's submission of false or fraudulent claims to Medicare and Medicaid by providing OU Med with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between OU Med's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause OU Med to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, OU Med submitted approximately $6,300 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

vv.    From October 2006 through April 2009, Kaiser Foundation Hospital ("Kaiser LA") in Los Angeles, California, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Chris

Johnson and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Kaiser LA's submission of false or fraudulent claims to Medicare and Medicaid by providing Kaiser LA with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Kaiser LA's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Kaiser LA to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Kaiser LA submitted approximately $55,650 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

ww.    From October 2006 through April 2009, UCLA 100 Medical Plaza Community Oncology Practice ("UCLA"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Chris Johnson and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted UCLA's submission of false or fraudulent claims to Medicare and Medicaid by providing UCLA with "selling the spread" reimbursement

cards which highlighted the profit margin or "spread" between UCLA's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause UCLA to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, UCLA submitted approximately $75,600 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

xx.     From October 2006 through April 2009, Stanford Oncology Clinic ("Stanford"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Chris Johnson and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted Stanford's submission of false or fraudulent claims to Medicare and Medicaid by providing Stanford with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Stanford's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Stanford to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Stanford submitted approximately $19,950 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

070111.1

yy.     From October 2006 through April 2009, VA Palo Alto Health Care System ("VA Palo Alto"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Chris Johnosn and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted VA Palo Alto's submission of false or fraudulent claims to Medicare and Medicaid by providing VA Palo Alto with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between VA Palo Alto's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause VA Palo Alto to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, VA Palo Alto submitted approximately $26,250 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

zz.     From October 2006 through April 2009, Edward J. Ottenheimer, III, M.D. ("Ottenheimer") in Roseburg, Oregon, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"),

Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Kevin Kelly and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Ottenheimer's submission of false or fraudulent claims to Medicare and Medicaid by providing Ottenheimer with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Ottenheimer's cost for Ontak and the Medicare reimbursement amount.   Defendant intended that these "selling the spread" reimbursement cards would cause Ottenheimer to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Ottenheimer submitted approximately $95,550 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

aaa.    From October 2006 through April 2009, Oregon Health & Science University ("Oregon Health"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Kevin Kelly and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant

91

promoted Oregon Health's submission of false or fraudulent claims to Medicare and Medicaid by providing Oregon Health with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Oregon Health's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Oregon Health to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak. During this period, Oregon Health submitted approximately $11,550 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

bbb.   From October 2006 through April 2009, City of Hope ("Hope") in Duarte, California, submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas"). During this period, Defendant's sales representatives, including Donna Weise and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions. Defendant promoted Hope's submission of false or fraudulent claims to Medicare and Medicaid by providing Hope with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Hope's cost for Ontak and the Medicare reimbursement amount. Defendant intended that these "selling the spread" reimbursement cards would cause Hope to submit false and fraudulent claims to

Medicare and Medicaid for off-label use of Ontak.  During this period, Hope submitted approximately $44,100 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

ccc.   From October 2006 through April 2009, Nevada Cancer Institute ("Nevada Cancer"), submitted off-label claims for Ontak to Medicare and Medicaid for various off-label uses, including peripheral T cell lymphoma ("PTCL"), CTCL patients lacking a CD+25 expression, Graft Versus Host Disease ("GVHD"), B cell lymphoma, N/K T-cell lymphoma ("Natural Killer"), Chronic Lymphocytic Leukemia ("CLL"), and other various T-cell lymphomas ("other Lymphomas").  During this period, Defendant's sales representatives, including Donna Weise and manager Brad Pierson, promoted Ontak off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Ontak for off-label conditions.  Defendant promoted Nevada Cancer's submission of false or fraudulent claims to Medicare and Medicaid by providing Nevada Cancer with "selling the spread" reimbursement cards which highlighted the profit margin or "spread" between Nevada Cancer's cost for Ontak and the Medicare reimbursement amount.  Defendant intended that these "selling the spread" reimbursement cards would cause Nevada Cancer to submit false and fraudulent claims to Medicare and Medicaid for off-label use of Ontak.  During this period, Nevada Cancer submitted approximately $127,050 of false claims annually to Medicare for off-label use of Ontak as a direct result of Defendant's conduct.

070111.1

169.    In addition to the Accounts, there were hundreds of additional active Accounts that regularly purchased Ontak for off-label uses and submitted false claims to Medicare and Medicaid.

170.    Upon information and belief, these lucrative schemes have continued after Relator's employment with Eisai.  As of his last date of employment, there were no signs whatsoever that Eisai intended to comply with the Medicare, Medicaid, and FDA requirements discussed.  From at least October 2006 through the present, Eisai, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, caused the submission of false or fraudulent claims to be paid or approved by the Government, through its off-label promotion of Ontak and the other Subject Drugs, its Best Price violations and schemes, its kickbacks, and other wrongful marketing schemes involving the Subject Drugs, all described above.

## COUNT I

## VIOLATION OF THE FALSE CLAIMS ACT (AS AMNEDED BY THE FERA)

171.    Relator repeats and realleges paragraphs 1 through 170 of this Complaint.

172.    From at least October 2006 until the present, Eisai, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, caused the submission of false or fraudulent claims to be paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1) and (a)(2) through its off-label promotion of Ontak and the other Subject Drugs, its Best Price violations and schemes, its kickbacks, and other wrongful marketing schemes involving the Subject Drugs, all described above.

173.   From at least October, 2006 until the present, Eisai, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, conspired with physicians, pharmacies and others to defraud the Government Health Care Programs by causing false or fraudulent claims for reimbursement to be paid or approved by the government in violation of 31 U.S.C. § 3729(a)(3).

174.   Upon information and belief, these lucrative schemes have continued after Relator's employment with Eisai.  As of his last date of employment, there were no signs whatsoever that Eisai intended to comply with the Medicare, Medicaid, and FDA requirements discussed.

175.   Relator specifically alleges, therefore, that the Medicare, Medicaid, FDA, and therefore False Claims Act, violations have continued through 2010, into 2011, and continue to exist, for which the U.S. Treasury should be made whole.

176.   Defendant has violated 31 U.S.C. § 3729(a)(2) by causing the states to submit false claims to the United States Government in Form CMS-64 (Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program), which falsely certified that all drugs for which federal reimbursement was sought, including Ontak, were paid for in compliance with federal law.  States submitted false claims to the Government Health Care Programs because when Ontak was prescribed off-label it was not prescribed for a medically accepted indication, yet states sought reimbursement from the United States Government for all Ontak expenditures.

177.   The United States, its fiscal intermediaries and state Medicaid programs, were unaware of Eisai's conspiracies or the falsity of the records, statements

and claims made by Eisai and its co-conspirators and as a result thereby have paid and continue to pay Government Health Care Programs reimbursement that they would not otherwise have paid.

178.    The United States and state Medicaid programs have been damaged by the payment of false and fraudulent claims.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the United States:

(1)    Three times the amount of actual damages which the United States has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the United States;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to § 3730(d) of the FCA and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred  in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just

## COUNT II

## AVOIDING FEDERAL PRICE CONTROLS/EXPERIMENTAL

## USE OF A DRUG/FCA, AS AMENDED BY FERA

179.    Relator repeats and realleges paragraphs 1 through 170 of this Complaint.

180.    Federal regulation 21 C.F.R. § 312.7 imposes price controls on investigational new drugs used in clinical trials.  The regulations state that charging for an investigational new drug is not permitted without FDA approval.

181.    Eisai has launched a nationwide illegal program of experimentation with Ontak.

182.    Eisai has encouraged and caused physicians to experiment with Ontak for off-label usage.

183.    These experimental programs are informal, generally unscientific and not reported to the FDA.

184.    Eisai has encouraged these experimental programs with offers to physicians of cash incentives, assistance in drafting publications and other benefits.

185.    These informal experiments have been conducted for the dual purpose of increasing sales of Ontak, while at the same time developing data for use in the creation of promotional materials for Eisai.

186.    These informal experiments were conducted by means of prescriptions to patients whose prescriptions have been paid for, in substantial measure, by the Government Health Care Programs.

187.    Eisai's deliberate avoidance of federal price controls on experimental use of drugs constitutes a pattern of fraudulent conduct which induced payments by the federal government, and constitute a false claim within the meaning of 31 U.S.C. §3729.

WHEREFORE, Plaintiffs demand judgment against Eisai as follows:

a.      That by reason of the aforementioned violations of the False Claims Act and price control regulations that this Court enter judgment in the United States' favor and against Eisai in an amount equal to three times the amount of damages that the United States has sustained because of Eisai's and its co-conspirators' actions, plus a civil penalty of not less than $5,500 nor more than $11,000 for each violation of 31 U.S.C. §3729;

b.      That Relator, as *Qui Tam* plaintiff, be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act and/or any other applicable provision of law;

c.      That Relator be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.      That Plaintiff and Relator have such other relief that this Court deems just and proper.

## COUNT III

## ILLEGAL KICKBACKS/FCA, AS AMNDED BY FERA

188.    Relator repeats and realleges paragraphs 1 through 170 of this Complaint.

189.    Federal laws and regulations governing the Government Health Care Programs prohibit kickbacks or inducements paid to physicians and medical care providers.  Parties who contract or subcontract with the federal government are subject to the provisions of the Anti-Kickback Act.  The Anti-Kickback Act provides that it is a felony to knowingly or willfully offer or pay any remuneration directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person "to purchase,

lease order, or arrange for or recommend purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). Kickback is defined as "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract." 41 U.S.C. §§ 52-53.

190.    The Government deems such misconduct to be material to its decision to pay healthcare claims, in part through its requirement that providers certify compliance with this law as a condition of payment under, and participation in, Government Health Care Programs.

191.    As part of its nationwide program of illegal promotion for the Subject Drugs, Eisai has established a system of kickbacks to physicians who are prescribers of large amounts of the Subject Drugs.

192.    These kickbacks and other inducements are administered by Eisai's sales department and include such means as discounts offered under the 340B program, as well as the OAR program which assures physicians full payment for their prescription and use of the Subject Drugs.

193.    These kickbacks are strictly illegal and have the effect of greatly increasing the amount of the Subject Drug prescriptions and, indirectly, the amount of money spent by the federal government for reimbursement of prescriptions covered by the Government Health Care Programs.

194.    Payment of these kickbacks represents the inducement of federal payments through a pattern of fraudulent conduct and constitute false claims within the meaning of 31 U.S.C. §3729.

195.    If the Government had been aware that the Subject Drugs were prescribed as a result of such prohibited conduct, the Government would not have paid the claims submitted as a result of Eisai's wrongful conduct.

196.    But-for Eisai's unlawful kickbacks to induce off-label uses of the Subject Drugs, health care providers would not have used the Subject Drugs for off-label uses, and would not have submitted claims for reimbursement to the Medicare and Medicaid Programs, which were paid in the normal, routine course of administration of these programs.

197.    Upon information and belief, these lucrative kickback schemes have continued after Relator's employment with Eisai.   As of his last date of employment, there were no signs whatsoever that Eisai intended to comply with the Medicare, Medicaid, and FDA requirements discussed.

198.

WHEREFORE, Plaintiffs demand judgment against Eisai as follows:

a.    That by reason of the aforementioned violations of the False Claims Act and Anti-Kickback Act that this Court enter judgment in the United States' favor and against Eisai in an amount equal to three times the amount of damages that the United States has sustained because of Eisai's and its co-conspirators' actions, plus a civil penalty of not less than $5,500 nor more than $11,000 for each violation of 31 U.S.C. §3729;

b.      That Relator, as *Qui Tam* plaintiff, be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act and/or any other applicable provision of law;

c.      That Relator be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.      That Plaintiff and Relator have such other relief that this Court deems just and proper.

## COUNT IV

## CALIFORNIA FALSE CLAIMS ACT

199.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

200.    This is a *qui tam* action brought by Relator on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

201.    Cal. Gov't Code § 12651 (a) provides liability for any person who

(1)     knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval;
(2)     knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;
(3)     conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.
. . .
(8)     is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

202.    In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code § 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code §14107.2.

203.    Eisai violated Cal. Bus. & Prof. Code § 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 by engaging in the conduct described herein.

204.    Eisai furthermore violated Cal. Gov't Code § 12651 (a) and knowingly caused false claims to be made, used and presented to the State of California by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, Cal. Bus. & Prof. Code § 650-650,1 and Cal. Welf. & Inst. Code § 14107.2 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs.

205.    The State of California, by and through the California Medicaid program and other state healthcare programs, and unaware of Eisai's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

206.    Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of California in connection with Eisai's conduct.  Compliance with applicable California statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of California.

102

207.    Had the State of California known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

208.    As a result of Eisai's violation of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

209.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of California:

(1)    Three times the amount of actual damages which the State of California has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5000 and not more than $10,000 for each false claim which Defendant presented or caused to be presented to the State of California;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relator incurred  in connection with this action;
(3)    An award of reasonable attorney's fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT V

## DELAWARE FALSE CLAIMS AND REPORTING ACT

210.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

211.    This is a *qui tam* action brought by Relator on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, Title 6, Chapter 12 of the Delaware Code.

212.    6 Del. C. § 1201(a) provides liability for any person who-

> (1)    knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;
> (2)    knowingly makes, uses, or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved; or
> (3)    conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

213.    In addition, 31 Del. C. § 1005 prohibits the solicitation or receipt of any remuneration (including kickbacks, bribes or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for the furnishing of any medical care or services for which payment may be made in whole or in part under any public assistance program.

214.    Eisai violated 31 Del. C. § 1005 by engaging in the conduct described herein.

215.    Eisai furthermore violated 6 Del. C. § 1201(a) and knowingly caused false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws, including the FCA, the Anti-Kickback Act, and 31 Del. C. § 1005 and by virtue of the fact that none of the

claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

216.    The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, was unaware of Defendant's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

217.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Eisai's conduct.   Compliance with applicable Delaware statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Delaware.

218.    Had the State of Delaware known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

219.    As a result of Eisai's violation of 6 Del. C. § 1201(a), the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

220.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 6 Del. C. § 1203(b) on behalf of himself and the State of Delaware.

070111.1

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Delaware:

(1) Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Delaware;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to 6 Del C. § 1205, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorney's fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT VI

## FLORIDA FALSE CLAIMS ACT

221. Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

222. This is a *qui tam* action brought by Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

223. Fla. Stat. § 68.082(2) provides liability for any person who-

(a) knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

106

(c)     conspires to submit a false or fraudulent claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

224.    In addition, Fla. Stat. § 409.920 makes it a crime to:

(c)  knowingly charge, solicit, accept, or receive anything of value, other than an authorized copayment from a Medicaid recipient, from any source in addition to the amount legally payable for an item or service provided to a Medicaid recipient under the Medicaid program or knowingly fail to credit the agency or its fiscal agent for any payment received from a third-party source;

* * *

(e)  knowingly, solicit, offer, pay or receive any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing of any item or service for which payment may be made, in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging, for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Medicaid program.

225.    Fla. Stat. §456.054(2) also prohibits the offering, payment, solicitation, or receipt of a kickback to a healthcare provider, whether directly or indirectly, overtly or covertly, in cash or in kind, in exchange for referring or soliciting patients.

226.    Eisai violated Fla. Stat. § 409.920(c) and (e) and §456.054(2) by engaging in the conduct described herein.

227.    Eisai furthermore violated Fla. Stat. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, Fla. Stat. § 409.920(c) and (e) and §456.054(2) and by virtue of the

fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

228. The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, was unaware of Defendant's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

229. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Eisai's conduct.   Compliance with applicable Florida statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Florida.

230. Had the State of Florida known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

231. As a result of Eisai's violation of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

232. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of himself and the State of Florida.

WHEREFORE, Relator respectfully request this Court to award the following damages to the following parties and against Eisai:

To the State of Florida:

(1)     Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $5,500 and not more than $ 11,000 for each false claim which Defendant caused to be presented to the State of Florida;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action,

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT VII

## GEORGIA FALSE MEDICAID CLAIMS ACT

233.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

234.    This is a *qui tam* action brought by Relator on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, O.C.G.A. §49-4-168(2008) *et seq.*

235.    O.C.G.A. § 49-4-168.1(a) provides liability for any person who:

(1)     knowingly presents, or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3)     conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid.

070111.1

236.    Eisai violated O.C.G.A. § 49-4-168 *et seq.* by engaging in the conduct described herein.

237.    Eisai furthermore violated O.C.G.A. § 49-4-168 and knowingly caused false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

238.    The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, was unaware of Defendant's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

239.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Eisai's conduct.   Compliance with applicable Georgia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Georgia.

240.    Had the State of Georgia known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

070111.1

241.     As a result of Eisai's violation of O.C.G. A. § 49-4-168, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

242.     Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to O.C.G. A. § 49-4-168 on behalf of himself and the State of Georgia.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Georgia:

(1)     Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendant's conduct;
(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Georgia;
(3)     Prejudgment interest; and
(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to O.C.G.A. § 49-4-168 and/or any other applicable provision of law;
(2)     Reimbursement for reasonable  expenses  which Relator incurred in connection with this action;
(3)     An award of reasonable attorney's fees and costs; and
(4)     Such further relief as this Court deems equitable and just.

## COUNT VIII

## HAWAII FALSE CLAIMS ACT

243.     Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

070111.1

244.    This is a *qui tam* action brought by Relator on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

245.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who-

(1)    knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3)    conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or
\* \* \*

(8)    is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

246.    Eisai violated Haw. Rev. Stat. §661-21(a) and knowingly caused false claims to be made, used and presented to the State of Hawaii by its deliberate and systematic violation of federal and state laws, including the FCA and Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

247.    The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

248.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and

belief; also an express condition of payment of claims submitted to the State of Hawaii in connection with Eisai's conduct.   Compliance with applicable Hawaii statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Hawaii.

249.    Had the State of Hawaii known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

250.    As a result of Eisai's violation of Haw. Rev. Stat § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

251.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of himself and the State of Hawaii.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Hawaii:

(1)    Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendant's illegal conduct;
(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Hawaii;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Haw. Rev. Stat. §661 - 27 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorney's fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT IX

## ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT

252. Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

253. This is a *qui tam* action brought by Relator on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 111. Comp. Stat. 175 *et seq.*

254. 740 111. Comp. Stat. 175/3(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

255. In addition, 305 111. Comp. Stat. 5/8 A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Illinois Medicaid program.

256. Eisai violated 305 111. Comp. Stat. 5/8A-3(b) by engaging in the conduct described herein.

070111.1

257.   Eisai furthermore violated 740 111. Comp. Stat. 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and the Illinois Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

258.   The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

259.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Eisai's conduct.   Compliance with applicable Illinois statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Illinois.

260.   Had the State of Illinois known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third parry payers in connection with that conduct.

261.    As a result of Eisai's violation of 740 111. Comp. Stat. 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

262.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 740 111 Comp. Stat. 175/3(b) on behalf of himself and the State of Illinois.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Illinois:

(1)    Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Illinois;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to 740 111. Comp. Stat. 175/4(d) and/or any other applicable provision of law;
(2)    Reimbursement for reasonable  expenses  which Relator incurred in connection with this action;
(3)    An award of reasonable attorney's fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT X

## INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT

263.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

264.     This is a *qui tam* action brought by Relator on behalf of the State

of Indiana to recover treble damages and civil penalties under the Indiana False Claims

and Whistleblower Protection Act, Indiana Code 5-11-5.5 *et seq.* provides:

Sec. 2.(b) A person who knowingly or intentionally:

(1)     presents a false claim to the state for payment or approval;
(2)     makes or uses a false record or statement to obtain payment or
         approval of a false claim from the state;
(3)     with intent to defraud the state, delivers less money or property to
         the state than the amount recorded on the certificate or receipt the
         person receives from the state;
(4)     with intent to defraud the state, authorizes issuance of a receipt
         without knowing that the information on the receipt is true;
(5)     receives public property as a pledge of an obligation on a debt
         from an employee who is not lawfully authorized to sell or pledge
         the property;
(6)     makes or uses a false record or statement to avoid an obligation to
         pay or transmit property to the state;
(7)     conspires with another person to perform an act described in
         subdivisions (1) through (6); or
(8)     causes or induces another person to perform an act described in
         subdivisions (1) through (6)...

265.     In addition, Indiana Code 5-11-5.5 *et seq.* prohibits the

solicitation or receipt of any remuneration, including any kickback, bribe or rebate,

directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any

item or service for which payment may be made in whole or in part under the Indiana

Medicaid program.

266.     Eisai violated the Indiana Code 5-11-5.5 *et seq.* by engaging in

the conduct described herein.

267.     Eisai furthermore violated Indiana Code 5-11 -5.5 *et seq.* and

knowingly caused false claims to be made, used and presented to the State of Indiana by

its deliberate and systematic violation of federal and state laws, including the FCA,

federal Anti-Kickback Act, and the Indiana Vendor Fraud and Kickback statute, and by

virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

268.    The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

269.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Eisai's conduct.   Compliance with applicable Indiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Indiana.

270.    Had the State of Indiana known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

271.    As a result of Eisai's violation of Indiana Code 5-11-5.5 *et seq.*, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

272.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Indiana Code 5-11-5.5 *et seq.* on behalf of himself and the State of Indiana.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Indiana:

(1)     Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendant's conduct;
(2)     A Civil penalty of at least five thousand dollars ($5,000);
(3)     Prejudgment interest; and
(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to Indiana Code 5-11-5.5 *et seq.* and/or any other applicable provision of law;
(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3)     An award of reasonable attorney's fees and costs; and
(4)     Such further relief as this Court deems equitable and just.

## COUNT XI

## LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

273.     Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

274.     This is a *qui tam* action brought by Relator on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. 46: 437.1 *et seq.*

275.     La. Rev. Stat. 46: 438.3 provides-

(A)     No person shall knowingly present or cause to be presented a false or fraudulent claim;
(B)     No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;
(C)     No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim;

276.    In addition, La. Rev. Stat. 46:43 8.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash of in kind, for furnishing healthcare goods or services paid for in whole or in part by the Louisiana medical assistance programs.

277.    Eisai violated La. Rev. Stat. 46:438.2(A) by engaging in the conduct described herein.

278.    Eisai furthermore violated La. Rev. Stat. 46:43 8.3 and knowingly caused false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act and La. Rev. Stat. 456: 438.2(A), and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

279.    The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

280.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Eisai's conduct.  Compliance with applicable Louisiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Louisiana.

281.     Had the State of Louisiana known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

282.     As a result of Eisai's violation of La. Rev. Stat. 46:438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

283.     Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. 46: 439.1(A) on behalf of himself and the State of Louisiana.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Louisiana:

(1)     Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendant's conduct;
(2)     A civil penalty of up to $ 10,000 for each false claim which Defendant caused to be presented to the State of Louisiana;
(3)     Prejudgment interest; and
(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;
(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3)     An award of reasonable attorney's fees and costs; and
(4)     Such further relief as this Court deems equitable and just.

## COUNT XII

## MICHIGAN MEDICAID FALSE CLAIMS ACT

284.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

285.    This is a *qui tam* action brought by Relator on behalf of the State of Michigan to recover treble damages and civil penalties under the Michigan Medicaid False Claims Act. MI ST Ch. 400.603 *et seq.*

> 400.603 provides liability in pertinent part as follows: Sec. 3. (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid                                                        benefits; (2)A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit...

286.    In addition, MI ST Ch. 400.604 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Michigan Medicaid program.

287.    Eisai violated MI ST Ch. 400.603 *et seq.* by engaging in the conduct described herein.

288.    Eisai furthermore violated, MI ST Ch. 400.603 *et seq.* and knowingly caused false claims to be made, used and presented to the State of Michigan by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

070111.1

289.    The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, was unaware of Eiasi's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

290.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Eisai's conduct.   Compliance with applicable Michigan statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Michigan.

291.    Had the State of Michigan known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

292.    As a result of Eisai's violation of MI ST Ch. 400.603 *et seq.* the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

293.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to MI ST Ch. 400.603 *et seq.* on behalf of himself and the State of Michigan.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Michigan:

(1)     Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendant's conduct;

(2)     A civil penalty equal to the full amount received for each false claim which Defendant caused to be presented to the State of Michigan;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to MI ST Ch. 400.603 *et seq.* and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XIII

## MONTANA FALSE CLAIMS ACT
## MONT. CODE ANN. § 17-8-403(a)-(b)

294.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 above as if fully set forth herein.

295.     This is a *qui tam* action brought by Relator on behalf of the State of Montana to recover treble damages and penalties under the Montana False Claims Act, Mont. Code Ann § 17-8-403(l)(a)-(b)

296.     17-8-403 provides liability for any person who:

(a)     knowingly presenting or causing to be presented to an officer or employee of the governmental entity a false claim for payment or approval;

(b)     knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved by the governmental entity;

(c)     conspiring to defraud the governmental entity by getting false claim allowed or paid by the governmental entity.

(h)     as a beneficiary of an inadvertent submission of a false claim to the governmental entity, subsequently discovering

124

the falsity of the claim and failing to disclose the false claim to the governmental entity within  -a reasonable time after discovery of the false claim.

297.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Montana in connection with Eisai's conduct.   Compliance with applicable Montana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Montana.

298.    Had the State of Montana known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

299.    The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Eisai, paid and continues to pay the claims that would not be paid but for Defendant's conduct.

300.    By reason of the Eisai's acts, the State of Montana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

301.    The State of Montana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, by Eisai.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

070111.1

To the State of Montana:

(1)     Not less than two times and not more than three times the amount of actual damages which the State of Montana has sustained as a result of Defendant's conduct;

(2)     A civil penalty of up to $ 10,000 for each false claim which Defendant caused to be presented to the State of Montana;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to Montana Code Ann. § 17-8-403 (1)(A)-(B). and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XIV

## NEVADA FALSE CLAIMS ACT

302.     Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

303.     This is a *qui tam* action brought by Relator on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. § 357.010, *et seq.*

304.     Nev. Rev. Stat. § 357.040(1) provides liability for any person who-

(a)     knowingly presents or causes to be presented a false claim for payment or approval;

(b)     knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

(c)     conspires to defraud by obtaining allowance or payment of a                    false                    claim; ***

(h)     is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to

disclose the falsity to the state or political subdivision within a reasonable time.

305.  In addition, Nev. Rev. Stat. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

306.  Eisai violated Nev. Rev. Stat. § 422.560 by engaging in the conduct described herein.

307.  Eisai furthermore violated Nev. Rev. Stat.§ 357.040(1) and knowingly caused false claims to be made, used and presented to the State of Nevada by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act and Nev. Rev. Stat. § 422.560, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

308.  The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, was unaware of Defendant's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

309.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Eisai's conduct.  Compliance with applicable Nevada statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Nevada.

310.   Had the State of Nevada known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

311.   As a result of Eisai's violation of Nev. Rev. Stat. § 357.040(1) the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

312.   Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Nev. Rev. Stat. § 357.080(1) on behalf of himself and the State of Nevada.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Nevada:

(1)   Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendant's conduct;
(2)   A civil penalty of not less than $5,000 and not more than $ 10,000 for each false claim which Defendant caused to be presented to the State of Nevada;
(3)   Prejudgment interest; and
(4)   All costs incurred in bringing this action..

To Relator:

(1)   The maximum amount allowed pursuant to Nev. Rev. Stat. § 357.210 and/or any other applicable provision of law;
(2)   Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3)   An award of reasonable attorney's fees and costs; and
(4)   Such further relief as this Court deems equitable and just.

## COUNT XV

## THE NEW HAMPSHIRE HEALTH CARE FALSE CLAIMS ACT

313.     Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

314.     This is a *qui tam* action brought by Relator on behalf of the State of New Hampshire to recover treble damages and civil penalties under the New Hampshire Health Care False Claims Law, N.H. Rev. Stat. Ann. §167:61-b *et seq.* provides:

1.     Any person shall be liable who...

(a)     knowingly presents, or causes to be presented, to an officer or employee of the department a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department;

(c)     conspires to defraud the State by getting a false or fraudulent claim              allowed              or              paid.
\*\*\*

(f)     Is a beneficiary of an inadvertent submission of a false claim to the department, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the department within a reasonable time after discovery of the false claim.

315.     In addition, N.H. Rev. Stat. Ann. prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Hampshire Medicaid program.

316.     Eisai violated the N.H. Rev. Stat. Ann by engaging in the conduct described herein.

317.    Eisai furthermore violated N.H. Rev. Stat. Ann. §167:61-b, and knowingly caused false claims to be made, used and presented to the State of New Hampshire by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and the New Hampshire Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

318.    The State of New Hampshire, by and through the New Hampshire Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

319.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Hampshire in connection with Eisai's conduct.   Compliance with applicable New Hampshire statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Hampshire.

320.    Had the State of New Hampshire known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

321.    As a result of Eisai's violation of N.H. Rev. Stat. Ann. §167:61-b *et seq.*, the State of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive of interest.

322.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.H. Rev.Stat. Ann. §167:61-b *et seq.* on behalf of himself and the State of New Hampshire.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of New Hampshire:

(1)    Three times the amount of actual damages which the State of New Hampshire has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New Hampshire;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to N.H. Rev. Stat. Ann § 167:61-b *et seq.* and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3)    An award of reasonable attorney's fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT XVI

## NEW JERSEY FALSE CLAIMS ACT

323.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

324.    This is a *qui tam* action brought by Relator on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.* (2008) *et seq.*

325.    N.J. Stat. § 2A:32C-3 provides liability for any person who:

(a)    knowingly presents, or causes to be presented, to an employee, officer, or agent of the State or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

326.    In addition, Section 17 of P.L. 1968, c.413 (C.30:4D717) of the New Jersey False Claims Act prohibits the solicitation, offer or receipt of any remuneration, including any kickback, rebate or bribe in connection with the furnishing of items or services for which payment is or may be made in whole or in part under the New Jersey Medicaid program.

327.    Eisai violated Section 17 of P.L. 1968, c.413 (C.30:4D-17) by engaging in the conduct described herein.

328.    Eisai furthermore violated N.J. Stat. § 2A:32C-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Jersey by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and the New Jersey False Claims Act and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

329.    The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

330.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Eisai's conduct.   Compliance with applicable New Jersey statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Jersey.

331.    Had the State of New Jersey known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

332.    As a result of Eisai's violation of N.J. Stat. § 2A:32C-1 *et seq.*, the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

333.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.J. Stat. § 2A:32C-1 *et seq.* on behalf of himself and the State of New Jersey.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of New Jersey:

(1)     Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act (31 U.S.C. s.3729 *et seq.*) which Defendant caused to be presented to the State of New Jersey;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to N.J. Stat. § 2A:32C-1 *et seq.* and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XVII

## NEW MEXICO MEDICAID FALSE CLAIMS ACT AND NEW MEXICO FRAUD AGAINST TAXPAYERS ACT

334.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

335.    This is a *qui tam* action brought by Relator on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act N.M. Stat. Ann§§ 27-14-1 *et seq.*

336.    Section 4 provides liability in pertinent part as follows:

A person ...shall be liable...if the person:

A.      presents, or causes to be presented, to the state a claim for payment
under the Medicaid program knowing that such claim is false or fraudulent;

B.      presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person

receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;

C.    makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

D.    conspires to defraud the state by getting a claim allowed or paid. Under the Medicaid program knowing that such claim is false or fraudulent.

337.    It is also brought by Relator on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act N.M. Stat. Ann § 44-9-1 *et seq.* provides liability in pertinent part as follows:

338.    § 44-9-3(A) A person shall not:

(1)    knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee or other recipient of state funds a false or fraudulent claim for payment or approval;

(2)    knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

(3)    conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim.

339.    In addition, N.M, Stat. Ann§ § 30-44-7 *et seq.* prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Mexico Medicaid program.

340.    Eisai violated N.M. Stat. Ann§§ 30-44-7 et seq. by engaging in the conduct described herein.

341.    Eisai furthermore violated, N.M. Stat. Ann§§ 27-14-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Mexico by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

342.    The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

343.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with Eisai's conduct.

344.    Compliance with applicable New Mexico statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Mexico.

345.    Had the State of New Mexico known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by. healthcare providers and third party payers in connection with that conduct.

346.    As a result of Eisai's violation of N.M. Stat. Ann§§ 27-14-1 *et seq.* the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

347.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.M. Stat. Ann§§ 27-14-1 *et seq.* on behalf of himself and the State of New Mexico.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of New Mexico:

(1)    Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New Mexico;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to N.M. Stat. Ann§§ 27-14-1 *et seq.* and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XVIII

## NEW YORK FALSE CLAIMS ACT

348.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

349.    This is a *qui tam* action brought by Relator on behalf of the State of New York to recover treble damages and civil penalties under the New York False Claims Act, 2007 N. Y. Laws 58, Section 39, Article XIII

350.    Section 189 provides liability for any person who:

> l.(a)    knowingly presents, or causes to be presented, to any employee, officer or agent of the state or local government, a false or fraudulent claim for payment or approval;
> 1.(b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or local government;
> 1. (c)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

351.    In addition, the New York State Consolidated Laws prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New York Medicaid program.

352.    Eisai violated the New York State Consolidated Laws by engaging in the conduct described herein.

353.    Eisai furthermore violated, 2007 N.Y. Laws 58, Section 39, Article XIII, and knowingly caused false claims to be made, used and presented to the State of New York by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and the New York Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

354.    The State of New York, by and through the New York Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

355.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with Eisai's conduct.   Compliance with applicable New York statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New York.

356.    Had the State of New York known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

357.    As a result of Eisai's violation of 2007 N. Y. Laws 58, Section 39, Article XIII, the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

358.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 2007 N. Y. Laws 58, Section 39, Article XIII, on behalf of himself and the State of New York.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

070111.1

To the State of New York:

(1)    Three times the amount of actual damages which the State of New York has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $6,000 and not more than $12,000 for each false claim which Defendant caused to be presented to the State of New York;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to 2007 N. Y. Laws 58, Section 39, Article XIII, and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XIX

## OKLAHOMA MEDICAID FALSE CLAIMS ACT

359.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

360.    This is a. *qui tam* action brought by Relator on behalf of the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act 63 Okl. St. §5053 (2008) *et seq.*

361.    63 Okl. St. § 5053.1 (2)(B) provides liability for any person who:

(1)    knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

(2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

362.    In addition, 56 Okl. St. § 1005 (2008) of the Oklahoma Medicaid Program Integrity Act prohibits the solicitation or receipt of any benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program.

363.    Eisai violated 56 Okl. St. § 1005 *et seq.* by engaging in the conduct described herein.

364.    Eisai furthermore violated 63 Okl. St. § 5053.1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and the Oklahoma Medicaid Program Integrity Act and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

365.    The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

366.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with Eisai's conduct.  Compliance with applicable Oklahoma statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Oklahoma.

367.    Had the State of Oklahoma known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

368.    As a result of Eisai's violation of 63 Okl. St. § 5053.1 *et seq.*, the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

369.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 63 Okl. St. § 5053.1 *et seq.* on behalf of himself and the State of Oklahoma.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Oklahoma:

(1)    Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Oklahoma;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to 63 Okl. St. § 5053.1 *et seq.* and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XX

## RHODE ISLAND STATE FALSE CLAIMS ACT

370.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

371.    This is a *qui tam* action brought by Relator on behalf of the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island State False Claims Act R.I. Gen. Laws §9-1.1-1 (2008) *et seq.*

372.    R.I. Gen. Laws § 9-1.1-3 provides liability for any person who:

    (1)    knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

    (3)    conspires to defraud the State by gettsing a false or fraudulent claim allowed or paid.

373.    In addition, R.I. Gen. Laws § 40-8.2-3(2)(i) prohibits the solicitation, receipt, offer or payment of any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Rhode Island Medicaid program.

374.    Eisai violated R.I. Gen. Laws § 40-8.2-3 *et seq.* by engaging in the conduct described herein.

375.    Eisai furthermore violated R.I. Gen. Laws § 9-1.1-1 and knowingly caused false claims to be made, used and presented to the State of Rhode Island by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and the Rhode Island General Laws and Kickback

statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

376.    The State of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

377.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with Eisai's conduct.  Compliance with applicable Rhode Island statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Rhode Island.

378.    Had the State of Rhode Island known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

379.    As a result of Eisai's violation of R.I. Gen. Laws §9-1.1-1, the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

380.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to R.I. Gen. Laws §9-1.1-1 *et seq.* on behalf of himself and the State of Rhode Island.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Rhode Island:

(1)    Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Rhode Island;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to R.I. Gen. Laws §9-1.1-4(d) and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3)    An award of reasonable attorney's fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT XXI

## TENNESSEE FALSE CLAIMS ACT

381.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

382.    This is a *qui tam* action brought by Relator on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101 *et seq.* and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

383.    § 4-18-103(a) provides liability for any person who-

145

(1)     Knowingly presents, or causes to be presented to an officer or employee of the state..., a false claim for payment or approval;
(2)     Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the state or by any political subdivision;
(3)     Conspires to defraud the state or any political subdivision by getting a claim allowed or paid by the state of by any political subdivision.

§ 71-5-182(a)(1) provides liability for any person who-

(A)     presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;
(B)     makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;
(C)     conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

384.   Eisai violated Tenn. Code Ann. § 4-18-103(a) and § 71-5-1 82(a)(1) and knowingly caused false claims to be made, used and presented to the State of Tennessee by its deliberate and systematic violation of federal and state laws, including the FCA and Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

385.   The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

386.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of

Tennessee in connection with Eisai's conduct. Compliance with applicable Tennessee statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Tennessee.

387.    Had the State of Tennessee known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

388.    As a result of Eisai's violation of Term. Code Ann. § 4-18-103(a) and § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

389.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 4-18 -103 (a) and § 71-5-183(a)(l) on behalf of himself and the State of Tennessee.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Tennessee:

(1)    Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $2,500 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Tennessee;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Tenn. Code Ann. § 71 -5-183 (c) and/or any other applicable provision of law;

(2) Reimbursement for reasonable  expenses  which Relator incurred in connection with this action;

(3) An award of reasonable attorney's fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXII

## TEXAS MEDICAID FRAUD PREVENTION LAW

390.   Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

391.   This is a *qui tam* action brought by Relator on behalf of the State of Texas to recover double damages and civil penalties under Tex. Hum. Res. Code § 36.001 *et seq.*

392.   Tex. Hum. Res. Code § 36.002 provides liability for any person who-

(1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

(a) on an application for a contract, benefit, or payment under the Medicaid program; or

(b) that is intended to be used to determine its eligibility for a benefit

(2) knowingly or intentionally concealing or failing to disclose an event:

(A) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of.

(i) the person, or

(ii) another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and

(B) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit            that            is            authorized;
***

148

(4)    knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning: ***

(B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5)    ... knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service provided to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program.

393.    Eisai violated Tex. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by its deliberate and systematic violation of federal and state laws, including the FDC A, federal Anti-kickback Act and § 36.002, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

394.    The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

395.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Eisai's conduct.  Compliance with applicable Texas statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Texas.

070111.1

396.    Had the State of Texas known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

397.    As a result of Eisai's violation of Tex. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

398.    Eisai did not, within 30 days after it first obtained information as to such violation, furnish such information to officials of the State responsible for investigating false claims violation, did not otherwise fully cooperate with any investigation of the violation, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

399.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tex. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Texas:

(1)    Two times the amount of actual damages which the State of Texas has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 or more than $ 15,000 pursuant to Tex. Hum.. Res. Code § 36.025(a)(3) for each false claim which Defendant cause to be presented to the state of Texas;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

070111.1

To Relator:

(1)    The maximum amount allowed pursuant to Tex. Hum. Res. Code §36.110, and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXIII

## WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT

400.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

401.    This is a *qui tam* action brought by Relator on behalf of the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 *et seq.*

402.    Wis. Stat. § 20.931 (2) provides liability for any person who:

(a)    Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.

(b)    Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.

(c)    conspires to defraud this State by obtaining allowance or payment of claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical                    Assistance                    Program; ***

(g)    knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance Program.

403.    In addition, Wis. Stat. § 49.49(2) of the Wisconsin Public Assistance Code prohibits the solicitation or receipt of any remuneration, including any

kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Wisconsin Medicaid program.

404.    Eisai violated Wis. Stat. § 49.49(2) by engaging in the conduct described herein.

405.    Eisai furthermore violated Wis. Stat. § 20.931 *et seq.* and knowingly caused false claims to be made, used and presented to the State of Wisconsin by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and the Wisconsin Public Assistance Code and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

406.    The State of Wisconsin, by and through the Wisconsin Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

407.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Wisconsin in connection with Eisai's conduct.  Compliance with applicable Wisconsin statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Wisconsin.

408.    Had the State of Wisconsin known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

409.    As a result of Eisai's violation of Wis. Stat. § 20.931 *et seq.* , the State of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

410.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Wis. Stat. § 20.931 *et seq.* on behalf of himself and the State of Wisconsin.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the State of Wisconsin:

(1)    Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Wisconsin;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to Wis. Stat. § 20.931 and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action(3)    An award of reasonable attorney's fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT XXIV

## MASSACHUSETTS FALSE CLAIMS ACT

411.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

412.    This is a *qui tam* action brought by Relator on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Chap. 12 § 5(A) *et seq.*

413.    Mass. Gen. Laws Chap. 12 § 5B provides liability for any person who-

> (1)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or
> (3)    conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;
> ***
> (9)    is a beneficiary of an inadvertent submission of a false claim . to the commonwealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim shall be liable to the commonwealth or political subdivision.

414.    In addition, Mass. Gen. Laws Chap. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

415.    Eisai violated Mass. Gen. Laws Chap. 118E § 41 by engaging in the conduct described herein.

416.    Eisai furthermore violated Mass. Gen. Laws Chap. 12 § 5B and knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, Mass. Gen. Law Chap. 118E § 41 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

417.    The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, was unaware of Eisai's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

418.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief: also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Eisai's conduct.   Compliance with applicable Massachusetts statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Massachusetts.

419.    Had the Commonwealth of Massachusetts known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

420.    As a result of Eisai's violation of Mass. Gen. Laws Chap. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

421.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Mass. Gen. Laws Chap. 12 § 5(c)(2) on behalf of himself and the Commonwealth of Massachusetts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the Commonwealth of Massachusetts:

(1)    Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the Commonwealth of Massachusetts;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to Mass. Gen. Laws Chap. 12, §5F and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3)    An award of reasonable attorney's fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT XXV

## VIRGINIA FRAUD AGAINST TAXPAYERS ACT

422.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

423.    This is a *qui tam* action brought by Relator on behalf of the Commonwealth of Virginia for treble damages and penalties under Va. Code Ann. § 8.01-216.3a provides liability for any person who:

> 1.      Knowingly presents, or causes to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval;
>
> 2.      Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth;
>
> 3.      Conspires to defraud the Commonwealth by getting a false or fraudulent claim allowed or paid.

424.    In addition, Va. Code Ann. § 32.1 -315 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Virginia Medicaid program.

425.    Eisai violated Va.Code Ann. §32.1-315 by engaging in the conduct described herein.

426.    Eisai furthermore violated Va. Code Ann. §§8.01-216.3a and knowingly caused false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, VA Code ANN §32.1-315 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

427.    The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, was unaware of Eisai's conduct

and paid the claims submitted by healthcare providers and third party payers in connection therewith.

428.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Eisai's conduct.  Compliance with applicable Virginia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

429.    Had the Commonwealth of Virginia known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

430.    As a result of Eisai's violation of Va. Code Ann. §8.01-216.3(a), the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

431.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Va. Code Ann. § 8.01-216.5 on behalf of himself and the Commonwealth of Virginia.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the Commonwealth of Virginia:

(1)    Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the Commonwealth of Virginia;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXVI

## DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT

432.    Relator repeats and realleges each allegation contained in paragraphs 1 through 170 above as if fully set forth herein.

433.    This is a *qui tam* action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.13 *et seq.*

434.    D.C. Code § 2-308.14(a) provides liability for any person who-

(1)    knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

(2)    knowingly makes, uses, or causes to: be made or used, a false record or statement to get a false claim paid or approved by the District;

(3)    conspires to defraud the District by getting a false claim allowed or paid by the District;
***

(8) is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

435.   In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

> (1)   Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid program, or
>
> (2)   Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program.

436.   Eisai violated D.C. Code § 4-802(c) by engaging in the illegal conduct described herein.   Eisai furthermore violated D.C. Code § 2-308.14(a) and knowingly caused thousands of false claims to be made, used and presented to the District of Columbia by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act D.C. Code § 4-802(c), and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the government-funded healthcare programs.

437.   The District of Columbia, by and through the District of Columbia Medicaid program and other state healthcare programs, was unaware of Eisai's illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

438.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the District of Columbia in connection with Eisai's illegal conduct.   Compliance with applicable D.C. statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the District of Columbia.

070111.1

439.    Had the District of Columbia known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

440.    As a result of Eisai's violation of D.C. Code § 2-308,14(a) the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

441.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the District of Columbia:

(1)    Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendant's illegal conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the District of Columbia;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXVII

## CONNECTICUT FALSE CLAIMS ACT

442.    Relator repeats and realleges each allegation contained in paragraphs 1-170 above as if fully set forth herein.

443.    This is a *qui tam* action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut Medical Assistance Program False Claims Act, § 17b-301a *et. seq.* (the "Act").

444.    The Act provides liability for any person who (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval under the medical assistance programs administered by the Department of Social Services; (2) knowingly makes, uses or causes to be made or used a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under medical assistance programs administered by the Department of Social Services; (3) conspires to defraud the state by securing the allowance or payment of a false or fraudulent claim under medical assistance programs administered by the Department of Social Services.

445.    Eisai violated Conn. Code § 17b-301b by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

446.    In addition, Conn. Code § 53a-161d, prohibits knowingly offering or paying any benefit with intent to influence such person for the furnishing of any

goods, facilities or services for which a claim for benefits or reimbursement has been filed with a local state or federal agency.

447.    Eisai violated Conn. Code § 53a-161d by engaging in the conduct described herein.

448.    Eisai furthermore violated Conn. Code § 17b-301b and knowingly caused false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, Conn. Code § 53a-161d and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs

449.    Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, was unaware of Eisai's illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

450.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Connecticut in connection with Eisai's illegal conduct.   Compliance with applicable Connecticut statutes, regulations and Pharmacy Manuals was also an express condition for payment of claims submitted to Connecticut.

451.    Had the State of Connecticut known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by

Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

452.    As a result of Eisai's violation of Conn. Code § 17b-301b, Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

453.    Relator is a private citizen with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Connecticut Code § 17b-301d on behalf of himself and the State of Connecticut.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To Connecticut:

(1)    Three times the amount of actual damages which Connecticut has sustained as a result of Defendant's illegal conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to Connecticut;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to Conn. Code § 17b-301e and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXVIII

## MINNESOTA FALSE CLAIMS ACT

454.   Relator repeats and realleges each allegation contained in paragraphs 1-170 above as if fully set forth herein.

455.   This is a *qui tam* action brought by Relator and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, § 15C.01 *et seq.* (the "Act").

456.   The Act provides liability for any person who (1) knowingly presents or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval; (2) knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision; (3) knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim.

457.   Eisai violated Minnesota Statute § 15C.02 by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

458.   In addition, Minnesota Statute § 62J.23 provides that the restrictions in the federal Medicare anti-kickback statutes apply to all persons in the state.

459.   Eisai furthermore violated Minn Stat. § 15C.02 and knowingly caused false claims to be made, used and presented to the State of Minnesota by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, Minn. Stat. § 15C.02 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs

460.   Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, was unaware of Eisai's illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

461.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Minnesota in connection with Eisai's illegal conduct.  Compliance with applicable Minnesota statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to Minnesota.

462.   Had the State of Minnesota known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

463.   As a result of Eisai's violation of Minn. Stat. § 15C.02, Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

464.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Minn. Stat § 15C.05 on behalf of himself and the State of Minnesota.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To Minnesota:

(1)    Three times the amount of actual damages which Minnesota has sustained as a result of Defendant's illegal conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to Connecticut;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to Minn. Stat. § 15C.13 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just

## COUNT XXIX

## NORTH CAROLINA FALSE CLAIMS ACT

465.    Relator repeats and realleges each allegation contained in paragraphs 1- 170 above as if fully set forth herein.

466.    This is a *qui tam* action brought by Relator and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, § 1-605 *et seq.* (the "Act").

467.   The Act provides liability for any person who (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; (2) knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspires to a violation of subdivision (1) or (2) of Section 1-607.

468.   Eisai violated North Carolina General Statute § 1-607 by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

469.   In addition N.C. Gen. Stat. § 90-401 provides that no health care provider who refers a patient of that provider to another health care provider shall receive financial or other compensation from the health care provider receiving the referral as a payment solely or primarily for the referral.

470.   Eisai violated N.C. Gen. Stat. § 90-401 by engaging in the conduct described herein.

471.   Eisai furthermore violated North Carolina General Statute § 1-607 and knowingly caused false claims to be made, used and presented to the State of North Carolina by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, North Carolina General Statute, § 1-607 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs

472.   North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, was unaware of Eisai's illegal conduct and

paid the claims submitted by healthcare providers and third party payers in connection therewith.

473.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to North Carolina in connection with Eisai's illegal conduct.  Compliance with applicable North Carolina statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to North Carolina.

474.    Had the State of North Carolina known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

475.    As a result of Eaisi's violation of North Carolina Gen. Stat. §1-607 North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

476.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to North Carolina Gen. Stat § 1-607 on behalf of himself and the State of North Carolina.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

070111.1

To North Carolina:

(1)     Three times the amount of actual damages which North Carolina has sustained as a result of Defendant's illegal conduct;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to North Carolina;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to North Carolina Gen. Stat. § 1-610 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just

## COUNT XXX

## COLORADO MEDICAID FALSE CLAIMS ACT

477.   Relator repeats and realleges each allegation contained in paragraphs 1-170 above as if fully set forth herein.

478.   This is a *qui tam* action brought by Relator and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, § 25.5-4-304 *et. seq.* (the "Act").

479.   The Act provides liability for any person who (1) knowingly presents or causes to be presented to an officer or employee of the state a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; (3)

170

conspires to commit a violation of paragraphs (a) or (b) of the Colorado Rev. Stat., §15.5-4-305.

480.    Eisai violated Col. Rev. Stat § §15.5-4-305 by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

481.    In addition Col. Rev. Stat. § 25.5-4-305 makes it illegal to offer, solicit, receive or pay any remuneration, including any kickback or bribe or rebate, directly or indirectly, overtly or covertly in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment is to be made by the Colorado Medicaid funds.

482.    Eisai violated  Col. Rev. Stat. § 25.5-4-305 by engaging in the illegal conduct described herein.

483.    Eisai furthermore violated Col. Rev. Stat § §15.5-4-305 and knowingly caused false claims to be made, used and presented to the State of Colorado by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs

484.    Colorado, by and through the Colorado Medicaid program and other state healthcare programs, was unaware of Eisai's illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

070111.1

485. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Colorado in connection with Eisai's illegal conduct. Compliance with applicable Colorado statutes, regulations and Pharmacy Manuals was also an express condition for payment of claims submitted to Connecticut.

486. Had the State of Colorado known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

487. As a result of Eisai's violation of Col. Rev. Stat § §15.5-4-305, Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

488. Relator is a private citizen with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Col. Rev. Stat § §15.5-4-306 on behalf of himself and the State of Colorado.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To Colorado:

(1) Three times the amount of actual damages which Colorado has sustained as a result of Defendant's illegal conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to Connecticut;

070111.1

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to Col. Rev. Stat. § 25.5-4-306 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorney's fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## <u>COUNT XXXI</u>

## <u>MARYLAND FALSE HEALTH CLAIMS ACT</u>

489.    Relator repeats and realleges each allegation contained in paragraphs 1-170 above as if fully set forth herein.

490.    This is a *qui tam* action brought by Relator and the State of Maryland to recover treble damages and civil penalties under the Maryland False Health Claims Act, Md. Health-General Code § 2-601 *et. seq.* (the "Act").

491.    The Act provides liability for any person who (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; (3) conspires to commit such a violation.

492.    Eisai violated Md. Health-General Code § 2-602 by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

493.    In addition Md. Criminal Code § 8-511 makes it illegal to solicit, offer, make, or receive a kickback or bribe in connection with providing items or services or making or receiving a benefit or payment under a State health plan.

494.    Eisai violated  Md. Criminal Code § 8-511 by engaging in the illegal conduct described herein.

495.    Eisai furthermore violated Md. Health-General Code § 2-602 and knowingly caused false claims to be made, used and presented to the State of Maryland by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs

496.    Maryland, by and through the Maryland Medicaid program and other state healthcare programs, was unaware of Eisai's illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

497.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Maryland in connection with Eisai's illegal conduct.  Compliance with applicable Maryland statutes, regulations and Pharmacy Manuals was also an express condition for payment of claims submitted to Maryland.

498.    Had the State of Maryland known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of Ontak and/or had been aware of the other wrongful conduct by

Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

499.   As a result of Eisai's violation of Md. Health-General Code § 2-602, Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

500.   Relator is a private citizen with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Md. Health-General Code § 2-604 on behalf of himself and the State of Maryland.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To Maryland:

(1)   Three times the amount of actual damages which Maryland has sustained as a result of Defendant's illegal conduct;

(2)   A civil penalty of not more than $10,000 for each false claim which Defendant caused to be presented to Maryland;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relator:

(1)   The maximum amount allowed pursuant to  Md. Health-General Code § 2-605 and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)   An award of reasonable attorney's fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## COUNT XXXII

## CHICAGO FALSE CLAIMS ACT

501.     Relator repeats and realleges each allegation contained in paragraphs 1-170 above as if fully set forth herein.

502.     This is a *qui tam* action brought by Relator and the City of Chicago to recover treble damages and civil penalties under the Chicago False Claims Act, § 1-22-010 *et seq.*

503.     The Municipal Code of Chicago § 1-22-020 provides liability for any person who-

    (a)    knowingly presents, or causes to be presented, to an officer or employee of the City a false or fraudulent claim for payment or approval;

    (b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the City;

    (c)    conspires to defraud the City by getting a false or fraudulent claim allowed or paid by the City.

504.     Eisai violated the Municipal Code of Chicago § 1-22-020 and knowingly caused thousands of false claims to be made, used and presented to the City of Chicago by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, Municipal Code of Chicago § 1-22-020, and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the government-funded healthcare programs.

505.     The City of Chicago, unaware of Eisai's illegal conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

506.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the City of Chicago in

070111.1

connection with Eisai's illegal conduct.  Compliance with applicable Chicago statutes and regulations was also an express condition of payment of claims submitted to the City of Chicago.

507.    Had the City of Chicago known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the Subject Drugs and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

508.    As a result of Eisai's violation of Chicago's Municipal Code § 1-22-020, the City of Chicago has been damaged in an amount far in excess of millions of dollars exclusive of interest.

509.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Municipal Code of Chicago § 1-22-030 on behalf of himself and the City of Chicago.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the City of Chicago:

(a)    Three times the amount of actual damages which the City of Chicago has sustained as a result of Defendant's illegal conduct;

(b)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the City of Chicago;

(c)    Prejudgment interest; and

(d)    All    costs    incurred    in    bringing    this    action.

To Relator:

(a)    The maximum amount allowed pursuant to the Municipal Code of Chicago § 1-22-030(d) and/or any other applicable provision of

law;

(b)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(c)    An award of reasonable attorneys' fees and costs; and

(d)    Such further relief as this Court deems equitable-and just.

## COUNT XXXIII

## NEW YORK CITY FALSE CLAIMS ACT

510.    Relator repeats and realleges each allegation contained in paragraphs 1-170 above as if fully set forth herein.

511.    This is a *qui tam* action brought by Relator and the City of New York to recover treble damages and civil penalties under the New York City False Claims Act, N.Y. Administrative Code § 7-801 *et seq.*

512.    N.Y. Administrative Code § 7-803 provides liability for any person who-

(a)    knowingly presents, or causes to be presented, to any City officer or employee a false claim for payment or approval by the City;

(b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the City;

(c)    conspires to defraud the City by getting a false claim allowed or paid by the City.

513.    Eisai violated N.Y. Administrative Code § 7-803 and knowingly caused thousands of false claims to be made, used and presented to the City of New York by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, N.Y. Administrative Code § 7-803, and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the government-funded healthcare programs.

514.    The City of New York, unaware of Eisai's illegal conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

070111.1

515.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the City of New York in connection with Eisai's illegal conduct.  Compliance with applicable New York statutes and regulations was also an express condition of payment of claims submitted to the City of New York.

516.    Had the City of New York known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the Subject Drugs and/or had been aware of the other wrongful conduct by Eisai, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

517.    As a result of Eisai's violation of N.Y. Administrative Code § 7-803, the City of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

518.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.Y. Administrative Code § 7-804 on behalf of himself and the City of New York.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Eisai:

To the City of New York:

(a)    Three times the amount of actual damages which the City of New York has sustained as a result of Defendant's illegal conduct;

(b)    A civil penalty of not less than $5,000 and not more than $15,000 for each false claim which Defendant caused to be presented to the City of New York;

(c)    Prejudgment interest; and

(d)    All    costs    incurred    in    bringing    this    action.

070111.1

To Relator:

(a)    The maximum amount allowed pursuant to N.Y. Administrative Code § 7-804 and/or any other applicable provision of law;

(b)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(c)    An award of reasonable attorneys' fees and costs; and

(d)    Such further relief as this Court

### Jury Demand

Plaintiff/Relator demands a jury trial on all counts.

Respectfully submitted,

/s/ Seth Lehrman_____
Gary Farmer FLBN 914444
Seth Lehrman FLBN 132896
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Tel.: 954-524-2820
Fax: 954-524-2822
Email: gary@pathtojustice.com
seth@pathtojustice.com

James P. Gitkin, Esq.  FLBN 570001
SALPETER GITKIN
200 S. Andrews Ave., Suite 503
Fort Lauderdale, FL 33301-1864
Tel. 954-467-8622
Fax. 954-467-8623
Email: jim@salpetergitkin.com

Steven F. Grover, Esq.  FLBN 131296
STEVEN F. GROVER, P.A.
One East Broward Blvd., Suite 700
Fort Lauderdale, FL 33301
Tel.: 954-356-0005
Fax: 954-356-0010
E-mail: lawhelp@earthlink.net

070111.1

*Attorneys for Plaintiff/Relator*
*Michael Keeler*

070111.1