**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:09-cv-22302-KMW**

UNITED STATES OF AMERICA, et al,
*EX REL.* MICHAEL KEELER

vs.

EISAI, INC.
-------------------------------------------------------/

**RELATOR'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT EISAI INC.'S MOTION TO DISMISS AND, IN THE ALTERNATIVE,**
**FOR AN INJUNCTION AGAINST KEELER**

Relator Michael Keeler, on behalf of the U.S.A. *et al*, hereby opposes Defendant's
Motion to Dismiss and, in the Alternative, for an Injunction Against Keeler ("the Motion"):

**INTRODUCTION**

This lawsuit under the *qui tam* provisions of the Federal Civil False Claims Act, 31
U.S.C. § 3729 *et seq.* ("FCA") (and 27 State and 3 municipal and/or district false claims acts)
alleges that pharmaceutical company Eisai Inc. has engaged in three schemes: (1) illegally failing
to provide the Government with the requisite "best price" for the drugs Aloxi, Fragmin, Ontak,
and Dacogen (referred to collectively as "the Subject Drugs"); (2) off-label (i.e., unapproved)
marketing of Ontak and Dacogen in violation of strict FDA laws; and (3) providing illicit
kickbacks to health care providers ("providers") to induce them to buy the Subject Drugs instead
of competitors' FDA-approved drugs. These schemes were successfully designed and
implemented to boost illegal sales of the drugs. Keeler has substantial inside knowledge of these
schemes from having been employed by Eisai as a pharmaceutical sales representative for
approximately two-and-a-half years. The FCA allows a person to sue on behalf of the U.S.A.  31
U.S.C. § 3730(b)—as is true for the other false claims statutes sued under.

Federal and State treasuries—the taxpayer—should be reimbursed for having improperly
paid out tens of millions of dollars (at the very least), through the Medicare and Medicaid
Programs for prescription drugs that Eisai knowingly tainted with kickbacks, FDA violations,
and pricing prohibitions. In addition, serious public health and safety concerns are raised by
Eisai's schemes: When a person, especially a cancer patient, is in need of medical care, the last
thing she should need to worry about is the specter of a doctor's prescribing a drug that has not

1

been FDA-approved for that use (and thus, not thoroughly tested), in lieu of an approved drug, because of a pharmaceutical company's undue influence on the doctor.[1] Congress enacted the Anti-Kickback Statute ("AKS") and the Food, Drug & Cosmetic Act ("FDCA") to protect the public from the types of actions that Eisai has taken. Remarkably, Eisai undertook its aggressive, nationwide off-label marketing scheme right after learning that the FDA had just sent Ligand Pharmaceuticals (from whom Eisai had just bought the rights to sell Ontak) a "Warning Letter" that reprimanded Ligand for having off-label marketed Ontak for prohibited, medically risky purposes. But Eisai simply continued the off-label marketing of Ontak where Ligand left off.

In its Motion, Eisai pretends that its off-label marketing is legal because *doctors* may prescribe a drug to a patient, provided that they use sound judgment and the drug was FDA-approved for *some* indication—not necessarily the FDA-approved indication. Eisai ignores the fact that federal law unequivocally prohibits *pharmaceutical companies* from off-label *marketing*, which is distinct from off-label *use* by a *physician*.  Congress has strictly prohibited Eisai's actions—not prescribing doctors' actions. With its specious argument, Eisai seeks to substitute its own judgment for that of Congress and the FDA. Ironically, it was in a recent Justice Department press release about the settlement of an off-label marketing case against *Eisai* (and another company), that Assistant Attorney General Tony West stated: "Off-label promotion of pharmaceutical products undermines the FDA's important role in protecting the American public by determining whether a drug is safe and effective for a particular use before it is marketed. Such illegal conduct by pharmaceutical companies also costs the government billions of dollars, and these civil settlements…demonstrate that such conduct will not be tolerated."[2]

The American Cancer Society understands the difference. To quote its website: "While it is legal for doctors to use drugs off label, it is not legal for drug companies to market their drugs for off-label uses….Off-label marketing is very different from off-label use." American Cancer Society (www.cancer.org/treatment). Thus, Eisai clearly disagrees with the views of Congress, the FDA, the Justice Department, and the American Cancer Society, and apparently is not about to change the way it does business. Under Eisai's twisted logic, it would be legal for tobacco

---

[1] Regardless, whether kickbacks and off-label marketing of cancer drugs in the case at bar was dangerous or not is a fact-intensive issue that is appropriate, if at all, for jury determination—not by a motion to dismiss under Rule 12(b)(6) and not even by a summary judgment motion.

[2] Dept. of Justice Press Release, Pharmaceutical Companies to Pay $214.5 Million to Resolve Allegations of Off-Label Promotion of Epilepsy Drug, Dec. 15, 2010 [**Exhibit "A"**].

companies to advertise cigarettes on television and radio—which is strictly prohibited—because local grocery and convenience stores are allowed to sell cigarettes.

Eisai's Motion must be denied because Keeler's claims are plausible under Rule 12(b)(6), and pleaded with sufficient particularity to put Eisai on notice of his claims, satisfying Rules 8(a) and 9(b). Congress has *deemed* kickbacks as FCA violations due to their inherent taint on the health care system; Keeler need not prove causation or materiality for them. On the off-label marketing and "best-price" violations, Keeler may have to prove that Eisai's conduct was "capable of influencing" Government payment for the drugs, but he need not prove that at the pleading stage; determinations of causation and materiality are improper under Rule 12(b)(6).

## RELEVANT PROCEDURAL BACKGROUND

Keeler filed suit under seal on August 4, 2009. (Throughout this Memorandum, "Keeler" is used as shorthand for "Michael Keeler, on behalf of the U.S.A."). On July 8, 2010, a First Amended Complaint ("FAC") [DE 19] was filed under seal. On February 24, 2011, the U.S.A. declined to intervene [DE 23], but referred the Court to Subsection 3730(b)(1) of the FCA, which expressly allows relators to pursue FCA suits for the U.S.A.[3] The FAC was unsealed in February 2011, and Eisai moved to dismiss [DE 19]. On June 21, 2011, the Court entered an Order [DE 61] rejecting many of Eisai's arguments. Although leave to amend was granted on most of the FAC, Keeler's kickback and retaliatory discharge counts were dismissed without leave to amend. Keeler filed a Notice of Appeal [DE 73] and moved for reconsideration [DE 74], arguing that leave should have been granted on the kickback count. The Court then amended its Order to clarify that the dismissal of the kickback count was without prejudice, allowing leave to amend [DE 77]. Keeler withdrew the appeal [DE 78].

---

[3] The U.S.A. could still later intervene. Though the U.S.A. may intervene and take over a *qui tam* suit, "it often declines to do so." U.S. ex rel. Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1167 (10th Cir. 2010).  That the U.S.A. has not intervened is not a reflection on the merits. U.S. ex rel. Atkins v. McInteer, 470 F.3d 1350, 1359 n.17 (11th Cir. 2006). At least hundreds of millions of dollars have been recovered in non-intervened *qui tam* suits. The U.S.A. intervenes in just a small fraction of *qui tam* suits because of financial constraints and other reasons. U.S. Attorneys cannot pursue every case, and often focus on the highest-damage cases. Since 2001, the U.S.A. has recouped more than $4 billion in FCA suits premised on manufacturers' violations of the FDCA through illegal off-label promotion of drugs and medical devices. Dept. HHS & DOJ Health Care Fraud & Abuse Control Program Annual Report for FY 2010, at 5 (available at http://oig.hhs.gov/publications/docs/hcfac/hcfacreport2010.pdf). In one non-intervened *qui tam* suit alone, U.S.A. ex rel. Tyson v. Amerigroup Corp., a $334 million verdict and judgment was entered in favor of the U.S.A.

Now a 189-page Third Amended Complaint ("the Complaint") is operative. It contains 86 more pages of details than the 103-page FAC that Judge Ungaro found lacking in sufficient specificity. In fact, the sections preceding the counts—predominated by factual allegations—consist of 108 pages: some five times as many pages as the comparable 21 pages in the FAC.

LAW AND ARGUMENT

**A.    FCA LIABILITY PROVISIONS AND THE FERA AMENDMENTS TO THE FCA**

As made clear by Complaint (see, e.g., ¶¶ 5, 259-261, 264, 267, 273, &, among others), Keeler has sued under three different FCA liability provisions:  31 U.S.C. §§ 3729(a)(1), (a)(2), and (a)(3). The Fraud Enforcement and Recovery Act of 2009 ("FERA") modified and renumbered these subsections. To avoid confusion, and especially because this case involves false claims both pre-dating and post-dating the FERA's enactment in 2009, Keeler cites to the *pre*-amendment subsections (as many courts do, to simplify). But the FERA amendments apply, as alleged. Eisai glosses over these different liability provisions and standards, resulting in its misapplication of case law.[4] Further, Eisai did not challenge some of these liability claims at all.

---

[4] **Subsection (a)(1)** prohibits *presentation*, or the *causing* of presentation, of false or fraudulent *claims* to the Government. This renders a person liable under the FCA even if he had no contractual relations with the Government. U.S. ex rel. Marcus v. Hess, 317 U.S. 537 (1943) (quoting  U.S. v Bornstein, 423 U.S. 303 (1976) (subcontractor liable for causing prime contractor to submit false claims)); U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc., 2007 U.S. Dist. LEXIS 96344, *24 (M.D. Fla. 2007).

  **Subsection (a)(2)** prohibits use of a false or fraudulent *statement or record* to get the Government to pay a claim. A wide variety of types of statements or records may support a cause of action under (a)(2). A document that contains untrue assertions, one that omits information, and verification of an earlier false statement or record, may constitute a false statement or record. U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp., 20 F. Supp.2d 1017 (S.D. Tex. 1998) (annual cost reports); U.S. ex rel. Lamers v. City of Green Bay, 998 F. Supp. 971, 986, 989 (E.D. Wis. 1998), aff'd, 168 F.3d 1013, 1018 (7th Cir. 1999) (standard assurances of compliance with grant requirements, and letters in support of application).  Like (a)(1), (a)(2) imposes liability on a person who *causes another* to engage in the prohibited conduct, as well as upon a person who directly violates the subsection. U.S. v. Mackby, 261 F.3d 821, 826 (9th Cir. 2001).  (a)(2) does not require proof that the defendant presented, or caused be presented, a false claim to the Government, or that the defendant's false record or statement itself was ever submitted to the Government. Rather, it encompasses any false statement or record "having a natural tendency to influence, or being capable of influencing, the payment or receipt of money or property." See Hopper v. Solvay Pharmaceuticals, Inc., 588 F.3d 1318, 1327 (11th Cir. 2009), as clarified by, FERA, 31 U.S.C.A. § 3729(b)(4).

  **Subsection (a)(3)** prohibits a person from *conspiring* to get a false or fraudulent claim allowed or paid by the Government. The understanding may take many forms, and may be tacit. U.S. ex

4

For example, Eisai did not challenge the conspiracy claims. Proof of damages to the Government is not required for the imposition of damages—or *at the very least* for civil penalties—under either Subsections 3729(a)(1), (a)(2), or (a)(3).[5] Virtually all of the FERA's FCA amendments apply "across the board," to every aspect of this case, because the FERA was a clarification of existing law: The FERA, both explicitly and in its legislative history, shows Congress's primary purpose was to clarify existing provisions that had been misinterpreted in select cases.[6]

_____

rel. Durcholz v. FKW Inc., 189 F.3d 542, 546 (7th Cir. 1999). Each conspirator need not have known all the details of the agreement, or all the participants involved, but they must have shared in the general conspiratorial objective. Each participant is jointly and severally liable even if he did not personally commit the act, know the scope of the conspiracy, or know identity of each member. (a)(3) makes no mention of an "overt act" requirement. Keeler alleged that Eisai conspired (civilly) with the Lash Group (¶¶ 241-47, 261, 267), Nam Dang, M.D. (¶¶ 148, 248, 261, 267), and Lauren Pinter-Brown, M.D. (¶ 249, 261) in making kickbacks; and with the Lash Group (¶¶ 241-47, 261, 267), Nam Dang, M.D., (¶¶ 148, 164, 248, 261, 267), and Lauren Pinter-Brown, M.D. (¶¶ 154, 249, 261, 267) in off-label marketing. In the unlikely event the Court were ever to find that an overt act is required under (a)(3), overt acts are alleged throughout the Complaint (notably, for kickbacks, ¶¶ 135-64, 241-47, 249; and for off-label marketing, ¶¶ 86-165 & 241-47). Keeler disclaims any allegation of a conspiracy on the "best price" claims.

[5] Rex Trailer Co. v. U.S., 350 U.S. 148, 153 (1956) (damages need not be shown under FCA); U.S. ex rel. Sanders v. East Alabama Healthcare Auth., 953 F. Supp. 1404 (M.D. Ala. 1996). Congress reaffirmed this when it enacted the 1986 amendments to the FCA.  S. Rep. No. 99-345, at 8 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5273 ("The U.S. is entitled to recover such forfeitures solely upon proof that false claims were made, without proof of any damages….").
[6] (a)(2) is a bit different, however: Concerning FCA liability, Eisai's reliance on Allison Engine Co., Inc. v. U.S. ex rel. Sanders, 553 U.S. 662 (2008), is misplaced because Congress made clear, with the FERA, that the decision was at odds with its intent in amending the FCA in 1986. Allison Engine was restricted to (a)(2) and (a)(3). It did not change (a)(1). In Allison Engine, the Supreme Court held that (a)(2) did not require demonstration that a false or fraudulent statement was "presented" to an officer or employee of the Government. To limit the reach of the FCA, the Supreme Court implied an intent requirement into (a)(2): that the person who submitted the false statement or record must have intended it to be "for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'" Id.  But when Congress enacted the FERA, it made three changes to eliminate Allison Engine's added intent requirement. First, the FERA deleted "to get" and "paid or approved" from (a)(2). Second, the FERA placed "material" in lieu of "to get," requiring a false statement of record to be "material." Third, a definition of "material" was added to § 3729(b). See S. Rep. No. 111-10, at 12. The FCA now expressly defines "material" to mean "having a natural tendency to influence, or being capable of influencing, the payment or receipt of money or property." 31 U.S.C.A. § 3729(b)(4); see also S. Rep. No. 11-10, at 12; Hopper, 588 F.3d at 1327. Congress expressly made these specific changes to (a)(2) effective as of *June 7, 2008*:  the date that Allison Engine was decided). Hence, Congress was clear in its intent to overrule that decision and restore the law to what Congress had intended it to be before the date of the decision.

The meaning of "material," through the FERA and prior case law—"having a natural tendency to influence, or being capable of influencing, the payment or receipt of money or property"—is important to the off-label marketing and "best price" violations. It is both the causation and materiality standard.  But it does not apply to the kickback claims because kickbacks are *deemed* material, as set forth below.

**B.     RULES 8(A)(2) AND 12(B)(6)**

Federal Rule 8(a)(2) requires that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what…the claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). The allegations are to be taken as true and all reasonable inferences must be construed in the light most favorable to the non-movant. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009); United Techs. Corp. v. Mazer, 556 F.3d 1260, 1269 (11th Cir. 2009). The Complaint must have sufficient factual allegation which, taken as true, "raise a right to relief above the speculative level" to the level that it "is plausible on its face." Twombly, id. at 555. But this is not a "probability requirement." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) (citing Iqbal, 129 S.Ct. at 570). The allegation need merely be "suggestive of illegal conduct." Twombly, at 564 n.8. "The complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Id.  The Supreme Court in Iqbal was "saying instead that the plaintiff must give enough details…to present a story that holds together.…*[C]ould* these things have happened, not *did* they happen." Swanson v. Citibank, N.A., 614 F.3d 400, 404 (7th Cir. 2010) (emphases in original).

Though the pleader must do more than simply offer formulaic labels and conclusions, a well-pleaded complaint must survive a motion to dismiss even if it seems that a recovery is very remote or improbable. Twombly, 550 U.S. at 556. In the Supreme Court's words: "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Id. Indeed, dozens of post-Twombly and post-Iqbal cases make clear that this is so "even if the possibility of recovery is *extremely* 'remote and unlikely.'"[7] Because dismissal under Rule 12(b)(6) is on the merits,

---

[7] See, e.g., D.M.I. Dynamic Mgmt. & Investments, B.V. v. Konvict Muzik, LLC, 2011 U.S. Dist. LEXIS 56382, *3 (N.D. Ga. May 26, 2011) (citing Twombly) (emphasis added); Martin v.

Federated Dept. Stores v. Moitie, 452 U.S. 394, 399 n.3 (1981), pleading rules must not substitute for evaluating a case on its merits after discovery; discovery and summary judgment motions exist to dispose of unmeritorious claims. Cleveland v. Secretary of Treas., 407 Fed. Appx. 386, 388 (11th Cir. 2011)).

In considering a Rule 12(b)(6) motion, the court must consider the complaint, exhibits attached to it, documents incorporated by reference, and matters of which the court may take judicial notice. Citizens State Bank v. Dixie Cty., 2011 U.S. Dist. LEXIS 38067, *8 (N.D. Fla. Apr. 7, 2011) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)). "[A] court may take judicial notice of the public record, without converting the motion into one for summary judgment, because such documents are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Id. at *9; Fed. R. Ev. 201.

## C.   RULE 9(B) AND THE FALSE CLAIMS ACT

Eisai's argument that the Court should dismiss the Complaint "for the same reasons" that Judge Ungaro dismissed the FAC, ignores the fact that Judge Ungaro granted leave to amend, and the Complaint now contains 86 more pages than the 103-page FAC.

Under Rule 9(b), Keeler must plead the *circumstances* of fraud with particularity, but "[m]alice, intent, knowledge, and other conditions of…mind…may be averred generally." Fed. R. Civ. P. 9(b). Rule 9(b) must be read in conjunction with Rule 8(a) because Rule 9(b) dismissal is "a severe sanction" and notice to the defendant remains its purpose, so that he may begin formulating a defense. Friedlander v. Nims, 755 F.2d 810, 813-14 (11th Cir. 1985). The Complaint clearly has put Eisai on notice of his allegations. Indeed, Eisai's many Rule 12(b)(6) arguments are proof-positive that it already has identified its defenses. One could literally "cut and paste" sentences from the Motion into the "Affirmative Defenses" section of Eisai's answer.

Keeler is not required to set forth the *facts* in detail—that is left for discovery.  Rather, he must set forth—in the words of Rule 9(b)—the "*circumstances* of the fraud" with particularity. Bane, 2007 U.S. Dist. LEXIS 96344 at *4 (M.D. Fla. 2007) (emphasis added). The legislative history of Rule 9(b) makes clear that the rule was intentionally crafted with the use of the word "circumstances", instead of "facts," because a fraud claimant is unlikely to know many of the facts. It is also important to note that Rule 9(b) rests largely upon the premise that "shotgun"

---

Citimortgage, 2010 U.S. Dist. LEXIS 88677, *2 (N.D. Ga. Aug. 25, 2010) (same; noting that plaintiff "receives the benefit of imagination" at the pleading stage).

allegations of fraud against *multiple* defendants should be scrutinized to prevent "guilt by association."[8] In this case, that concern is not present: Keeler has named only Eisai as a defendant. There are no co-defendants "along for the ride."

What is ultimately required is "*some* indicia of reliability" ("indicia" of course meaning "signs" or "indications"). "The stringent requirements of Rule 9(b) 'must be harmonized with Rule 8(a)'....The Eleventh Circuit has held that Rule 9(b) 'must not be read to abrogate Rule 8'....Essentially, the requirements of Rule 9(b) are satisfied if the complaint 'provide[s] a reasonable delineation of the underlying acts and transactions allegedly constituting the fraud' such that the defendants have 'fair notice of the nature of plaintiff's claims and the grounds upon which it is based.'" <u>U.S. ex rel. Heater v. Holy Cross Hosp.</u>, 2006 U.S. Dist. LEXIS 75690, *13-14 (S.D. Fla. Oct. 18, 2006) (quoting 11th Cir.). These indicia need not consist of exhaustive information, details, or examples. "A FCA plaintiff 'is not required to plead representative examples of false claims submitted to the Government to support every allegation, but he must plead with sufficient particularity to lead to a strong inference that false claims were actually submitted."[9] But "a relator *may* use *an example* to satisfy the requisite indicia of reliability...." <u>Bane</u>, 2007 U.S. Dist. LEXIS at *16 n.9 (emphases added).

Where a complaint alleges a "complex and far-reaching fraudulent scheme," then pleading *examples* of some of the resulting false claims satisfies Rule 9(b).[10] There are "valid reasons for not requiring a relator to plead every specific instance of fraud where the relator's allegations encompass many allegedly false claims over a substantial period of time." <u>Id.</u> It is impractical, if not impossible, to do so when an extensive scheme has been alleged.[11] Thus, it has been widely held that "where the fraud allegedly was complex and occurred over a period of

---

[8] <u>U.S. ex rel. Clausen v. Lab. Corp. of America, Inc.</u>, 290 F.3d 1301, 1308-09 (11th Cir. 2002) (quoting <u>U.S. ex rel. Cooper v. Blue Cross & Blue Shield</u>, 19 F.3d 562, 566-67 (11th Cir. 1994)).
[9] <u>U.S. v. Ctr. for Diag. Imaging, Inc.</u>, 2011 U.S. Dist. LEXIS 40459, *6 (W.D. Wash. Apr. 4. 2011) (quoting <u>Ebeid v. Lungwitz</u>, 616 F.3d 993, 998 (9th Cir. 2010), and <u>Frazier v. Iasis Health Corp.</u>, 392 Fed. Appx. 535, 20101 U.S. App. LEXIS 16894, at *2-3 (9th Cir. Aug. 10, 2010)).
[10] <u>See</u> <u>Clausen</u>, 290 F.3d at 1312 & n.21.
[11] <u>U.S. ex rel. Franklin v. Parke-Davis</u>, 147 F.Supp.2d 39, 49 (D. Mass. 2001) (..."pleading every instance of fraud would be extremely ungainly, if not impossible" in a case where the complaint alleges a series of claims produced by a far-reaching scheme).

time, the requirements of Rule 9(b) are less stringently applied."[12] Any other approach would allow the more sophisticated to cheat the Government. Keeler has specifically alleged that the schemes at issue were extensive, far-reaching, and national.  He is thus deserving of a relaxation of Rule 9(b). As he has pled many examples, he has satisfied the standard.

In assessing the Complaint under Rule 9(b), it is also important to bear in mind that this is a FCA case—not a classic fraud case. The FCA unequivocally does not require proof of specific intent to defraud. The False Claims Act is not the "Fraudulent Claims Act." Although a fraud case may be a FCA case, a FCA case need not be a fraud case. What is required is that a defendant "knowingly" presented, or caused to be presented, a false claim. Under the FCA, "knowing" is defined as *either* "actual knowledge," "reckless disregard", or "deliberate ignorance." 31 U.S.C. § 3729. Keeler's suit is based on false claims, not fraud.

Even with common law fraud, the Supreme Court held long ago that "[t]o establish fraud, it is not necessary to prove it by direct and positive evidence. Circumstantial evidence is not only sufficient, but in most cases is the only proof that can be adduced." Rea v. Missouri, 84 U.S. 532 (1873). Notably, the Complaint alleges both circumstantial and direct evidence—including evidence attached to the Complaint. The fact that Keeler is both alleging and demonstrating the existence of evidence that *exceeds* what is needed in a *common-law fraud* case, at the *pleading* stage of a *FCA* case, gives the Complaint indicia of reliability that meets Rule 9(b).

The "who, what, where and when" of a fraud are not expressly required by Rule 9(b), and the particularity requirement of Rule 9(b) is not to be used as a straightjacket.[13] "[R]ule 9(b) in the context of the FCA does not provide courts with a mandatory checklist of what must be included in the complaint." U.S. v. Albinson, 2010 U.S. Dist. LEXIS 83644, *45 (D. N.J. Aug. 16, 2010). The particularity is context-specific and necessarily differs with the situation presented by each case. Grubbs, 565 F.3d at 185, 188. "[A] relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular

---

[12] See, e.g., Anthony Distributors, Inc. v. Miller Brewing Co., 904 F. Supp. 1363, 1366 (M.D. Fla. 1995); Hirt v. UM Leasing Corp., 614 F. Supp. 1066, 1072 (D. Neb. 1985) (quoting 2A J. Moore's Federal Practice, 9.093, at 9–28 (1979)).

[13] U.S. ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009); U.S. ex rel. Lusby v. Rolls Royce Corp., 570 F.3d 849, 854 (7th Cir. 2009); Lemmon, 2010 WL 3025021 at *7 (10th Cir. Aug. 4, 2010) ("claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme").

details of a scheme to submit false claims paired with the reliable indicia that lead to a strong inference that claims were actually submitted." Id. at 190.

Decades of Eleventh Circuit precedents clearly and repeatedly show that Rule 9(b) is *not* to be applied inflexibly or unrealistically. Indeed, the Eleventh Circuit has firmly embraced at least three independent bases for relaxing Rule 9(b): (1) if the pleader/relator was an insider; (2) if a complex, multi-year scheme is alleged; and (3) if information or documents are almost exclusively in the hands of the defendant or others. Keeler qualifies for relaxation under all of these bases, as he alleged in the Complaint and as explained further above and below. (This is not to say that he does not satisfy Rule 9(b) without a relaxation.) Complex, multi-year schemes are set forth in the Complaint, *passim*, and specifically averred. Complaint, ¶ 53-55. Keeler was an insider; much of his knowledge is based on information he saw in the form of e-mails and their attachments during his years working in the very sales/marketing department that carried out the kickbacks and off-label marketing. Id., ¶¶ 12-14, 51. Indeed, some are attached to the Complaint. Nonetheless, the lion's share of relevant documents is in the hands of Eisai, which "closely guarded information concerning clients, billing of drug therapies and related services, in order to conceal…Defendant's activities. Numerous details…are within the exclusive, collective knowledge of Eisai, and may only be utilized in this litigation through the taking of discovery." Id., ¶¶ 52. Also, given the nature of the false claims at issue—namely, medical prescriptions and reimbursement claims—much of the documentation and information needed to prove Keeler's claims were never within his control due to the Health Insurance Portability and Accountability Act ("HIPAA"). Besides, he worked for Eisai—not the providers. (As described below, this is a key fact.) In discovery, these medical records may be obtained with HIPAA protections.

In Clausen, the Eleventh Circuit emphasized that "[t]he application of Rule 9(b)…must not abrogate the concept of notice pleading", and that Rule 9(b) may be "relaxed…in appropriate circumstances to aid those alleging prolonged multi-act schemes." Id. at 1310, 1314. In Hill v. Morehouse Med. Assocs., Inc., 2003 WL 22019936 (11th Cir. Aug. 15, 2003), the court made clear that Rule 9(b) may be relaxed where the relator was an insider, because that "insider" status affords the relator's allegations with higher indicia of reliability, or when "specific factual information [about the fraud is peculiarly within [the opposing party's] knowledge or control." Id. at *3. In Hopper v. Solvay Pharm., Inc., 588 F.3d 1318 (11th Cir. 2009), which was an off-

label marketing case, the Eleventh Circuit reemphasized that the complaint requires "some indicia of reliability," and that relaxation of Rule 9(b) may be proper. Id. at 1325.

To quote the Eleventh Circuit in Hopper:  "So, our analyses in Clausen, Corsello, and Atkins do not necessarily foreclose the possibility that, for claims under [FCA] subsection (a)(2), general allegations of improper government payments to third parties, supported by factual or statistical evidence to strengthen the inference of fraud, like those in the relators' Complaint, could satisfy the particularity requirement of Rule 9(b). The identity of the person or entity who submitted or caused to be submitted a claim for payment is not an element of a § 3729(a)(2) cause of action.  So, in the appropriate case, we may consider whether the particularity requirements of Rule 9(b), as to the details of the alleged false claims at issue, are more relaxed for claims under 31 U.S.C. § 3729(a)(1).[14]

The Eleventh Circuit in Hopper elaborated that in Duxbury, also an off-label case under the FCA, "the relator 'alleged facts…that support his claim that [the defendant] *intended* to cause the submission of false claims….For example, the complaint in Duxbury alleged, in part, that the defendant pharmaceutical marketer gave a healthcare provider "more than $5,000 of [prescription drugs] *so that* [the provider] could submit the free product for reimbursement to Medicare under the false and fraudulent certification that the provider had paid for the product and that [the provider] *was reimbursed* by Medicare for the free [prescription drugs].'  Id. at 31 (quotations omitted) (emphasis in original). The First Circuit found these and similar allegations supported the claim that the defendant intended its false statements to be material to the government's decision to pay a claim. Id. at 30 (citing Allison Engine, 128 S.Ct. at 2126)." Id. at 1330 (quoting Duxbury; emphases in original—in both Hopper and Duxbury).

Duxbury is attached hereto as **Exhibit "B"** because the Eleventh Circuit cited it favorably, for the importance of realistically applying Rule 9(b) in FCA cases in which it is alleged that the defendant *induced third parties* to submit false claims. That is precisely what Keeler has alleged with his off-label marketing and kickback claims. The Eleventh Circuit in

---

[14] See United States ex rel. Duxbury v. Ortho Biotech. Prods., 579 F.3d 13, 29 (1st Cir. 2009) (distinguishing between qui tam actions alleging that the defendant made a false claim and actions in which the defendant induced third parties to file false claims; reasoning, '[i]n the latter context,…a relator could satisfy Rule 9(b) by providing factual or statistical evidence of fraud beyond possibility without necessarily providing details as to each false claim')…"; Hopper, 588 F.3d at 1329 (emphasis added; quoting Duxbury).

Hopper also noted that it would not ignore the obvious on a motion to dismiss: "We will assume *arguendo* that when a physician writes an off-label prescription with knowledge or intent that the cost of filling that prescription will be borne by the federal government, and when a claim is ultimately submitted to the federal government to pay for that prescription, 31 U.S.C. § 3729(a)(1) may have been violated." Id. at 1326 (citing U.S. ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 732-33 (1st Cir. 2007)). Hence, this Honorable Court should either assume these same obvious mechanisms, under the tenet that the pleader's factual allegations are to be assumed to be true, or by judicial notice of this routine practice in the medical industry. It does not require a leap of faith because Keeler specifically detailed the names of 188 health care providers—Eisai clients—that submitted claims for Ontak. Indeed, he attached an exhibit to the Complaint, called a "COERS report," that showed highly detailed information about each of these 188 providers' specific Ontak orders. He also specifically pled that several managers confirmed that these providers billed Medicare for the Ontak they purchased from Eisai. In U.S. ex rel. Walker v. R & F Props. of Lake Cty., 433 F.3d 1349 (11th Cir. 2005), the Eleventh Circuit affirmed the *denial* of a motion to dismiss under Rule 9(b). The fact that the relator's supervisor had told the relator of the scheme at issue, while she worked for the defendant, was pivotal to the court's decision. "Specifically, she alleged that the defendant's office administrator had told her that the defendant [medical office] billed Medicare at arguably inflated rates." U.S. ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1305 (11th Cir. 2010) (summarizing 9(b) holding in Walker). The fact that some of Keeler's supervisors confirmed that providers listed in the COERS report billed Medicare should be given weight for the same reasons. The report is evidence of false claims.

It is essential to note that off-labeling marketing, kickback, and "best price" schemes are *not* the paradigmatic FCA case in which a contractor has submitted a false invoice to the Government for a product or service. In the Medicare context, such a case often involves a provider (e.g., a doctor or hospital) who billed for services that were not rendered, or who billed for services at a higher rate than was proper (e.g., upcoding). In contrast, this is a "*cause to be submitted*" case in which Eisai has *caused* providers to present claims for improper Medicare and Medicaid reimbursement, stemming from Eisai's schemes.[15]

---

[15] The FCA does not require that the defendant present a claim or order, or benefit from the scheme. Marcus, 317 U.S. at 544.

Unquestionably, one of the most important cases for assessing Keeler's claims under Rule 9(b) is U.S. ex rel. Underwood v. Genentech, Inc., 720 F. Supp.2d 671 (E.D. Pa. 2010), which masterfully synthesizes Clausen and Grubbs.  In Underwood, a declined *qui tam* suit, the relator alleged off-label marketing and kickbacks, as in the case at bar.  Also like the case at bar, the defendant argued that Clausen exactingly required the pleading of specific false claims that were submitted.  Following the lead of several other courts, the court rejected that position, because it would read the FCA out of existence, stating in part:

> As the Government observes…when the 'marketing scheme [to promote a drug's unauthorized use by Medicare/Medicaid patients] is large enough in scope…[a]bsent extraordinary circumstances, the foreseeability that the drug would be billed to the Government by at least some prescribers can be presumed.' Even if I were not prepared to accept the Government's invitation—and 'presume' the submission of false claims—I would be equally unprepared to apply Clausen's 'actual false claim' requirement here. Genentech ignores that the relators in Clausen and its progeny alleged that the defendant companies themselves had submitted false claims *directly* to the Government.  Clausen, 290 F.3d at 1303; Karavelas, 360 F.3d at 223; U.S. ex rel. Schmidt v. Zimmer, Inc., No. 00-1044, 2005 U.S. Dist. LEXIS 15648, at *7-8 (E.D. Pa July 29, 2005)….Given that these relators, like virtually all relators, were present or former employees of these companies, courts thought it reasonable to require the relators to identify at least one of their employers' false claims.

> In the instant case, however, Relator alleges that Genentech corruptly induced *others* to submit false claims to the Government. As the United States argues, in 'off-label cases, where the alleged false claims were submitted not by the defendant, but instead by a third party , a relator need not allege the details of particular claims, so long as the complaint as a whole is sufficiently particular to pass muster under the FCA.' (multiple citations omitted)….

> I do not see how Relator reasonably could be required to identify at the pleading stage a specific false claim submitted to the Government by a third party (perhaps doctors or a pharmacy). On the contrary, 'requiring production of actual documentation with the complaint [would require] a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.' Grubbs, 5656 F.3d at 190. Indeed, requiring every relator alleging the indirect submission of fraudulent claims to identify in his complaint a specific false claim would effectively eliminate part of the False Claims Act.  See *31 U.S.C. § 3729(a)(1)* (any person who 'presents, or causes to be presented, a false or fraudulent claim for payment…is liable to the United States government for a civil penalty') (emphasis supplied). I am obligated to interpret federal statutes, not read them out of existence.

Id. at 678-679 (emphases in original).

The notion that Rule 9(b) should be relaxed—where the plaintiff was not party to the

relevant transaction with the Government—has been endorsed by Wright and Miller, and followed by courts, for decades.[16]

### D.   THE "BEST PRICE" CLAIMS (CONTAINED IN COUNT I) SATISFY RULES 8(a) AND 9(b) BECAUSE THAY ARE PLED WITH SUFFICIENT PARTICULARITY TO PUT EISAI ON NOTICE OF THOSE CLAIMS.

The federal "best price" program is a cost-savings law that was passed in 1990 in response to increasing Medicaid expenditures for prescription drugs. If drug makers choose to participate in the program, they must provide the Government with the "best price." The Complaint clearly sets forth the "who, what, where, and when" of a "best price" scheme concerning Ontak, Dacogen, Aloxi and Fragmin. See Complaint, ¶¶ 185-217. The victims are identified as the U.S. Treasury, as well as 27 States, two cities, and the District of Columbia, through false "best price"—and related Average Wholesale Price ("AWP")—reporting to CMS. Based on specific statements in the Complaint, and logical inferences that flow from the dates that Eisai acquired the rights to each drug, these "best price" violations occurred from January 2008 forward for Aloxi and Dacogen, from September 2005 forward for Fragmin, and from October 2006 forward for Ontak.[17] Mr. Keeler learned of the schemes during his employment from September 2006 through April 2009. ¶¶ 12-13, 51. Notably, at no point does Keeler allege that sales representatives were instructed to tell commercial buyers that they could not be provided a price that was lower the Government's "best price." Sometimes silence speaks louder than words: If Eisai had intended to comply with the "best price" statute, Eisai would have instructed him and other salespeople to take care not to promise or provide commercial buyers with a lower price than "$X" or "the Government's price of $X."

Although the Complaint alleges "best price" violations with respect to all four drugs, the most attention is given to Aloxi and Fragmin. It is true that some, but not all, of Keeler's "best-price" allegations are based on circumstantial evidence. But even with common-law fraud, the Supreme Court recognized and held long ago that, "[t]o establish fraud, it is not necessary to prove it by direct and positive evidence. Circumstantial evidence is not only sufficient, but in

---

[16] See 5 Charles A. Wright and Arthur R. Miller, 5 Fed. Prac. and Pro. n. 12 § 1298 (2d ed. 1990); U.S. ex rel. Themmes v. Hamilton Enters., Inc., 2005 WL 1268784 (E.D. Wis. 2005) (relaxed standard may be appropriate where the plaintiff is alleging fraud against a third party and may not have access to all the information).

[17] For example, the Complaint states that Eisai acquired the rights to Aloxi and Dacogen when Eisai acquired MGI Pharmaceuticals in January 2008.

most cases is the only proof that can be adduced." Rea, 84 U.S. at 543. If the burden of proof in a common-law criminal fraud trial can be carried by circumstantial evidence, then certainly it should be fully credited at the *pleading* stage of a *FCA* case.

To properly assess the adequacy of Keeler's "best price" allegations, it is very important to understand, first, that such information is shrouded in secrecy because of a legalized ban on price disclosures by pharmaceutical manufacturer. The Supreme Court recently acknowledged that secrecy.[18] Thus, details are *not* readily available to people who could serve as whistleblowers. This reality should be taken into account, by judicial notice or in general, in evaluating the particularity of Keeler's allegations. Drug companies are required to sign standardized Rebate Agreements with the Secretary of HHS that promise the "best price" to CMS.  See 42 U.S.C. §1396r-8(a)(1). The Rebate Agreement [**Exhibit "C"**] requires manufacturers to submit standardized Quarterly Reports (CMS-367's) [**Exhibit "D"**], *which must be signed by the CEO, CFO, or a person with directly delegated authority from one of them*, 42 C.F.R. 447.510(e)—i.e., it is not seen by virtually any employee. (It is respectfully requested that this Honorable Court take judicial notice of these standard forms.) Also, only Eisai could know its catalog prices for the Subject Drugs. Even *the Secretary of HHS* cannot audit a drug company for confidential catalog prices; it can only conduct an informal "survey." 42 U.S.C. § 1396r-8(b)(3)(B). "As a practical matter, the confidentiality of the pricing information and the lack of audit powers inhibit the ability of the State to monitor drug fraud…" In re Pharm. Indus. Avg. Wholesale Price Litig. ("AWP Litig."), 321 F. Supp.2d 187, 199 (D. Mass. 2004).

Thus, a FCA "best price" claim deserves relaxation under Rule 9(b). When a lot of the facts relating to the alleged fraud are "peculiarly within the perpetrator's knowledge, the Rule 9(b) standard is relaxed." U.S. ex rel. Russell v. Epic Healthcare Mgmt. Group, 193 F.3d 304,

---

[18] "To gain payment under Medicaid for covered drugs, a [pharmaceutical] manufacturer must enter a standardized agreement with HHS; in the agreement, the manufacturer undertakes to provide rebates to States on their Medicaid drug purchases….Calculation of a manufacturer's 'average' and 'best' prices, undertaken by the pharmaceutical company, is a complex enterprise requiring recourse to detailed information about the company's sales and pricing.  § 1396r-8(k); 42 CFR 447.500-520 (2010).  To enable HHS to calculate the rebate for each drug, manufacturers submit the relevant data to HHSA on a quarterly basis.  § 1396r-8(b)(3).  *With exceptions set out in the legislation, HHS is prohibited from disclosing the submitted [pricing] information 'in a form which discloses the identity of a specific [drug] manufacturer…[or] prices charged for drugs by such manufacturer.*  § 1396r-8(b)(3)(D) ." Astra USA, Inc. v. Santa Clara Cty., 131 S.Ct. 1342, 1346 (2011) (emphasis in original).

308 (5th Cir. 1999). It would be exceedingly demanding to fault Keeler, at the pleading stage, for not knowing more details than he does. It would be akin to a newspaper publisher's faulting a journalist for failing to uncover all of the facts in a sealed grand jury proceeding after being sent to the courthouse to cover the story.  He has alleged enough information to put Eisai on notice of his claims, and that is all that is required.  See also U.S. ex rel. Hunt v. Merck-Medco Managed Care, 336 F. Supp.2d 430, 450 (E.D. Pa. 2004) (holding that issue of whether payments were improper or "lawfully negotiated drug rebates…is one of fact, inappropriate for consideration on a motion to dismiss"). Moreover, "best price" FCA claims have survived motions to dismiss under Rule 9(b) with less detailed allegations than Keeler has made. For example, in State of Nevada v. Merck & Co., Inc., 432 F. Supp.2d 1082, 1082 (D. Nev. 2006), a case brought under the Nevada False Claims Act, the court ruled that the State of Nevada satisfied Rule 9(b) because it pled that it had been defrauded because the defendant's "best price" reports failed to take into account free or discounted drugs given to hospitals as part of an incentive program from 1999 forward. Id. at 1089.[19] Here, Keeler set forth analogous information.

**E.      KEELER'S "BEST PRICE" CLAIMS (CONTAINED IN COUNT I) SATISFY RULE 12(B)(6) BECAUSE THEY ARE PLAUSIBLE.**

Eisai's argument that failing to provide the "best price" is not illegal because of the First Amendment is absurd. As detailed below, the First Amendment does not protect misstatements to the Government. Further, Eisai cites to the regulatory definition of "best price," and a

---

[19] The court stated: "Merck lastly contends that Nevada has failed to plead fraud with particularity as required by Fed. R. Civ. P. 9(b). If a plaintiff makes an allegation of fraud or mistake, "the circumstances constituting fraud or mistake shall be stated with particularity." However, "[m]alice, intent, knowledge, and other condition of mind…may be averred generally."  Fed. R. Civ. P. 9(b). This requirement is satisfied in [that] the plaintiff pleads "(i) some of the specific customers defrauded, (ii) the type of conduct at issue, (iii) the general time frame in which the conduct occurred, and (iv) why the conduct was fraudulent  U.S. v. Smithkline Beecham Clinical Labs., 245 F.3d 1048, 1051 (9th Cir. 2001). The pleading requirement is also relaxed "with respect to matters within the opposing party's knowledge.  In such situations, plaintiffs cannot be expected to have personal knowledge of the relevant facts." Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir. 1993). Rule 9(b) is therefore satisfied if the complaint provides notice of the alleged misrepresentations. Here Nevada has pled that it has been defrauded by Merck's best price reports that failed to take into account free or discounted pharmaceuticals given to hospitals as part of an incentive program between 1999 and the present in violation of the Nevada False Claims Act.  The court finds that this satisfies the requirements of Rule 9(b). Accordingly, IT IS ORDERED that defendant's Motion to Dismiss Plaintiff's Amended Complaint (#34) be DENIED." Id.

provision allowing drugs to be sold together, as if they are a panacea. But those provisions do not lessen the company's duty to give the "best price":  those very regulations make clear that all rebates, including bundles, must be separated and quantified per drug to ensure the "best price" is given. 43 C.F.R. 447.502. Because the U.S.A. may sue for "best price" violations, <u>Buckman Co. v. Plaintiffs' Legal Comm.</u>, 531 U.S. 341 (2001), they are clearly proper as FCA suits.

**F.    KEELER'S OFF-LABEL MARKETING CLAIMS (CONTAINED IN COUNT I) SATISFY RULES 8(A) AND 9(B) BECAUSE THEY ARE PLED WITH SUFFICIENT PARTICULARITY TO PUT EISAI ON NOTICE OF THOSE CLAIMS.**

Keeler clearly has alleged the "who, what, where, and when" of Eisai's off-label marketing schemes with drugs Ontak and Dacogen. Complaint, ¶¶ 39-44, 59-133, 165-184, & 238 forward. Please note that the kickback allegations are also inherently off-label allegations. <u>Id.</u>, ¶¶ 18-38, 134-64. The Complaint sets forth directly—or, as the case may be, by easy inference from the dates set forth that Eisai acquired the rights to the Subject Drugs—the dates that these schemes took place: from October 2006 forward for Ontak and from January 2008 forward for Dacogen. With respect to Ontak, Keeler includes an extremely high level of detail concerning 188 providers, supported by a highly detailed sales report. Complaint, Exh. "G." This list, which reflects approximately 20% of Eisai's customers/providers, *located throughout the U.S.A.,* provides indicia that the off-label scheme was nationwide. These providers, like others, signed Provider Agreements and Hospital Cost Reports supporting their Medicare and Medicaid claims submissions which certified that they were in compliance with all applicable federal healthcare laws, including the AKS, which are conditions of reimbursement from Medicare and Medicaid. <u>Id.</u>, ¶¶ 224, 225. Further, they acknowledged, by signing the provider agreements and hospital cost reports, that violations of the AKS may give rise to liability under the FCA. <u>Id.</u>, ¶¶ 227, 228. However, the provider agreements and hospital cost reports signed by these hospitals in connection with off-label claims contained misrepresentations which violated AKS and other applicable healthcare laws. <u>Id.</u>, ¶228. Because of Eisai.  These misrepresentations, by the express language of the agreements, were material because they had a natural tendency to influence, or were capable of influencing, the decisions of CMS in approving the submitted claims. <u>Id.</u>, ¶237.

**G.    KEELER'S OFF-LABEL MARKETING CLAIMS (CONTAINED IN COUNT I) SATISFY RULE 12(B)(6) BECAUSE THEY ARE PLAUSIBLE.**

Eisai mischaracterizes Keeler's claims as challenging the right of *physicians* to exercise independent medical judgment in the treatment of cancer patients. In reality, Keeler has challenged *Eisai's* campaign of false promotion, which jeopardizes patient safety and deprives cancer patients of the most effective treatment by undermining the ability of physicians to exercise independent medical judgment. Although physicians may prescribe drugs for uses other than those approved by the FDA, the drug manufacturer's off-label promotion is strictly prohibited by federal statute and regulations. See FDCA.[20] Significantly, when Eisai promoted Ontak and Dacogen for off-label cancer treatments, competitors' *FDA-approved* drugs were available for those patients.[21]

It is unlawful for a manufacturer to market a drug for an intended use lacking FDA approval. WLF, 202 F.3d at 332. But the manufacturer is not obligated to seek approval for

---

[20] 21 U.S.C. § 301 *et seq*. Off-label use of cancer drugs is particularly unsafe because many of these potent drugs have severe side effects and have not been proven effective for unapproved uses touted by manufacturers. Physicians depend upon reliable scientific evidence. A core mission of the FDA is to ensure that the drugs that it approves are effective and safe. The FDA follows a statutory drug approval process which requires the FDA to consider *reliable* scientific evidence in assessing the efficacy and safety of a drug's proposed use. In addition, the FDA has promulgated regulations which impose strict limits on manufacturers through the FDCA. In reckless disregard of these laws, since October 2006 and January 2008, for Ontak and Dacogen, respectively, Eisai has illegally marketed the drugs for uses which were not "medically accepted," and has intentionally caused physicians and other medical providers to submit false claims to Medicare and Medicaid. Complaint, ¶¶ 93-97, 218-22, 240, 256.

[21] The centerpiece of drug regulation under the FDCA is the requirement that all "new drugs" obtain FDA approval before they may be distributed. 21 U.S.C. §§ 331(d), 355(a). "[A] new drug may not be approved for marketing unless it has been shown to be safe and effective for its intended uses(s)." 21 C.F.R. § 21-303(a). To obtain such approval, a manufacturer must submit a new drug application ("NDA") "demonstrat[ing] that its product is safe and effective for each of its intended uses." Wash. Legal Found. v. Henney, 202 F.3d 331, 332 (D.C. Cir. 2000) ("WLF"); 21 U.S.C. § 355(a). The FDA reviews the manufacturer's data under a rigorous evidentiary standard that requires well-controlled scientific data, and cannot be satisfied by impressions or beliefs of physicians, reports lacking in details, or personal testimonials. See Weinberger v. Hynson, Westcott & Dunning, 412 U.S. 609, 618-19, 630 (1973); Edison Pharm. Co., Inc. v. FDA, 600 F.2d 831, 842-43 (D.C. Cir. 1979); 21 C.F.R. §314.50(d)(5) (describing requirements for clinical data). This standard is one of the cornerstones of evidence-based medicine in the U.S. A drug manufacturer's promotion of an approved drug for an unapproved use is considered to be an unapproved "new drug" with respect to that use. 21 U.S.C. §§ 331(d), 355(a). Drugs that have been promoted off-label are misbranded because the labeling cannot include "adequate directions for use" for the off-label use. 21 U.S.C. §§ 331(a), 352(f). Off-label promotion that does not come within precise safe-harbors violates the FDCA and these violations are criminal offenses, even without specific intent to defraud or mislead. 21 U.S.C. § 333.

unapproved uses that are not intended. Thus, the applicability of the NDA requirement turns on a question of the manufacturer's intent: whether an unapproved use is intended. Intended use also plays a key role in the FDCA's misbranding provisions, because the manufacturer's obligation to provide adequate directions for use extends to all intended uses.[22] "[I]t is well established that the 'intended use' of a product, within the meaning of the Act, is determined from its label, accompanying labeling, promotional claims, advertising, and any other relevant source."[23] The manufacturer's objective intent "may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives."[24] Absent promotional claims, the dissemination of safety information relating to an unapproved use does not establish that the use is an intended use, and does not trigger either the new drug approval process or the misbranding provisions of the FDCA.[25]

Although no private right of action exists for violations of the FDCA, such violations are frequently the basis of FCA suits, in which the Government is the true plaintiff—directly or through the relator. Franklin, 147 F. Supp.2d at 51-52.[26] It is axiomatic that a drug company's off-label marketing, in violation of the FDCA, may support FCA liability, even if the drug was FDA-approved for some "related" indication.[27]

In 1999, the FDA approved Ontak for one narrow use: the treatment of persistent or recurrent cutaneous T-cell lymphoma ("CTCL") whose malignant cells express the CD25 component of the IL-2 receptor. Complaint, ¶ 62. In other words, the indication was not *all* patients with CTCL, but only the approximately 1,500 new patients each year whose CTCL expressed this particular feature. This narrow indication qualified Ontak as an "orphan drug." On October 23, 2006, the FDA issued a stern warning letter to Ligand, the prior licensee of

---

[22] See 21 U.S.C. § 352(f)(1); 21 C.F.R. §§ 201.5, 201.100(c)(1).

[23] Action on Smoking and Health v. Harris, 655 F.2d 236, 239 (D.C. Cir. 1980).

[24] 21 C.F.R. § 201.128.

[25] Guidance for Industry on Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices (available at http://www.fda.gov/oc/op/goodreprint.html) (Reprint Guidance).

[26] Since 2001, the Government has recovered more than $4 billion in FCA *qui tam* actions premised on manufacturers' violations of the FDCA through illegal off-label promotion of drugs and medical devices. Dept. HHS & DOJ Health Care Fraud & Abuse Control Program Annual Report for FY 2010 (http://oig.hhs.gov/publications/docs/hcfac/hcfacreport2010.pdf).

[27] Franklin, 147 F. Supp.2d at 51-52.

Ontak, detailing Ligand's illegal off-label promotion of Ontak by overstating its effectiveness, broadening its indication, and minimizing its risks. This alerted Ligand of the precise nature of the promotional activities that were at issue and provided explicit notice by setting forth detailed findings of Ligand's specific promotion practices, identifying specific claims made, and analyzing why these claims were false and misleading. Moreover, the FDA articulated to Ligand specifically how their promotional activities illegally misbranded Ontak. *Only two days later*, Eisai closed on its purchase of the rights to Ontak (and Targretin) for approximately $200 million, and Eisai continued the off-label marketing of Ontak right where Ligand left off, from October 2006 forward. Eisai also promoted Dacogen for indications that were not FDA-approved. Complaint, ¶¶ 62-111, 165-184. Eisai's sales representatives followed national corporate sales policies by engaging in off-label discussions with doctors, furnishing them with unreliable scientific literature (including case studies prepared by doctors who were paid kickbacks disguised as excessive fees for signing their names to ghost-written studies not approved by the FDA.[28]

Eisai contends that the off-label claims fail because the Drugdex compendia (one of several compendia) supports the off-label uses at issue in this action. This argument is wrong and disingenuous. First, this argument is improper on a Motion to Dismiss. Second, Eisai is wrong that Drugdex supports all off-label uses alleged by Keeler. Drugdex was *not* added to the list of approved compendia until June 5, 2008. Effective that date, an off-label use supported by a Drugdex citation would be deemed a "medically accepted indication" for purposes of Medicare reimbursement. Before June 5, 2008, the Drugdex citation was *not* an approved compendia. Thus, regardless of the compendia citation, it did not render any off-label use medically accepted

---

[28] For example, Eisai sales representatives routinely told physicians that there were studies showing that CD-25 positive expression made no difference in the treatment of patients. Eisai knew this claim was false. FDA approval of Ontak was limited to those CTCL cases which had a positive expression of CD-25. As part of this illegal marketing, Eisai made false statements to providers concerning the safety of Ontak and Dacogen for unapproved uses which concealed or understated the side effects associated with off-label use. Eisai also makes unsubstantiated claims concerning the supposed effectiveness of Ontak and Dacogen for treating types of cancer that are not FDA-approved. Further, Eisai has promoted the drugs for treating types of cancer that are *not* supported by any compendia citation. Eisai intended that these false statements and non-peer reviewed medical literature will mislead physicians, impair their medical judgment, and cause the sale of Ontak and Dacogen for unapproved uses. Moreover, Eisai intended that many of these off-label sales would result in the submission of false claims to Medicare and Medicaid.

and reimbursable by Medicare and Medicaid. In other words, before June 5, 2008, there was no compendia support for off-label use of Ontak. Thus, any off-label Ontak claim to Medicare or Medicaid before June 5, 2008 is a false claim, and Keeler's allegations that Eisai illegally off-label marketed Ontak from October 2006 through June 4, 2008 are cognizable FCA claims.

Third, starting on June 5, 2008, the Drugdex citation to Ontak supported the indicated or approved use of CTCL with CD25+ expression, as well as the following off-label uses: (1) Chronic lymphoid leukemia ("CLL"), (2) Non-Hodgkin's lymphoma ("NHL"), and (3) Peripheral T-cell lymphoma. Accordingly, Eisai's best argument is that claims submitted to Medicare and Medicaid on or after that date, for these *three* off-label conditions, are supported by the Drugdex citation and therefore do not constitute false claims under the FCA. But this argument does not touch the *other six* off-label cancers that are not supported by Drugdex citations and never have been. Keeler has alleged that Eisai systematically made false statements to providers, claiming that Ontak was a safe and effective treatment for the following unapproved uses: (1) CTCL lacking CD+25 expression, (2) Graft Versus Host Disease ("GVHD"), (3) B cell lymphoma, (4) N/K T-cell lymphoma ("Natural Killer"), (5) other T-cell lymphomas, and (6) Melanoma. Complaint, ¶ 256. The FDA has not approved Ontak for the treatment of these six cancers. Id., Exh. "A" [D.E. 80-1]. Hence, the fact that statutes provide for coverage for off-label uses that are supported by citation in certain compendia is irrelevant to whether Eisai made a false statement. In addition, neither Drugdex nor any other compendia cite Ontak as being a sufficiently effective and safe treatment for these six cancers. See Drugdex [D.E. 95-1]. Keeler sets forth detailed allegations about Eisai's systematic off-label promotions to providers across the country. Id., ¶¶ 240, 256. Further, Keeler has set forth detailed allegations that these providers have submitted claims for these six off-label uses that are not supported by any compendia citation as a direct result of Eisai's illegal promotion. Id. Thus, Keeler's allegations that Eisai promoted the off-label use of Ontak for these six cancers since June 5, 2008, through *false* claims of efficacy and safety which resulted in the submission of claims to Medicare and other government health services, states a claim for FCA liability.[29][30][31]

---

[29] See Franklin, 147 F.Supp.2d at 52.

[30] A claim may be rendered false if a drug company falsified studies or engaged in other unlawful conduct in the promotion of a drug or to procure FDA approval or inclusion in a compendium. See, e.g., U.S. v. Dynamics Research Corp., 2008 WL 886035, *10 (D. Mass. Mar. 31, 2008) ("[W]here a claim for payment is the result of a fraudulent process-bid rigging, self-

## H.   EISAI'S FALSE AND MISLEADING STATEMENTS ABOUT ITS DRUGS ARE NOT PROTECTED BY THE FIRST AMENDMENT.

Commercial speech that concerns unlawful activity or which is misleading is not protected by the First Amendment.[32] Keeler has made detailed allegations about false, unsubstantiated, and misleading statements, including omissions, that Eisai has made to promote Ontak and Dacogen for unapproved uses. Eisai understated or failed to state the *true* dangerous risks and side effects

---

dealing, etc. such that the reliability and trustworthiness of a claim is compromised, the claim may be considered false under the FCA despite its facial accuracy."). Thus, the fact that a particular use is a "medically accepted indication" does not eliminate the possibility that the manufacturer's misleading conduct or abuse could render a resulting claim false and ineligible for payment. Under certain circumstances, off-label prescriptions by doctors may be a useful practice. However, Eisai has illegally distorted this process with Ontak and Dacogen, compromising the safety of cancer patients and knowingly causing Medicare and Medicaid to pay for drugs tainted with kickbacks, FDA violations, and pricing prohibitions.

[31] Eisai relies upon Bennett v. Boston Sci. Corp., 2011 WL 1231577 (S.D. Tex. Mar. 31, 2011), to argue that there is no FCA liability in instances where the alleged off-label use is "medically accepted." However, Bennett is distinguishable from the case at bar for several reasons. First, unlike Keeler, who was a true insider, employed by Eisai for two-and-a-half years, the relator in Bennett was employed for merely 4 months by a medical device manufacturer. Second, the relator in Bennett lacked personal knowledge sufficient to adequately plead the particulars, and her allegations were not deemed to have the indicia of reliability that would allow the application of a relaxed pleading standard. Third, Bennett did *not* allege that the defendants had made any false statements in their off-label promotion. Fourth, Bennett did not identify any provider who submitted an allegedly false claim or otherwise allege the particulars of defendant's alleged false scheme. Finally, the court in Bennett, unusually, did *not* permit an implied false certification theory, finding that the Fifth Circuit had never adopted such a standard. Thus, the alleged false certifications by third party providers of compliance with AKS and other health care laws that are a precondition to Medicare payment, were not imputed to the manufacturer. Bennett, 2011 WL 1231577 at *1, 27-28, 32.

  Compliance with the AKS and other federal health care laws is a condition of payment by the Medicare program. McNutt v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1259 (11th Cir. 2005). At least seven Courts of Appeal, including the Eleventh Circuit, have held that an implied false certification creates liability under the FCA. McNutt, id.; Mikes, 274 F.3d at 699-700; U.S. ex rel. Augustine v. Century Health Servs., Inc., 289 F.3d 409, 415 (6th Cir. 2002); Ebeid, 616 F.3d at 996-998; Conner, 543 F.3d at 1217-18; Sci. Apps. Int'l Corp., 626 F.3d at 1266, 1269.

[32] Central Hudson Gas & Elec. Corp. v. Publ. Serv. Comm'n of New York, 447 U.S. 557, 770 (1993). See also 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 497 n.7 (1996) (plurality opinion) ("the First Amendment does not protect commercial speech about unlawful activities"); Fla. Bar v. Went For It, Inc., 515 U.S. 618, 623-24 (1995) ("the government may freely regulate commercial speech that concerns unlawful activity"); Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 638 (1985); Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 69 (1983); Whitaker, 353 F.3d at 953.

of these drugs. And Eisai *falsely* claimed that these drugs were effective for treating specific types of cancers, despite knowing that they lacked reliable scientific evidence to support such claims.[33] A medical device or drug manufacturer strikes a "bargain with the FDA in the approval process by promising to limit its promotion" to approved uses, and the FDA relies on that promise to avoid speech about off-label uses.[34] The drug manufacturer certifies on the new drug application that, if the application is approved, that it will comply with all applicable federal laws and regulations, including, but not limited to, the labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809, and prescription drug advertising regulations in 21 CFR Part 202.[35] This form [**Exhibit "E"**] went into effect in October 2005.  By definition, Eisai must have signed it, because Ontak and Dacogen were FDA-approved drugs (not to mention its many other FDA-approved drugs); Eisai would not and cannot reasonably dispute that.  Keeler respectfully asks the Court to take judicial notice of this fact. Tellabs, 551 U.S. at 322.

Even if such off-label promotion were subject to First Amendment protection, the prohibition of off-label promotion of prescription drugs presents no First Amendment problem under Central Hudson because the subject off-label promotions were designed to promote a transaction–the distribution of a drug for an unapproved use–that is itself unlawful. "[I]t is unlawful for a manufacturer to introduce a drug into interstate commerce with an intent that it be used for an off-label purpose."[36] It is also unlawful for manufacturer to do an act, e.g., to promote a drug for an unapproved use that causes the drug to be misbranded "while it is held for sale after shipment in interstate commerce."[37]  The FDCA's misbranding provisions require that prescription drug advertisement contain "a true statement" of "such...information in brief summary relating to side effects, contraindications, and effectiveness" as the FDA may require by regulation.[38]  The limitation on advertising that promotes unapproved uses of prescription

---

[33] Complaint, ¶¶ 112-116, 167-169.

[34] Id. at 939-940. See also U.S. v. Caputo, 517 F.3d 935 (7th Cir. 2008)(Seventh Circuit found that defendants had sought, through their speech, to promote an illegal activity—the illegal sale of medical devices without FDA approval and rejected the precise First Amendment defense raised by Eisai.[34]

[35] Application to Market a New Drug, Biologic, or an Antibiotic Drug for Human Use, FDA Form 356h (10/05)
http://www.fda.gov/downloads/AboutFDA/ReportsManuals-Forms/Forms/UCM082348.pdf.

[36] WLF, 202 F.3d at 332-33.

[37] 21 U.S.C. § 331(k).

[38] 21 U.S.C. § 352(n).

drugs presents no First Amendment problem under the applicable First Amendment standards that govern commercial speech.[39] The Supreme Court has made it clear that "commercial speech enjoys First Amendment protection only if it concerns a lawful activity and is not misleading."[40]

## I.  KEELER'S KICKBACK CLAIMS (COMPRISING COUNT II) SATISFY RULES 8(A) AND 9(B) BECAUSE THEY ARE PLED WITH SUFFICIENT PARTICULARITY TO PUT EISAI ON NOTICE.

Keeler has adequately pled the "who, what, where, and when" of a *combination* of four aggressive, prohibited kickback schemes that Eisai designed and implemented to cause providers to disregard the dangerous, frequent side effects of off-label use of Ontak, Dacogen, Aloxi and Fragmin, as compared to the *FDA-approved* uses of *competitor* drugs. The Complaint sets forth directly—or, as the case may be, by easy inference from the dates set forth that Eisai acquired the rights to the Subject Drugs—the dates that these schemes took place:  from October 2006 forward for Ontak, from January 2008 forward for Dacogen, from January 2008 forward for Aloxi, and from September 2005 forward for Fragmin.  Complaint, ¶¶ 18-38, 134-164.  The four schemes are, in summary, that:

> Eisai's Oncology Reimbursement Assistance ("OAR") Program, previously called the Ontak Credit Program ("OCP"), *guaranteed* money for prescribing Ontak.

>  Eisai routinely made grants to buy access to teaching hospitals and their administrators, in order to gain access to off-label doctor promoters to make presentations pushing off-label uses.

>  Eisai provided all-expense paid weekend trips to doctors for their speaking at, or merely attending, resort-based "programs" across the U.S.A. about off-label use of Ontak and Dacogen.

> Eisai illegally "marketed the spread" with drugs Aloxi, Ontak, Fragmin and Dacogen.

Regarding this fourth kickback scheme: "If a pharmaceutical manufacturer purposefully manipulates the Average Wholesale Price ("AWP") to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated."[41] Under the AKS, offering remuneration to a purchaser is improper if done to induce the purchase. "[I]t is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to

---

[39] Central Hudson, 447 U.S. 557 (1980).

[40] Whitaker, 353 F.3d at 952; see Central Hudson, 47 U.S. at 563.

[41] OIG Compliance Program Guidance for Pharmaceutical Manufacturers, Fed. Reg., Vol. 68, No. 86, Notices 23736, 23737 (May 5, 2003).

induce customers to purchase its product." Id., 23737. The OIG with HHS has publicly announced that manipulation of the AWP, in conjunction with active marketing of the spread, constitutes an indirect offer or payment of remuneration.

Eisai manipulated the AWPs of Aloxi, Ontak, Fragmin, and Dacogen while actively "marketing the spread" on these drugs. Eisai sales representatives "marketed the spread" pursuant to national sales practices aimed at promoting these drugs to providers. For example, Eisai distributed "selling the spread" reimbursement cards to physicians and hospitals which highlighted the profit margin, or "spread," between an account's wholesale acquisition cost for Ontak and the amount of Medicare or Medicaid reimbursement. Id., ¶ 254.[42]

In tandem with marketing the spread, Eisai also intentionally reported false "best price" and AWP data on the Subject Drugs during the same time period. Id., ¶ 193. Eisai was required to report its "best price" (based on AWP) in Quarterly Reports to CMS to allow CMS to calculate the proper rebate amounts due each State under the Medicare Rebate Program. See id., ¶¶ 187, 189, 191. Eisai was required to report all rebates, discounts, grants, coupons and other incentives offered to purchasers, and its failure to properly do so resulted in false claims under the FCA. Id., ¶ 192. For instance, Eisai falsely reported that the cost of Aloxi had risen, thereby increasing the stated average sales price to obtain higher reimbursement from Medicare and Medicaid. Id., ¶ 204. But the cost of Aloxi was not increasing. Keeler sets forth the details of several instances where accounts were given steep discounts that were not reported to CMS.[43]

---

[42] Eisai intended that marketing the spread would induce accounts to prescribe the Subject Drugs for off-label uses and submit false claims to Medicare and Medicaid. Drawing from his inside knowledge, Keeler alleged examples of Eisai's "marketing the spread" with Ontak to 55 different providers across the country during that time period. Id., ¶¶ 256. He explained that Eisai sales representatives used reimbursement flash cards which drew attention to the spread. Eisai also marketed the spread when promoting Aloxi, Fragmin, and Dacogen. Id., ¶ 201. Again, these were given as *examples* of a broader, nationwide practice—as was also the case with the other kickback schemes.

[43] Id., ¶ 212. For example, Eisai gave Florida Cancer Specialists, U.S. Oncology in Texas, and Jackson Memorial Hospital steep discounts on Aloxi and Fragmin. Id., ¶ 213. These discounts were not reported to CMS as required. Id., ¶¶ 212, 216. Eisai intended that their manipulation of AWP, failing to report discounts in order to maintain artificially high AWP, would result in higher Medicare and Medicaid reimbursement. Eisai's intended result was achieved because providers received higher reimbursement from Medicare and Medicaid and realized greater profits because Eisai not only marketed the spread but increased the spread beyond what it properly should have been. Id., ¶ 217.

**J.      KEELER'S KICKBACK CLAIMS (COMPRISING COUNT II) SATISFY RULE 12(B)(6) BECAUSE THEY ARE PLAUSIBLE.**

These four kickback schemes are plausible violations of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7(b)(2). It is well settled that AKS violations may form the basis of FCA liability. If *any* one of them is plausible, then Count II should withstand scrutiny at the pleading stage. AKS safe harbor arguments are improper for adjudication at this stage. See Schmidt, 386 F.3d 235, 240-41 (3d Cir. 2004).[44] The main purpose of the AKS is to prevent improper financial considerations from influencing the amount, type, cost, and/or selection of health care services financed to any extent by the U.S. Treasury. 42 U.S.C. § 1320(a)-7(b). Under the AKS's broad definitions in 41 U.S.C. §§ 52-53, the AKS's prohibitions apply whether the financial benefit is provided directly or indirectly, "in cash or in kind." Prohibited kickbacks can take a number of forms, including cash, gifts, supplies, long-term credit arrangements, equipment and services. Id.

In 2010, Congress enacted the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010). Among other things, PPACA amended the AKS to make clear that kickback-tainted Medicare and Medicaid claims *are* "false claims" under the FCA.[45] PPACA's AKS provisions reflect a legislative overruling of isolated  judicial rulings that AKS-based FCA claims are not viable under an "implied certification" theory (e.g., U.S. ex rel. Westmoreland v. Amgen, Inc., No. 06-10972-WGY, 2010 WL 1634315, at *10 n.4 (D. Mass. Apr. 23, 2010)). Under this theory, "where the government pays funds to a party, and would not have paid those funds had it known a violation of a law or regulation, the claim submitted for

---

[44] See also AWP Litig., 491 F. Supp.2d 12, 19 (D. Mass. 2007) (holding that determination of whether alleged discounts, in conjunction with marketing the spread, constitutes a kickback for which there is AKS liability, will "inevitably be highly fact specific" and is therefore improper for determination at the pleading stage; because a AKS violation renders all resulting claims to Medicare and Medicaid "false" for FCA purposes, a litigant need only plead with particularity the existence of the fraud, and not the contents of the claim that is actually submitted).

[45] PPACA, 124 Stat. 119, § 6402(g) (amending Section 1128B of Social Security Act, 42 U.S.C. § 1320-7(b)(g)). Specifically, the AKS now states that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." PPACA § 6402(f), codified at 42 U.S.C. § 1320-7b(g). The amendment thus clarifies that all claims for services that have been tainted by the payment of a kickback are false claims under the FCA, *regardless of what entity ultimately submitted the claims for payment.* Another PPACA amendment of the AKS clarified that specific intent to violate the AKS, or actual knowledge of a kickback violation, is not required under the FCA.  PPACA, § 6402(f)(1).

those funds contained an implied certification of compliance with the law or regulation and was fraudulent." U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp.2d 28, 33 (D.D.C. 2003). Even if PPACA had not been enacted, the kickback count (II) would still be valid because this theory is well-recognized in the Eleventh and other Circuits, and is very consistent with the core principle that the FCA is violated "not only by a person who makes a false statement or a false record to get the government to pay a claim, but also by one who engaged in a fraudulent course of conduct that causes the government to pay a claim for money."[46] The vast majority of courts to address the issue have held that claims tainted by illegal kickbacks are false claims under the "implied certification" theory because compliance with the AKS is a condition of payment under the Medicare program.[47]

Although a claim may clearly be "false" under the FCA where it rests upon a false certification of compliance with a condition of payment (express or implied), it is not necessary to examine any "certifications" made in connection with claims for goods or services that do not conform to the Government's stated criteria for payment. In such circumstances, the presentation of a claim is "factually false" regardless of what "certifications" are made in conjunction with such a claim. Because the AKS expressly prohibits the Government from paying for services tainted by fraudulent conduct, a claim seeking payment for such services is "factually false" (i.e., the services are not what the Government bargained for), and the FCA imposes liability where a defendant knowingly "causes" such a claim to be presented.

It is well settled that compliance with the AKS is a condition of payment under the Medicare and Medicaid Programs.[48] The Government is not required to pay for services tainted by kickbacks, because in such circumstances the Government has no assurance that the medical services were provided in the best interests of the patient instead of the financial interests of the

---

[46] U.S. v. Village of Island Park, 888 F. Supp. 419, 439 (E.D.N.Y. 1995).  See also, e.g., McNutt, 423 F.3d 1256 (11th Cir. 2005); U.S. ex rel. Compton v. Circle B Enters., Inc., 2010 U.S. Dist. LEXIS 22749 (M.D. Ga. Mar. 11 2010).

[47] See, e.g., U.S. ex rel. Freedman v. Suarez-Hoyos, et al, Case No. 8:04-cv-933-T-24-EAJ, 2011 WL 972585 (M.D. Fla. Mar. 18, 2011) (denying motion to dismiss); U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of America, 238 F. Supp. 2d 258, 264 (D.D.C. 2002).

[48] See U.S. v. Rogan, 517 F.3d 449, 452-53 (7th Cir. 2008); Haleyville Med. Supplies, Inc., 423 F.3d at 1259; AWP Litig., 491 F. Supp. 2d 12, 18 (D. Mass. 2007) ("compliance with the anti-kickback statute is a prerequisite to payment in the Medicare program"); U.S. ex rel. Bidani v. Lewis, 264 F. Supp. 2d 612, 616 (N.D. Ill. 2003) ("Compliance with the AKS is thus central to the reimbursement plan of Medicare.").

health care provider or the party that induced the provider. A claim for payment of a medical treatment tainted by kickbacks is factually false in the same way that a claim for payment is false where the defendant delivers defective products. This is so even if the person submitting the claim to the Government makes no express false statements and even if he is unaware of the underlying falsity of the claim.[49] The FCA not only creates liability for claims that are facially false, but also broadly reaches all fraudulent attempts to cause the Government to pay out sums of money. U.S. v. Neifert-White, 390 U.S. 228, 233 (1968).  Because any violation of the AKS renders false all claims tainted by the violations, Keeler need only plead facts that link a scheme to submit false claims to the submission of false claims.  Under the FCA, it is adequate to allege that a false claim was knowingly presented, regardless of the details of the actually submitted false claim.[50] While Eisai may contend that the four categories of kickbacks did not actually taint provider decisionmaking, the PPACA, the AKS, and jurisprudence *deem* them tainted.

Keeler alleged that in order to induce the off-label use of Ontak and Dacogen, Eisai utilized its OCP and OAR programs paid providers their wholesale cost of these drugs in those instances when submitted claims to Medicare were denied.  The Government has pursued drug manufacturers for AKS violations premised on very similar invoice credit schemes.[51] These kickbacks were intended to and did remove the risk of non-reimbursement or underpayment from providers. Eisai distorts Keeler's allegations by unconvincingly suggesting that the invoice credits, as Keeler described them, could satisfy a safe harbor if they were given at the time of sale: There is no doubt that Keeler has not alleged credits given at the time of sale.  Keeler

---

[49] See U.S. v. Rivera, 55 F.3d 703, 707 (1st Cir. 1995) (FCA reaches fraud where innocent person presents claims for payment to the Government); Mason v. Medline Indus., Inc., 731 F. Supp.2d 730, 738 (N.D. Ill. 2010) ("It is well-established that a person may submit a false claim to the government without knowing it is false.").

[50] Grubbs, 565 F.3d at 189 (stating that, unlike common law fraud, "the contents of the bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim"); Suarez-Hoyos, at 9 (rejecting motion to dismiss under Rule 9(b)).

[51] OIG Advisory Op. No. 00-10 (http://oig.hhs.gov/fraud/docs/advisory-opinions/2000/ao00_10.pdf) This invoice credit program for denied claims "implicates the Federal anti-kickback statute. Under the Program, the Company couples reimbursement support services with extended payment terms and, if necessary, an invoice credit or replacement vial of the Drug. These additional elements confer an independent financial benefit upon referring physicians by shifting the financial risk of anticipated delays and denials associated with obtaining third party payor reimbursement from the prescribing physicians to the [drug] Company." Id.

clearly alleges that these illegal credits were guaranteed *before* the sale, to induce, but were only paid by Eisai after sales were made and only where off-label claims were either not reimbursed or underpaid. Eisai claims the alleged invoice credit could come within the discount safe harbor in 42 C.F.R. § 1001.952(h)(1) to (h)(2). But safe harbor specifically excludes "[a] reduction in price applicable to one payor but not to Medicare or a State health care program."[52] Accordingly, because the alleged invoice credit or discount only provides a discount to Eisai's accounts and not Medicare or Medicaid, the arrangement would not fall into the discount safe harbor.[53]

Keeler has alleged that Eisai paid kickbacks to doctors across the country to incentivize and reward doctors to prescribe Ontak and Dacogen for off-label uses. Complaint, ¶¶ 152-64. Allegations of payments to physicians made for the referral of business are quintessential kickbacks in violation of the AKS.[54]

Eisai routinely made grant funds and other valuable resources available to teaching hospitals in return for off-label sales presentations by doctors. Complaint, ¶¶ 147-51. These allegations set forth a plausible, well-recognized, *quid pro quo*–type of AKS-based violation. See, e.g., U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 2011 WL 2150191, *3 (1st Cir. 2011) (AKS claim was viable when based upon allegations that medical device manufacturer paid kickbacks to physicians, including payments for research grants.).

**K.     KEELER'S SIGNING OF A RELEASE DOES NOT BAR THIS *QUI TAM* SUIT; HE CANNOT BE ENJOINED FROM PURSUING IT FOR THE GOVERNMENT.**

Keeler adopts the reasoning in Judge Ungaro's prior ruling [in DE 61] that the release which Keeler signed does not bar this suit. Where a person signs a release of claims after having filed a *qui tam* suit (as Keeler did on Dec. 10, 2010 [DE 46-1], after filing suit on Aug. 4, 2009), any claimed release of *qui tam* claims is unenforceable as against public policy and the FCA; the

---

[52] See 42 C.F.R. § 1001.952(h)(3)(iii).

[53] Klaczak v. Cons. Med. Transport, Inc., 2002 WL 31010850 (N.D. Ill. 2002) (holding that discount allegedly provided to hospital or physician, but not Medicare and Medicaid, does not come within discount safe harbor.)

[54] See, e.g., McNutt, 423 F.3d at 1258; U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 2011 WL 2150191, *3 (1st Cir. 2011) (recognizing viability of AKS claims premised on allegations of "monthly payments under sham consulting agreements; paid development projects; research grants; royalties; exorbitant and sometimes illicit entertainment expenses; high-end travel and accommodations; speaking engagements and seminars; and other illegal incentives").

U.S.A. must consent to dismissals of *qui tam* suits.[55] Eisai cites to distinguishable cases; the courts' analyses rest upon the fact that the releases were sign before filing of the *qui tam* suits.

**L.      EISAI'S MOTION SHOULD BE DENIED AS A MATTER OF JUDICIAL ECONOMY.**

Eisai's Motion only makes one argument concerning the 27 State and 3 local false claims acts counts. On page 27, in footnote 8, Eisai argues that the State law counts should be dismissed because of the release that Keeler signed. As set forth immediately above, it is well settled that these claims may proceed despite the release. That being clear, the State FCA counts of course will remain. Eisai argues that one of the main purposes of Rule 9(b) is to protect defendants from discovery in meritless cases. That alleged purpose cannot be served when at least 30 FCA counts should remain after the Court rules. It only makes sense to deny Eisai's Motion, as a matter of judicial economy, because the discovery that Eisai seeks to prevent will be occurring anyway.

CONCLUSION

For all of the above reasons, Eisai's Motion must be denied.[56]


Respectfully submitted:

s/ Steven F. Grover                                                s/ Seth M. Lehrman
----------------------------------------                           ----------------------------------------
Steven F. Grover, Esq. (131296)                                    Gary Michael Farmer, Jr., Esq.
Steven F. Grover, PA                                               Steven R. Jaffe, Esq.
One East Broward Blvd., Suite 700                                  Seth Michael Lehrman, Esq.
Fort Lauderdale, FL 33301                                          Farmer Jaffe Weissing Edwards
Tel.: 954-356-0005 / Fax : 954-356-0010                           Fistos & Lehrman PL
E-mail: lawhelp@earthlink.net                                      425 N. Andrews Ave., Suite 2
                                                                   Ft. Lauderdale, FL 33301
James Paul Gitkin, Esq.
Salpeter Gitkin LLP
Museum Plaza, Suite 503
200 S. Andrews Ave.
Ft. Lauderdale, FL 33301
954-467-8622 / 954-467-8623 (fax)

Keeler.OppMemo.092311.1140pm

---

[55] See, e.g., U.S. ex rel. El-Amin v. George Washington Univ., 2007 WL 1302597, *7-8 (D.D.C. 2007); U.S. v. Purdue Pharm. L.P., 600 F.3d 319, 326 (4th Cir. 2010).

[56] It is respectfully submitted that this Memorandum meets page limits because the caption, signature page, and certificate are not included in the page computation under Local Rules.