**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:09-cv-22302-KMW**

UNITED STATES OF AMERICA, et al,
*EX REL.* MICHAEL KEELER

vs.

EISAI, INC.
--------------------------------------------------------/

### RELATOR'S MOTION TO COMPEL DEFENDANT EISAI INC. TO PRODUCE DOCUMENTS

Relator Michael Keeler, on behalf of the U.S.A. *et al*, hereby moves this Honorable Court to overrule all of Eisai's objections and order it to produce documents within 10 days:

#### CERTIFICATION

Undersigned counsel hereby certifies that he has extensively conferred in good faith with defense counsel, both in detailed letter exchanges and in telephone calls, about the issues in this Motion to Compel Requests for Production of Documents ("RFPs"). Although the parties were able to reach agreement on a few of the RFPs (which consequently are left out of this Motion), the parties were unable to agree on the vast majority of issues. Indeed, Eisai has not dropped its objections to any of the Requests covered herein. Hence, it was necessary to file this Motion.

#### PAGE LENGTH

This Motion involves approximately 67 Requests for Production in a case involving complex litigation—the multiple schemes described below. Eisai has objected to each and every Request—not conceding that a single one was proper. Although each Request was concise, Eisai's objections were verbose, boilerplate, and duplicative. Keeler's replies to each also required explanation, of course. It is also inevitable that page limits for this Motion must be exceeded, due to the following requirement in Local Rule 26.1(h)(2): "[M]otions to compel…production of documents…shall, for each separate…request for production…state: (A) verbatim the specific item to be compelled; (B) the specific objections; (C) the grounds assigned for the objection (if not apparent from the objection); and (D) the reasons assigned as supporting the motion as it relates to that specific item. The party shall write this information in immediate

1

succession (e.g., specific request for production, objection, grounds for the objection, reasons to support motion; next request for production, objection, grounds for the objection, reasons to support motion; and so on) to enable the Court to rule separately on each individual item in the motion." Wherever possible, however, Keeler has attempted to limit the number of pages by referring this Honorable Court to prior arguments that were made with respect to previously appearing Requests. Further, one benefit of this local rule is that it eliminates the need for the Court to go back and forth between yet-more documents: the RFPs and the Responses themselves. That is, the need for the Court to examine exhibits is limited by this local rule which requires consolidation of the Requests, the Responses, etc.

Finally, while this Motion covers approximately 67 RFPs, the task of assessing this Motion is less time-consuming than one might first believe: there are "subsets" to these RFPs in which the Requests and the Responses are nearly identical; the only substantial difference is that a different drug is involved. For example, Requests 8 through 11 are identical except that Request 8 is for "any and all documents relating to your research, development, marketing, sales, and/or policies and/or procedures relating to Ontak", while RFP 9 is the same for Fragmin, RFP 10 is the same for Aloxi, and RFP 11 is the same for Dacogen. And the Objections to each are substantially similar. Thus, the analytical frameworks are similar, as may be the Court's determinations.

## INTRODUCTION

This lawsuit under the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") (and 27 State and 3 municipal and/or district false claims acts) alleges that pharmaceutical company Eisai Inc. has engaged in three complex, nationwide schemes: (1) illegally failing to provide the Government with the requisite "best price" for the drugs Aloxi, Fragmin, Ontak, and Dacogen (referred to collectively as "the Subject Drugs"); (2) off-label (i.e., unapproved) marketing of Ontak and Dacogen in violation of strict FDA laws; and (3) providing illicit kickbacks to health care providers ("providers") to induce them to buy the Subject Drugs instead of competitors' FDA-approved drugs. (The kickback scheme actually consists of four distinct categories of kickbacks.) These three schemes were successfully designed and implemented to boost illegal sales of the Subject Drugs. Keeler has substantial inside knowledge of these schemes from having been employed by Eisai as a pharmaceutical

sales representative for approximately two-and-a-half years, from approximately 2006 through mid-2009. The FCA allows a person to sue on behalf of the U.S.A.  31 U.S.C. § 3730(b)—as is true for the other false claims statutes sued under.

Federal and State treasuries—the taxpayer—should be reimbursed for having improperly paid out tens of millions of dollars (at the very least), through the Medicare and Medicaid Programs for prescription drugs that Eisai knowingly tainted with kickbacks, FDA violations, and pricing prohibitions. In addition, serious public health and safety concerns are raised by Eisai's schemes: When a person, especially a cancer patient, is in need of medical care, the last thing she should need to worry about is the specter of a doctor's prescribing a drug that has not been FDA-approved for that use (and thus, not thoroughly tested), in lieu of an approved drug, because of a pharmaceutical company's undue influence on the doctor. Congress enacted the Anti-Kickback Statute ("AKS") and the Food, Drug & Cosmetic Act ("FDCA") to protect the public from the types of actions that Eisai has taken. Remarkably, Eisai undertook its aggressive, nationwide off-label marketing scheme right after learning that the FDA had just sent Ligand Pharmaceuticals (from whom Eisai had just bought the rights to sell Ontak) a "Warning Letter" that reprimanded Ligand for having off-label marketed Ontak for prohibited, medically risky purposes. But Eisai simply continued off-label marketing Ontak right where Ligand left off.

In this litigation, Eisai has contended that its off-label marketing is legal because *doctors* may prescribe a drug to a patient, provided that they use sound judgment and the drug was FDA-approved for *some* indication—not necessarily the FDA-approved indication. Eisai ignores the fact that federal law unequivocally prohibits *pharmaceutical companies* from off-label *marketing*, which is distinct from off-label *use* by a *physician*. Congress has strictly prohibited Eisai's actions—not prescribing doctors' actions. With its specious argument, Eisai seeks to substitute its own judgment for that of Congress and the FDA. Ironically, it was in a recent Justice Department press release about the settlement of an off-label marketing case against *Eisai* (and another company), that Assistant Attorney General Tony West stated: "Off-label promotion of pharmaceutical products undermines the FDA's important role in protecting the American public by determining whether a drug is safe and effective for a particular use before it is

marketed. Such illegal conduct by pharmaceutical companies also costs the government billions of dollars, and these civil settlements…demonstrate that such conduct will not be tolerated."[1]

The American Cancer Society understands the difference. To quote its website: "While it is legal for doctors to use drugs off label, it is not legal for drug companies to market their drugs for off-label uses….Off-label marketing is very different from off-label use." American Cancer Society (www.cancer.org/treatment). Thus, Eisai clearly disagrees with the views of Congress, the FDA, the Justice Department, and the American Cancer Society, and apparently is not about to change the way it does business.

### RELEVANT PROCEDURAL BACKGROUND

Keeler filed suit under seal on August 4, 2009. (Throughout this Motion, "Keeler" is used as shorthand for "Michael Keeler, on behalf of the U.S.A.," because Keeler is proceeding on behalf of the U.S.A. by its express consent). On July 8, 2010, a First Amended Complaint ("FAC") [DE 19] was filed under seal. On February 24, 2011, the U.S.A. declined to intervene [DE 23], but specifically referred the Court to Subsection 3730(b)(1) of the FCA, which expressly allows relators to pursue FCA suits for the U.S.A. The U.S.A. could still later intervene. Though the U.S.A. may intervene and take over a *qui tam* suit, "it often declines to do so." U.S. ex rel. Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1167 (10th Cir. 2010). That the U.S.A. has not intervened is not a reflection on the merits.[2] The FAC was unsealed in February 2011. Presently, a 189-page Third Amended Complaint ("the Complaint") is operative.

Keeler has sued under three different FCA liability provisions: 31 U.S.C. §§ 3729(a)(1), (a)(2), and (a)(3). The Fraud Enforcement and Recovery Act of 2009 ("FERA") modified and

[1] Dept. of Justice Press Release, Pharmaceutical Companies to Pay $214.5 Million to Resolve Allegations of Off-Label Promotion of Epilepsy Drug, Dec. 15, 2010.

[2] U.S. ex rel. Atkins v. McInteer, 470 F.3d 1350, 1359 n.17 (11th Cir. 2006). At least hundreds of millions of dollars have been recovered in non-intervened *qui tam* suits. The U.S.A. intervenes in just a small fraction of *qui tam* suits because of financial constraints and other reasons. U.S. Attorneys cannot pursue every case, and often focus on the highest-damage cases. Since 2001, the U.S.A. has recouped more than $4 billion in FCA suits premised on manufacturers' violations of the FDCA through illegal off-label promotion of drugs and medical devices. Dept. HHS & DOJ Health Care Fraud & Abuse Control Program Annual Report for FY 2010, at 5 (available at http://oig.hhs.gov/publications/docs/hcfac/hcfacreport2010.pdf). In one non-intervened *qui tam* suit alone, U.S.A. ex rel. Tyson v. Amerigroup Corp., a $334 million verdict and judgment was entered in favor of the U.S.A.

renumbered these subsections. To avoid confusion, and especially because this case involves false claims both pre-dating and post-dating the FERA's enactment in 2009, Keeler cites to the *pre*-amendment subsections (as many courts do, to simplify). But the FERA amendments apply, as alleged.

**Subsection (a)(1)** prohibits *presentation*, or the *causing* of presentation, of false or fraudulent *claims* to the Government.

**Subsection (a)(2)** prohibits use of a false or fraudulent *statement or record* to get the Government to pay a claim. A wide variety of types of statements or records may support a cause of action under Subsection (a)(2). A document that contains untrue assertions, one that omits information, and verification of an earlier false statement or record, may constitute a false statement or record. U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp., 20 F. Supp.2d 1017 (S.D. Tex. 1998) (annual cost reports); U.S. ex rel. Lamers v. City of Green Bay, 998 F. Supp. 971, 986, 989 (E.D. Wis. 1998), aff'd, 168 F.3d 1013, 1018 (7th Cir. 1999) (standard assurances of compliance with grant requirements, and letters in support of application). Like Subsection (a)(1), Subsection (a)(2) imposes liability on a person who *causes another* to engage in the prohibited conduct, as well as upon a person who directly violates the subsection. U.S. v. Mackby, 261 F.3d 821, 826 (9th Cir. 2001).

**Subsection (a)(3)** prohibits a person from *conspiring* to get a false or fraudulent claim allowed or paid by the Government. The understanding may take many forms, and may be tacit. U.S. ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 546 (7th Cir. 1999). Keeler alleged that Eisai conspired (civilly) with the Lash Group (Complaint, ¶¶ 241-47, 261, 267), Nam Dang, M.D. (Id., ¶¶ 148, 248, 261, 267), and Lauren Pinter-Brown, M.D. (Id., ¶ 249, 261) in making kickbacks; and with the Lash Group (Id., ¶¶ 241-47, 261, 267), Dr. Dang, (Id., ¶¶ 148, 164, 248, 261, 267), and Dr. Pinter-Brown (Id., ¶¶ 154, 249, 261, 267) in off-label marketing.

Despite the breadth of Eisai's three schemes, which will be summarized below, it is very important to note, in assessing the alleged burdensomeness of Keeler's RFPs to Eisai, that the off-labeling marketing and kickback schemes do *not* involve allegations that Eisai submitted false claims to the Government. It is the health care providers (e.g., doctors, hospitals, pharmacies) who submitted claims for reimbursement to Medicare and Medicaid. This is a "*cause to be submitted*" case in which it is alleged that Eisai has *caused* providers to present

claims for improper Medicare and Medicaid reimbursement, stemming from Eisai's schemes. Consequently, the universe of documents that Eisai possesses, or has custody or control of, is far, far less extensive than if Eisai had submitted the actual claims to the Government (which *is* the situation in many FCA cases, in which it is alleged that the providers themselves submitted the claims to Medicare and/or Medicaid). Thus, for example, a request for all CMS-1500s relating to the drugs would not trigger a very large number of documents.

In contrast, for the "best price" claims, it is alleged that Eisai directly provided quarterly reports to the CMS which set forth "best prices" which were false. However, these quarterly reports were few in number because it was a short form submission (of under 10 pages each) for each of the four drugs for each quarter.

*Keeler served the Requests approximately three months ago. To date, Eisai has not produced a single document.*

## APPLICABLE DISCOVERY RULES AND PRINCIPLES

### A.    FULL AND BROAD SCOPE OF DISCOVERY, INCLUDING "RELEVANCY"

"The Federal Rules of Civil Procedure strongly favor a full and broad scope of discovery whenever possible, allowing a party to obtain discovery of 'any matter, not privileged, that is relevant to the claim or defense of any party.'" Rosenbaum v. Becker & Poliakoff, PA, 2010 U.S. Dist. LEXIS 21656 (Feb. 23, 2010) (quoting Fed.R.Civ.P. 26(b)(1) and citing Farnsworth v. Procter & Gamble Co., 758 F.2d 1545, 1547 (11th Cir. 1985); Stern v. O'Quinn, 253 F.R.D. 663 , 687 (S.D. Fla. 2008); Dunkin' Donuts, Inc. v. Mary's Donuts, Inc., 206 F.R.D. 518 (S.D. Fla. 2002)). "It is a basic tenet that '[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.'" Rosenbaum, 2010 U.S. Dist. LEXIS at *4 n.2 (quoting Hickman v. Taylor, 329 U.S. 495, 507-08 (1947)). The intent of the Federal Rules is to "'make trial less a game of blind man's bluff and more of a fair contest with the basic issues and facts disclosed to the fullest practical extent.'" Id. at *4 n.3 (quoting U.S. v. Procter & Gamble Co., 356 U.S. 677, 682 (1958)). Indeed, "[t]he Advisory Committee Notes to Rule 26 approve the concept that 'the…Rules permit "fishing for evidence as they should."'" Id. at *4 n.4 (quoting Hickman, 329 U.S. at 507, as "indicating [the] 'cry of fishing expedition' can no longer serve to prevent inquiry into underlying facts of opponent's case").

"Relevancy" under Rule 26(b)(1) is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" Id. at *3 (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)). "Thus, ordinarily, discovery based on relevance should be allowed 'unless it is clear that the information sought has no possible bearing on the claims and defenses of the parties or otherwise on the subject matter of the action.'" Rosenbaum, 2010 U.S. Dist. LEXIS at *4 (quoting Tate v. U.S. Postal Serv., 2007 U.S. Dist. LEXIS 10086, at *1 (S.D. Fla. Feb. 14, 2007) and citing Dunkin' Donuts)).

"In order to sustain objections to discovery, the party seeking the protection must show the absence of any possible bearing of the information sought to the claims and defenses of the case….Such a showing requires either demonstrating that the information is outside Rule 26's broad scope of relevance, or that it 'is of such marginal relevance that the potential harm occasioned by the discovery would far outweigh the ordinary presumption in favor of broad disclosure.'" Rosenbaum, 2010 U.S. Dist. LEXIS at *4 n.5 (quoting Tate, 2007 U.S. Dist. LEXIS 10086 at *2). As Judge Marra stated in Rosenbaum:

> Indeed, 'discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify issues….Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits.' Oppenheimer Fund, 437 U.S. at 351. In short, information can be relevant and, therefore, discoverable, even if not admissible at trial, so long as the information is reasonably calculated to lead to the discovery of admissible evidence. Dunbar v. U.S., 502 F.2d 506, 509-10 (5th Cir. 1974) (citations omitted).

Id. at *5-6.

An objection that a discovery request is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence must include a specific explanation describing why the request lacks relevance and specifically why the information sought will not reasonably lead to admissible evidence. Consumer Electronics, 2008 U.S. Dist. LEXIS 80465, *6 (S.D. Fla. Sept. 18, 2008). Eisai's boilerplate objections are completely lacking in such detail.

In contrast, Keeler's RFPs are for relevant and/or potentially documents that are at the heart of the instant case. The RFPs are the farthest thing from some random shot in the dark. They target the three schemes that Eisai committed, focusing on only four of the many drugs that

Eisai has manufactured and marketed. Moreover, if the RFPs cover a lot of ground, that is merely because *Eisai's illegal schemes covered a lot of ground*. Eisai cannot commit three nationwide schemes, bilking the U.S. Treasury out of at least tens of millions of dollars, and then complain that discovery should be limited to documents *less than* those that may or will cast light on those schemes. The law simply does permit Eisai to maintain such a convenient, self-serving position, in frustration of Keeler's (and, by definition, the Government's) right to discovery of critical facts. What Eisai overlooks in making this argument is the basic mantra, recited in nearly every federal court order regarding relevancy, namely that "relevancy" under Rule 26(b)(1) is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." Oppenheimer Fund, 437 U.S. at 351; Rosenbaum, 2010 U.S. Dist. LEXIS at *15-16.  In a nutshell, the Supreme Court has already addressed and rejected Eisai's relevancy arguments. Id. at 351.

## B.    OBJECTIONS THAT REQUESTS ARE VAGUE, OVERLY BROAD OR UNDULY BURDENSOME

It is axiomatic that the objecting party "shall not make nonspecific, boilerplate objections. Such objections do not comply with Local Rule 26.1(G)(3)(a), which provides, 'Where an objection is made[…]to any document request under [Rule] 34, the objection shall state with specificity all grounds.' Objections that state that a discovery request is 'vague, overly broad, or unduly burdensome' are, standing alone, meaningless, and will be found meritless by this Court. A party objecting on these grounds must explain the specific and particular way in which the request is vague, overly broad, or unduly burdensome." Consumer Electronics Assoc. v. Compras & Buy Magazine, Inc., 2008 U.S. Dist. LEXIS 80465, *5 (S.D. Fla. Sept. 18, 2008) (citing Fed.R.Civ.P. 33(b)(4); Josephs v. Harris Corp., 677 F.2d 985, 992 (3d Cir. 1982)).

The objecting party generally has the burden to substantiate its objections. Employers Commercial Union Ins. Co. of America v. Browning-Ferris Indus. of Kansas City, Inc., 1993 U.S. Dist. LEXIS 21098, *10 (D. Kan. 1993) (quoting Chubb Integrated Sys. Ltd. v. National Bank, 103 F.R.D. 52, 58 (D.D.C. 1984)). General objections are not useful to the court ruling on a discovery motion. Id. at *8-*9. Nor does a general objection fulfill [a party's] burden to explain its objections. Id. at *9. Under the federal rules, an evasive or incomplete response is equal to a

8

party's complete failure to respond. <u>Miller v. Narval Shipping Corp.</u>, 2000 U.S. Dist. LEXIS 14152, *2-*3 (E.D. La. 2000) (citing Fed. R. Civ. P. 37(a)(3)). The objecting party falls woefully short of its burden when it asserts broad-based, non-specific objections. <u>Panola Land Buyers Assoc. v. Shuman</u>, 762 F.2d 1550, 1559 (11th Cir. 1985).

As Judge Hoeveler from the Southern District of Florida has written: "Local Rule 26.1.G.6(b) provides the proper procedure for raising objections to a request for production; its requirements are mandatory, not merely aspirational. The Rule's text is plain and clear: a party seeking to object to a request for production must...[s]tate with specificity all grounds for the objection. Any ground not stated shall be waived...." <u>Hoglund v. Limbach Constructors, Inc.</u>, 1998 U.S. Dist. LEXIS 8577, *8-9 (S.D. Fla. 1998) (citing L.R. S.D. Fla. 26.G.6). Judge Hoeveler went on to state: "Moreover, aside from Plaintiff's blanket and passive claims that to the extent that any of the documents have been requested by the Plaintiff's counsel to be prepared in anticipation of litigation, then the work product privilege applies, and as phrased the request would invade the attorney work product privilege in that the request asked for diaries, notes, and chronicles kept to present date, Plaintiff does not provide any real, substantive support for her claimed privilege...Plaintiff never identified the general subject matter of the document(s) she was claiming to be privileged....In claiming privilege, Plaintiff did not provide the slightest indication as to the contents of the privileged documents." <u>Id.</u> at *12-13. The same is true of Eisai's boilerplate objections.

When a party fails to make "specific legitimate objections" to particular requests for production within the time allowed, the court may appropriately deem all such objections waived. <u>See</u> <u>Pulsecard, Inc. v. Discover Card Services, Inc.</u>, 168 F.R.D. 295, 304 (D. Kan. 1996) (citation omitted). Here, Eisai has not made timely, specific, legitimate objections, so all of their objections should be deemed waived. Eisai scarcely even attempted to substantiate its objections. Its failure went beyond failure to produce a privilege log (argument detailed below): Eisai repeatedly made blanket, conclusory objections with little to no explanations for them. Such objections should be overruled.

Under well-settled law, the party resisting production bears the responsibility of establishing undue burden. <u>Coker v. Duke & Co., Inc.</u>, 177 F.R.D. 682, 686 (M.D. Ala. 1998) (citation omitted). An objection must show specifically how a [discovery request] is overly

broad, burdensome or oppressive, *by submitting evidence or offering evidence which reveals the nature of the burden*. Id. (quoting Chubb Integrated Sys. Ltd., supra, 103 F.R.D. at 59-60) (emphasis added). "The resisting party must make a particular and specific demonstration of fact and cannot rely on simple conclusory assertions about the difficulty of complying with a discovery request." Id. (citation omitted). "A mere showing of burden and expense is not enough." Id. (citation omitted). "[N]or is a claim that answering the discovery will require the objecting party to expend considerable time and effort analyzing huge volumes of documents and information a sufficient factual basis for sustaining the objection." Wagner v. Innovative Homes & Design, Inc., 208 F.R.D. 606, 610 (D. Neb. 2001) (quoting Roesberg v. Johns-Manville Corp., 85 F.R.D. 292, 296-97 (E.D. Pa. 1980)).

The lion's share of Eisai's objections are insufficient boilerplate claims of over-breadth and over-burdensomeness. Without detailed, convincing explanations, these objections are clearly insufficient and must be overruled.

## C.   OBJECTIONS BASED ON SCOPE

The time periods pertaining to Keeler's RFPs are reasonable given the schemes involved and his allegations that they started with the acquisitions of the drugs and continued after his employment ended. Regardless, Eisai has no right to have unilaterally withheld documents from the time periods that it has not disputed. "If there is an objection based on an unduly broad scope, such as time frame or geographic location, discovery should be provided as to those matters within the scope which is not disputed. For example, if discovery is sought nationwide for a ten-year period, and the responding party objects on the grounds that only a five-year period limited to activities in the state of Florida is appropriate, the responding party shall provide responsive discovery falling within the five-year period as to the State of Florida." Consumer Electronics, 2008 U.S. Dist. LEXIS 80465, *6 (S.D. Fla. Sept. 18, 2008).

## D.   FORMULAIC OBJECTIONS FOLLOWED BY AN ANSWER

"The Parties shall not recite a formulaic objection followed by an answer to the request. It has become common practice for a Party to object on the basis of any of the above reasons, and then state that 'notwithstanding the above,' the Party will respond to the discovery request, subject to or without waiving such objection. Such an objection and answer preserves nothing and serves only to waste the time and resources of both the Parties and the Court." Consumer Electronics, at *7.

E.      **CLAIMS OF ATTORNEY-CLIENT PRIVILEGE, WORK PRODUCT, & THE LACK OF A PRIVILEGE LOG**

Federal Rule 26(b)(5) requires that when documents are withheld on a claim of privilege, the claim shall be made timely, expressly, and shall be supported by a description of the nature of the documents, communications or things not produced, which is sufficient to enable the demanding party to contest the claim. The failure to do so via a privilege log may result in a waiver of the privilege as it relates to the withheld documents. Rosenbaum, 2010 U.S. Dist. LEXIS 21656, *12 n.7 (citing Fed.R.Civ.P. 26(b)(5) and Universal City Dev. Partners, Ltd. v. Ride & Show Eng., Inc., 230 F.R.D. 688 (M.D. Fla. 2005) (attorney-client and work product privileges waived because of failure to timely produce privilege log)). "Generalized objections asserting attorney-client privilege or work product doctrine also do not comply with…Local Rule 26.1(G)(3)(b) [which] requires that objections based upon privilege identify the specific nature of the privilege being asserted, as well as, inter alia, the nature and subject matter of the communication at issue and the sender and receiver of the communication and their relationship to each other." Consumer Electronics, at *7-8. "Blanket" claims of privilege do not suffice; if a party seeks to claim a privilege, he must file a privilege log that complies with Local Rule 26.1(g)(3)(b)." Id. at *2 (S.D. Fla. Sept. 18, 2008).

"It is well established that one who seeks to invoke the [attorney-client] privilege has the burden to prove that the specific communications or documents sought to be discovered fall within the protection of the attorney-client privilege. Moreover, invocation of the privilege must be specific and must be asserted on a question-by-question or *document-by-document basis*; blanket claims of privilege will not justify a wholesale refusal to testify or produce documents in response to a request. Obviously, the privilege serves not to enlighten, but rather to obscure the truth, and for this reason it should be construed as narrowly as possible." In re Hillsborough Holdings Corp., 118 B.R. 866, 869 (M.D. Fla. 1990) (emphasis added; citations omitted). See also In re Grand Jury Subpoena, 831 F.2d 225, 227 (11th Cir. 1987) (privilege must be asserted on a document-by-document basis); In re Duque, 134 B.R. 679, 687 (S.D. Fla. Bkrtcy.1991) (same).

"We have made clear that the attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents. The privilege must be specifically asserted with

respect to particular documents." U.S. v. El Paso Co., 682 F.2d 530, 539 (5th Cir. 1982), cert.
denied, 466 U.S. 944 (1984). The rationale is, of course, that the person invoking the privilege
has the burden of establishing the existence of an attorney-client relationship and the confidential
nature of the information sought.

      Federal Rule 26(b)(5) explicitly states that when a party claims work product protection,
it "shall describe the nature of the documents...in a manner that, without revealing information
itself privileged or protected, will enable other parties to assess the applicability of the privilege
or protection." Fed.R.Civ.P. 26(b)(5).

      Local Rule 26.1(G) also states:

**G. Interrogatories and Document Requests.**

3.(a) Where an objection is made to...any document request under Fed.R.Civ.P.
34, the objection shall state with specificity all grounds. Any ground not stated in
an objection within the time provided by the Federal Rules of Civil Procedure, or
any extensions thereof, *shall* be waived.

  (b) Where a claim of privilege is asserted in objecting to any...document
demand, or sub-part thereof, and an answer is not provided on the basis of such
assertion:

      (i) The attorney asserting the privilege shall in the objection to
the...document demand, or sub-part thereof, identify the nature of the
privilege (including work product) which is being claimed and if the
privilege is being asserted in connection with a claim or defense governed
by state law, indicate the privilege rule being invoked; and

      (ii) The following information shall be provided in the objection, unless
divulgence of such information would cause disclosure of the allegedly
privileged information:

          (A) For documents:  (1) the type of document; (2) general subject
matter of the document; (3) date of the document; (4) such other
information as is sufficient to identify the document for a subpoena
duces tecum, including, where appropriate, the author of the
document, the addressee of the document, and, where not apparent,
the relationship of the author and addressee to each other;

\*   \*   \*

(c) This rule requires preparation of a privilege log with respect to all documents and oral communications withheld on the basis of a claim of privilege or work product protection except the following:  written and oral communications between a party and its counsel after commencement of the action and work product material created after commencement of the action.

S.D. Fla. L.R. 26.1(G).

Eisai has failed to provide a privilege log, supported by a proper affidavit, even though it has had months to do so. Indeed, Eisai has failed to make any real attempt to describe any documents that are deserving of protection from disclosure. Further, Eisai has invoked the attorney-client privilege and the work product doctrine indiscriminately—asserting the privileges in response to virtually all of Keeler's Requests.

The attorney-client privilege is to be "construed as narrowly as is consistent with its purpose." U.S. v. Suarez, 820 F.2d 1158, 1160 (11th Cir. 1987), cert. denied, 484 U.S. 987 (1987). The privilege applies only to confidential communications—not to underlying facts. Upjohn Co. v. U.S. 449 U.S. 383, 395-96 (1981).

**F.      REQUIRED ORGANIZATION OF RESPONSES TO REQUESTS FOR PRODUCTION**

Under Rule 34(b), a party responding to requests for production is required to organize and label the documents so that the requesting party can determine which documents have been produced in response to which requests. Stiller v. Arnold, 167 F.R.D. 68 (N.D. Ind. 1996).  To satisfy Rule 34, the party must provide the requesting party with written responses which "clearly state, separately as to each request, whether all responsive documents in [its] possession, custody or control will be made available for inspection and related activities, or that [the responding party] has no responsive documents in [its] possession, custody or control." Innovative Therapy Products v. Roe, 1999 U.S. Dist. LEXIS 398, *4 (E.D. La. 1999). See also Poseidon Oil Co., L.L.C. v. Transocean Sedco Forex, Inc., 2002 U.S. Dist. LEXIS 15750, *9 (E.D. La. 2002); Pulsecard, Inc. v. Discover Card Services, Inc., 168 F.R.D. 295, 307 (D. Kan. 1996). Eisai should be ordered to comply with Rule 34's explicit requirements.

Since Eisai has not produced a single document, it obviously has not even come close to meeting this rule. *This Honorable Court should not countenance Eisai's continued withholding of documents that it admits to be relevant, when a protective order has not been entered in this case. More importantly, allegations of confidentiality do not equate with privilege, and are generally held to be insufficient grounds to withhold discovery.* Mike v. Dymon, Inc., 1996 U.S.

Dist. LEXIS 17329, *10 (D. Kan. 1996) (citing Federal Open Mkt. Comm. v. Merrill, 443 U.S. 340, 362, 61 L. Ed. 2d 587, 99 S. Ct. 2800 (1979)).  See In re Sahlen & Assocs., Inc., 1990 U.S. Dist. LEXIS 18793, *2-*3 (S.D. Fla. 1990). "Confidentiality alone is not an objection which precludes discovery." Kansas City Southern Railway, 2000 U.S. Dist. LEXIS 21806, *11-12 (D. Kan. 2000).

### THE COMPLAINT'S ALLEGATIONS: *THREE NATIONWIDE SCHEMES*

As set forth above, the scope of discovery is affected by—but not limited by—the scope of the Complaint's allegations. Thus, a summary of Keeler's allegations is in order. (Of course, this is just a summary; the "best evidence" of the allegations is, of course, the 189-page Third Amended Complaint [DE 80].) Eisai's assertion that every RFP is either or both not reasonably calculated to lead to the discovery of admissible evidence, and/or irrelevant, completely ignores the allegations of the Complaint.

The suit alleges that Eisai deliberately, knowingly, or recklessly caused the submission of false claims by health care providers to Medicare, Medicaid, and other federally funded government health care programs. Keeler alleges that Eisai violated the FCA by engaging in three schemes: (1) illegally failing to provide the Government with the requisite "best price" for the drugs Aloxi, Fragmin, Ontak, and Dacogen (referred to collectively as "the Subject Drugs"); (2) off-label (i.e., unapproved) marketing of Ontak and Dacogen in violation of strict FDA laws; and (3) providing illicit kickbacks to providers to induce them to buy the Subject Drugs instead of competitors' FDA-approved drugs. Keeler alleges that these schemes were committed on a nationwide basis.

The following chart shows the illegal schemes that are alleged with respect to each of the four drugs, the dates of each scheme as alleged in the Complaint (and/or by logical inference from the date that Eisai acquired the rights to sell each drug), as well as each drug's acquisition date. Clearly, most of the schemes are alleged to have taken place, to various extents, with *all four* of the Subject Drugs; only the off-label marketing allegations are limited to Ontak and Dacogen.

| Drug & Acquisition Date | Schemes | | | Dates of Schemes |
|---|---|---|---|---|
| Ontak-10/06: | best price violations | kickbacks | off-label marketing | 10/06 forward |
| Dacogen-1/08: | best price violations | kickbacks | off-label marketing | 1/08 forward |
| Aloxi-1/08: | best price violations | kickbacks | | 1/08 forward |
| Fragmin-9/05: | best price violations | kickbacks | | 9/05 forward |

*Off-label marketing* is an illegal practice whereby a pharmaceutical company promotes a drug for the treatment of symptoms and/or conditions other than those in its FDA-approved indication. The FDA has strict requirements for approval of prescription drugs. Manufacturers seeking to introduce new drugs for human use into interstate commerce must comply with FDA statutes and regulations, such as the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq*. The FDCA prohibits companies from distributing in interstate commerce any drugs that the FDA has not approved as safe and effective. 21 U.S.C. § 355(a), (b). In order for a company to gain FDA approval of a drug, the company must first submit and receive approval of a New Drug Application ("NDA") pursuant to 21 U.S.C. § 355. The company is required to include in the NDA all intended uses proposed for a new drug's labeling and to prove that the new drug is safe and effective for those uses.  21 U.S.C. § 355(b). To prove that the drug is safe and effective, it must provide the FDA with data from scientifically sound clinical trials. The FDA will refuse approval of a new drug unless, on the basis of all information reviewed, it is demonstrated that a drug can safely accomplish its purported effect under the conditions proposed, and that the method of manufacture and distribution will properly preserve the drug for this purpose. 21 U.S.C. § 355(d). A drug achieves an approved indication only after rigorous FDA review of tests and studies demonstrating the drug's safety and efficacy. Restrictions can also be placed on patient populations so that the use is limited to those for whom the drug is considered safe and effective. Any use of a drug that was not proposed in the NDA and approved for the label by the FDA is "unapproved" or "off-label." 65 Fed. Reg. 14286, 14286 (Mar. 16, 2000). Although physicians may traditionally prescribe a drug for an off-label use so long as the drug has been FDA-approved for some use, pharmaceutical companies are strictly prohibited from marketing a drug for an off-label use.

Keeler has alleged that Eisai off-label marketed Ontak more egregiously than in the typical case: Eisai purchased the rights to Ontak from Ligand Pharmaceuticals, Inc. ("Ligand"). On October 23, 2006, the FDA issued a stern "Warning Letter" to Ligand after review of Ligand's use of a cutaneous T-cell lymphoma study as a promotional item for Ontak. The FDA found that Ligand had been overstating the effectiveness of Ontak, broadening its indication, and minimizing its risks. On October 25, 2006, *a mere two days after the issuance of the FDA Warning Letter*, Eisai finalized and closed on its agreement with Ligand to purchase all rights to Ontak (as well as the drug, Targretin) for approximately $200 million dollars. It is alleged that Eisai knew of the FDA Warning Letter to Ligand when it bought the rights to Ontak on October 25th. *Despite the stern Warning Letter, Eisai began off-label marketing Ontak right away, and continued to do so thereafter*, ignoring the limitations of Ontak's narrow indication and directing its sales force to off-label promote Ontak for a variety of much more commonly occurring cancers, including, but not limited to: ovarian cancer, melanoma, B-cell non-Hodgkin's lymphoma, and Graft versus Host disease. Indeed, Eisai even used many of Ligand's sales materials when conducting off-label marketing and consummating sales.

Keeler alleges that, from October 2006 forward, Eisai caused approximately 2,000 hospitals, oncology offices, oncologists, and pharmacies to submit false claims through Eisai's acts and omissions. Eisai maintained a sales report, known as a "COERS" report, which reflects Ontak sales broken down by Account. These COERS reports were available to Defendant's sales representatives, including Keeler. Keeler attached to his Complaint a COERS report, for the period of April 2008 through April 2009, that reflects the identities and addresses of 188 health care providers—active accounts during that period—that were purchasing Eisai's drug products and billing Medicare and Medicaid for administration of the drugs and related services. Approximately 80% of these providers continued to be active accounts for the next 1-year period, and approximately 80% of these providers were active accounts for the previous 1-year period. However, because Eisai also had accounts that were not active, the active providers listed in the COERS report constitute, conservatively, only about 10% to 20% of the providers that Eisai caused to submit false claims. Eisai maintained sales reports—similar to the COERS reports—for the other Subject Drugs, as well.

In an effort to avoid detection of its off-label marketing and promotions of Ontak and Dacogen, Eisai instructed its sales force to use their cell phones, rather than the company's

phone lines, when conducting business or reaching out to Eisai management for direction. Eisai sales representatives routinely entered actual call notes from their sales encounters into the Eisai computer system. These call notes frequently showed extensive off-label discussions and attempts to elicit off-label discussions. Later, the Eisai computer system was reprogrammed to eliminate the possibility of the extensive details regarding off-label marketing discussions. The new system used designated drop-down categories to describe the sales calls, thereby precluding any reference to the off-label discussions that actually took place.

Keeler's off-label marketing allegations with respect to Dacogen are similar to those concerning Ontak: In January 2008, Eisai purchased MGI Pharma, Inc. ("MGI") in order to acquire the rights to MGI's drug, Dacogen. He alleges that, from 2008 forward, Eisai conducted Advisory Board meetings across the United States by which where doctors were hired by Eisai to speak on various off-label uses for Dacogen at weekend "conferences" at high-end resorts. Other health care professionals, particularly potential prescribers of the drugs, were invited. Keeler alleges that, at the very least, hundreds of doctors attended these nationwide. Dacogen is indicated only for the treatment of Myelodysplastic Syndromes ("MDS"), with a specific FDA dosage recommendation. However, Eisai off-label marketed Dacogen for treatment of Acute Myelogenous (i.e., Myeloid) Leukemia ("AML") and other diseases, and at a different dosage than the FDA-recommended dosage. Eisai sales representatives routinely encouraged physicians to use the drug outside its approved parameters. They made sales calls to oncologists, hospitals, and their staff members, pushed Dacogen, instructed them on alleged off-label benefit, shared misleading studies with them and promoted its use by Eisai-paid physician speakers, and conducted tutorials on how to bill Medicare and Medicaid for its use.

Keeler pled a *combination* of four aggressive, prohibited ***kickback schemes*** that Eisai designed and implemented to cause providers to disregard the dangerous, frequent side effects of use of all four of the Subject Drugs (Ontak, Dacogen, Aloxi and Fragmin), as compared to the *FDA-approved* uses of *competitor* drugs. The Complaint sets forth directly—or, as the case may be, by easy inference from the dates set forth that Eisai acquired the rights to the Subject Drugs—the dates that these schemes took place: from October 2006 forward for Ontak, from January 2008 forward for Dacogen, from January 2008 forward for Aloxi, and from September 2005 forward for Fragmin.  Complaint, ¶¶ 18-38, 134-164.  The four schemes are, in sum, that:

> Eisai's Oncology Reimbursement Assistance ("OAR") Program, previously called the Ontak Credit Program ("OCP"), *guaranteed* money for prescribing Ontak.[3]

> Eisai routinely made grants to buy access to teaching hospitals and their administrators, in order to gain access to off-label doctor promoters to make presentations pushing off-label uses.

> Eisai provided all-expense paid weekend trips to doctors for their speaking at, or merely attending, resort-based "programs" across the U.S.A. about off-label use of Ontak and Dacogen.

> Eisai illegally "marketed the spread" with drugs Aloxi, Ontak, Fragmin and Dacogen.

Regarding this fourth kickback scheme: "If a pharmaceutical manufacturer purposefully manipulates the Average Wholesale Price ("AWP") to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated."[4] Under the AKS, offering remuneration to a purchaser is improper if done to induce the purchase. "[I]t is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to induce customers to purchase its product." Id. The OIG with HHS has publicly announced that manipulation of the AWP, in conjunction with active marketing of the spread, constitutes an indirect offer or payment of remuneration.

Eisai manipulated the AWPs of Aloxi, Ontak, Fragmin, and Dacogen while actively "marketing the spread" on these drugs. Eisai sales representatives "marketed the spread" pursuant to national sales practices aimed at promoting these drugs to providers. For example, Eisai distributed "selling the spread" reimbursement cards to physicians and hospitals which highlighted the profit margin, or "spread," between an account's wholesale acquisition cost for Ontak and the amount of Medicare or Medicaid reimbursement. Id., ¶ 254.[5]

---

[3] Keeler alleged that in order to induce the off-label use of Ontak and Dacogen, Eisai utilized its OCP and OAR programs paid providers their wholesale cost of these drugs in those instances when submitted claims to Medicare were denied. These kickbacks were intended to and did remove the risk of non-reimbursement or underpayment from providers. Keeler has alleged that Eisai paid kickbacks to doctors across the country to incentivize and reward doctors to prescribe Ontak and Dacogen for off-label uses. Complaint, ¶¶ 152-64.

[4] OIG Compliance Program Guidance for Pharmaceutical Manufacturers, Fed. Reg., Vol. 68, No. 86, Notices 23736, 23737 (May 5, 2003).

[5] Eisai intended that marketing the spread would induce accounts to prescribe the Subject Drugs for off-label uses and submit false claims to Medicare and Medicaid. Drawing from his inside knowledge, Keeler alleged examples of Eisai's "marketing the spread" with Ontak to 55 different

In tandem with marketing the spread, Eisai also intentionally reported false "best price" and AWP data on the Subject Drugs during the same time period. Id., ¶ 193. Eisai was required to report its "best price" (based on AWP) in Quarterly Reports to CMS to allow CMS to calculate the proper rebate amounts due each State under the Medicare Rebate Program. See id., ¶¶ 187, 189, 191. Eisai was required to report all rebates, discounts, grants, coupons and other incentives offered to purchasers, and its failure to properly do so resulted in false claims under the FCA. Id., ¶ 192. For instance, Eisai falsely reported that the cost of Aloxi had risen, thereby increasing the stated average sales price to obtain higher reimbursement from Medicare and Medicaid. Id., ¶ 204. But the cost of Aloxi was not increasing. Keeler sets forth the details of several instances where accounts were given steep discounts that were not reported to CMS.[6]

Keeler also alleged "***best-price***" violations concerning Fragmin (from Sept. 2005 forward), Dacogen (from Jan. 2008 forward), Ontak (from Oct. 2006 forward), and Aloxi (from January 2008 forward). These best price violations have caused enormous losses to the Government. Private health care providers were routinely allowed steep discounts not included on all company price lists, which, by definition, meant that they were not included on lists sent to CMS. Eisai also utilized a discount program by which the price of Aloxi was reduced and directly linked to the volume of prescriptions attributable to the physician and/or institution tied to that physician. The more that was prescribed each quarter, the lower the price was offered. Effectively, there was an illegal "marketing of the spread," by which prices were lowered in exchange for market share. The Medicare Rebate Program is designed to ensure that the reimbursement rate that Medicare and Medicaid pay for prescription drugs is not higher than the prices that pharmaceutical companies offer to other entities. See 42 U.S.C. §1396r-8, including §1396r-8(a)(1). Under the Medicare Rebate Program, pharmaceutical companies are required to provide rebates to states to compensate for any drugs purchased above the manufacturer's best price.

---

providers across the country during that time period. Id., ¶¶ 256. He explained that Eisai sales representatives used reimbursement flash cards which drew attention to the spread. Eisai also marketed the spread when promoting Aloxi, Fragmin, and Dacogen. Id., ¶ 201. Again, these were given as *examples* of a broader, nationwide practice—as was also the case with the other kickback schemes.

[6] Id., ¶ 212. For example, Eisai gave Florida Cancer Specialists, U.S. Oncology in Texas, and Jackson Memorial Hospital steep discounts on Aloxi and Fragmin. Id., ¶ 213. These discounts were not reported to CMS as required. Id., ¶¶ 212, 216. Eisai intended that their manipulation of AWP, failing to report discounts in order to maintain artificially high AWP, would result in higher Medicare and Medicaid reimbursement.

Pharmaceutical companies enter into Rebate Agreements with the HHS Secretary to provide rebates. See 42 U.S.C. §1396r-8(a)(1). The Rebate Agreements require manufacturers to submit a Quarterly Report (Form CMS-367). The Quarterly Report includes information concerning each of the manufacturer's "covered" drugs, including such information as its "Average Manufacturer Price" ("AMP"), "Baseline AMP," and "Best Price." After receiving these Quarterly Reports, and based upon the information contained in them, CMS then informs the states how much rebate the state is entitled to collect with respect to each drug.  For "single source drugs" and "innovator multiple source drugs", manufacturers are required to rebate 15.1%, or the difference between AMP and Best Price at which the manufacturer sells the product to a non-public health service or Veterans Administration customer, whichever is greater.

As noted above, a pharmaceutical company is required to report its best price for each prescription drug to the CMS, which calculates the unit rebate amount and reports that amount to the state Medicare/Medicaid agency, which then calculates the total rebate.  A pharmaceutical company has an enormous financial incentive to falsify its best price reporting in order to decrease the overall rebate liability. Failure to accurately report the best price, which is required to include any and all rebates, discounts, grants, coupons, and other incentives offered to purchasers, constitutes pharmaceutical fraud under the FCA. There was a deliberate avoidance by Eisai of any centralized accounting to monitor whether the discounts afforded to commercial customers exceeded the best price allowed to the Government.  Indeed, the opposite was true. During all relevant times herein, both Aloxi and Fragmin were well known within Eisai as being contract drugs. To Eisai sales representatives, that meant that they were given free rein in negotiating whatever discount was necessary to "make the deal", i.e., to secure the sale.  Every steep discount was approved by management.

Another strategy employed by Eisai in the sale of Aloxi and Fragmin was to "bundle" the two drugs together and then offer them to hospitals at far below the combined "best price" for the two drugs. In another, related discount scheme, Eisai offered U.S. Oncology, a group purchasing organization, heavily discounted or free Fragmin, Aloxi and Dacogen in return for CTCL 25 patient information. The information revealed which U.S. Oncology members were treating patients diagnosed with CTCL. Eisai then used this patient information to target physicians treating CTCL. Again, the discounted sales prices for these drugs were *not* reported to

the federal government. The steep discounts on Aloxi and Fragmin, which were not reported to CMS (and hence, not reported to the Medicare and Medicaid Programs) unlawfully permitted physicians, hospitals, and other health care providers to obtain higher profits from treating Medicaid patients, at the expense of the Medicare Rebate Program, 42 U.S.C. §1396r-8, and in violation of the FCA.

Again, the above is merely a summary of approximately 100 pages of factual allegations in the Complaint, which of course frames the issues in the lawsuit.

### EISAI'S DEFENSES

Although Eisai has a pending Motion to Dismiss and has not yet filed its Answer and Affirmative Defenses, many of its defenses are clear as day from its Motion to Dismiss [DE 95]. Therein, Eisai argued, *inter alia*, that its marketing of the drugs has been lawful and proper; that its payments to providers was lawful; that physicians have the right to prescribe FDA-approved or compendium-listed drugs for an off-label use; that its financial arrangements with health care providers fall within legal safe harbors of the Anti-Kickback Statute; that its "best price" violations were not, in fact, violations of Medicare and Medicaid laws and rules; and that its marketing of the drugs and sales of the drugs to the Government could not be illegal because they are First Amendment-protected speech.  It can certainly be anticipated that these will also be affirmative defenses. Keeler recently filed an Opposition to this Motion to Dismiss, countering every argument. One of Keeler's principal counter-arguments was that pharmaceutical marketing is not protected by the First Amendment when the information is false or goes beyond the marketing boundaries that were set by the FDA (e.g., a false statement about the effectiveness of Ontak or Dacogen).

Of course, these alleged defenses, and Keeler' counter-arguments, must also be taken into account in assessing the scope of discovery. Eisai cannot simultaneously be allowed to argue that its marketing materials were truthful, and that it did not exceed the FDA's permissible scope for marketing, while withholding documents that are relevant to those claims/defenses, and resist Requests for Production which are reasonably calculated to lead to the discovery of evidence that those claims/defenses are accurate or inaccurate. But a review of Eisai's objections to the RFPs makes completely clear that Eisai wants "its cake and eat it too" in precisely that manner. Federal Rules 26 and 34, and Supreme Court and Eleventh Circuit precedents, clearly disallow Eisai from succeeding with such a strategy.

*Because Keeler contends that off-label marketing is directly tied to the FDA approval process, and because Eisai contends that its marketing was proper[7], and safer and more effective than the failure to off-label market, this case goes far beyond marketing, to the actual research and development of the Subject Drugs.  Accordingly, so must the scope of discovery, or Keeler will be stripped of an opportunity to penetrate Eisai's shield with evidence.*

## EISAI'S GENERAL OBJECTIONS

Eisai asserted the following "General Objections":

"Eisai objects to these requests, which were served on July 8, 2011, because Relator has refused to grant any extension of time to respond to these requests notwithstanding sections I(A) and (D) of the Court's Discovery Practices Handbook, and because Relator seeks actual production within five days after the response is due.

"Eisai objects to these requests to the extent they seek documents that are subject to the attorney-client or attorney work product privilege. Eisai also objects to these requests because they are so broad that as currently stated, it is extremely difficult for Eisai to determine those documents that may be subject to the attorney-client or attorney work product privilege.

"Eisai does not concede that any of the documents produced in response to these requests are relevant to the claims or defenses in this case or will be admissible at the trial or in any other proceeding in this or any other action, and Eisai does not waive any objections to the use of any documents produced at trial or in any other proceedings in this or any other action.

"These general objections are expressly incorporated into each of the specific responses set forth below. Eisai reserves the right to supplement these objections as necessary."

## RELATOR'S RESPONSE TO EISAI'S GENERAL OBJECTIONS

Eisai's general objections are invalid.  The Federal Rules of Civil Procedure and Local Rules clearly require the objection party to make specific objections to each specific request.

Relator did offer Eisai a brief extension of time to produce the documents, which was rejected. A greater amount of time would have been offered except for the fact that the discovery deadline is set for February 2012, and a greater extension of time might have compounded problems for completing discovery by that time.

Eisai's general objection on the basis of "the attorney-client or attorney work product privilege" is impermissibly broad and lacking in specificity.  A privilege log was also required in order to properly object on this basis. None was provided. That right arguably has been waived.

---

[7] For example, Eisai contends that the Drugdex compendia (one of several compendia) supports the off-label uses at issue in this action—at least for Ontak.

Eisai's serial claims that the Requests are "overbroad, overly burdensome, and seeking irrelevant documents" ignore Eisai's responsibilities under Rules 26 and 34, and have been made in disregard of the allegations of the case.

Eisai was not permitted to expressly incorporate general objections into each individual response. In any event, all of Eisai's general (and specific) objections are improper.

## [EISAI'S] OBJECTIONS TO RELATOR'S INSTRUCTIONS

"Eisai objects to the timing and manner of production set forth in Relator's request. Subject to Relator's agreement to reimburse Eisai for copying costs and upon execution or entry of a confidential agreement or order, Eisai will provide copies of those documents that are being produced on a rolling basis by mailing them to the law office of Stephen Grover. It will attempt to complete production by September 12, 2011, and will provide a privilege log for those documents that are among the categories of documents Eisai has agreed to produce and that are being withheld under a claim of privilege within 30 days after completion of its production.

"Eisai objects to these requests to the extent that they purport to impose obligations upon Eisai greater than or beyond the requirements of the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the Southern District of Florida."

## KEELER'S RESPONSE TO RELATOR'S INSTRUCTIONS

Eisai has no right to produce documents on a rolling basis as it unilaterally deems appropriate. Besides, Eisai still has not produced a single document. Eisai's privilege log is delinquent. Eisai has no automatic right to a protective order or confidentiality agreement, and should have moved for one or the other by the due date for its response to the Requests. The Requests do not impose obligations on Eisai greater than or beyond the requirements of the Federal Rules of Civil Procedure or Local Rules.

## [EISAI'S] OBJECTIONS TO RELATOR'S DEFINITIONS

"Eisai objects to the definition of 'relates to,' 'relating to,' and 'related to,' as set forth in Definition 2 because it is overly broad in scope, vague, and ambiguous, as it defines those terms to mean 'directly or indirectly referring to, evidencing, pertaining to, consisting of, reflecting, concerning and/or in any way logically or factually connected with the matter discussed.'

"Eisai objects to the definition of 'you' and 'your' as set forth in Definition 3 because it is overly broad in scope, vague, and ambiguous, as it defines those terms to include 'EISAI INC., and any and all of its branches, departments, affiliates, parent corporation(s)/ company(ies), subsidiary corporation(s)/company(ies), as well as all of their officers, directors, employees, servants, workers, independent contractors, agents, assigns and successors' and 'all persons who acted on your behalf at any time in relation to any of these discovery requests.'

23

"Eisai objects to the definition of 'Eisai Inc.' in Definition 6 because it is overly broad in scope, vague, and ambiguous, as it is defined to include 'its parent corporation(s)/ company(ies), subsidiary(ies), and/or any and all of their branches, departments, affiliates, officers, directors, employees, servants, workers, independent contractors, agents, assigns and successors,' as well as 'any and all persons who acted on your behalf at any time in relation to any of these discovery requests.'

"Eisai objects to the definition of 'U.S.A.' in Definition 14 because it is overly broad in scope, as it includes 'all agencies and programs of the United States Government.'"

## RESPONSE TO OBJECTIONS TO RELATOR'S DEFINITIONS

Relator's definitions of "relates to," "relating to," "related to," "you," "your," Eisai Inc.," and "U.S.A." are proper, used for the sake of clarity, and are consistent with the Federal Rules 26 and 34's standards that discovery is proper if "reasonably calculated to lead to the discovery of admissible evidence," and that a party has a duty to produce all such documents that are within its possession, custody, or control.  Because of the latter standard, Eisai is required to obtain and produce all such documents in the possession, custody, or control of any employee or agent of Eisai or any related company. Eisai also has no right to change the definitions.

## [EISAI'S] OBJECTIONS AND RESPONSES TO SPECIFIC REQUESTS

"The foregoing general objections and objections to Relator's instructions and definitions are specifically incorporated as if set forth verbatim in each of the following responses. Eisai's specific response and objections to each individual request is submitted without prejudice to and without in any respect waiving any general objections or objections to Relator's instructions or definitions not expressly set forth in the individual response."

[Relator previously disagreed with the above.]

## INCORPORATIONS INTO KEELERS REPLIES

For the sake of brevity, Keeler incorporates his above arguments into each Reply below, including all of the "discovery," "objection," and "privilege" arguments above.  Keeler also incorporates the following argument, stated above, into each Reply: "Despite the breadth of Eisai's three schemes…, it is very important to note, in assessing the alleged burdensomeness of Keeler's RFPs to Eisai, that the off-labeling marketing and kickback schemes do *not* involve allegations that Eisai submitted false claims to the Government. It is the health care providers (e.g., doctors, hospitals, pharmacies) who submitted claims for reimbursement to Medicare and Medicaid. This is a "*cause to be submitted*" case in which it is alleged that Eisai has *caused*

providers to present claims for improper Medicare and Medicaid reimbursement, stemming from Eisai's schemes. Consequently, the universe of documents that Eisai possesses, or has custody or control of, is far, far less extensive than if Eisai had submitted the actual claims to the Government (which *is* the situation in many FCA cases, in which it is alleged that the providers themselves submitted the claims to Medicare and/or Medicaid). Thus, for example, a request for all CMS-1500s relating to the drugs would not trigger a very large number of documents."

### REQUEST NO. 1
Please produce a complete **privilege log** for any and all documents that have been requested and that you contend are privileged.

### RESPONSE TO REQUEST NO. 1
As set forth in its objections to Relator's instructions, within 30 days after completion of its production, Eisai will produce a privilege log for those documents, if any, that are among the categories of documents Eisai has agreed to produce in response to Relator's first request for production that are being withheld under a claim of privilege.

### RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 1
Eisai stated that it will produce a privilege log "within 30 days after completion of its production." Because Eisai has not agreed to produce the documents within a time certain, its promise to produce a privilege log within 30 days of that indefinite, future time is also not a time certain. Eisai has no right to unilaterally decide to postpone, indefinitely or otherwise, production of a privilege log. Its rights have been waived, particularly considering the prejudice to Keeler if the trial date is not continued by 8-9 months with an 8-9 month extension of all pretrial deadlines.

### REQUEST NO. 2
Please produce any and all documents that you have obtained through **subpoenas, subpoenas duces tecum,** and/or that you have received and/or obtained from **third parties** that relate in any way to the case at bar and/or the allegations in the Second Amended Complaint therein.

### RESPONSE TO REQUEST NO. 2
Eisai objects to this request because it fails to describe with reasonable particularity the documents sought as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in both time period and scope, and unduly burdensome, as it requests any document received at any time from any third-party that relates in any way to the case or the allegations in the third amended complaint.  For these same reasons, Eisai objects to this request because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections or its general objections, Eisai will produce copies of any documents obtained through subpoenas, subpoenas duces tecum, or informal requests by counsel to third-parties in this action.  Eisai presently has no documents that are responsive to this request.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 2**
This Request asks for relevant documents obtained from third parties, by subpoena or otherwise, *that relate to the allegations in this lawsuit*. It is therefore neither an overly broad request for "everything under the sun," unduly burdensome, nor seeking documents not reasonably calculated to lead to the discovery of admissible evidence.  Rather, this request is tailored to the specific allegations in this lawsuit, and is therefore clearly reasonable.

**REQUEST NO. 3**
Please produce any and all documents relating in any way to **Michael Keeler,** including, but not limited to, his personnel and/or employment file, documents concerning his employment by you, e-mails to and/or from him, and/or e-mails that refer to him in any way.

**RESPONSE TO REQUEST NO. 3**
Eisai objects to this request because it fails to describe the documents sought with reasonable particularity as required by Fed. R. Civ. P. 34(b)(1)(A) and because the request is overly broad in both time period and scope and unduly burdensome, as it requests every document that mentions the Relator, a former employee of Eisai, without any limitations as to time period or subject matter. For this same reason, Eisai objects to this request because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence.  Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce the personnel file for Michael Keeler.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO.  3**
This Request for documents relating to Relator Michael Keeler, including his personnel file and e-mails to and from him, and concerning him, is clear and reasonably calculated to lead to the discovery of admissible evidence. Keeler, the relator, worked for Eisai for approximately two-and-a-half years: from September 2006 through April 2009.  During that period (and beyond it), the Complaint alleges, Eisai conducted illegal off-label marketing through its sales representatives (including Keeler himself) and others, and made illegal kickbacks to health care providers. As the Complaint alleges, Keeler repeatedly objected to Eisai's off-label marketing while he worked for Eisai. Therefore, his personnel files and e-mails to and from him, or about him, are relevant to this case, or could lead to the discovery of additional evidence in this case. His e-mails would show that Eisai was on notice of much of the illegal activity alleged in this case, and are highly relevant because the FCA generally requires proof that a defendant knowingly, or with reckless disregard, submitted false claims, or caused them to be submitted. Keeler's workplace experiences are completely intertwined with the allegations of this lawsuit. For all of these reasons, this Request is clearly reasonable and proper.

**REQUEST NO. 4**
Please produce a comprehensive list of the **full names of all persons employed by you at any time from 2004 through the present**, including their last-known home addresses, phone numbers, and e-mail addresses.  Please indicate which employees are current employees of yours and which are not.  Alternatively, two such lists may be produced:  one of current employees, and the other of former employees.

**RESPONSE TO REQUEST NO. 4**

Eisai objects to this request because it is overly broad in both time period and scope, as it requests the name of every person who was employed by Eisai at any time from 2004 to the present. For these same reasons, Eisai objects to this request because it seeks documents that are not relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai further objects to this request to the extent it seeks personal contact information for all of those persons for these same reasons. To the extent that the persons are employed by Eisai, they can be contacted through counsel for Eisai. Without waiving these objections or its general objections, Eisai will produce the current employee directory and organizational charts from 2006 to the present. In addition, to the extent that Relator seeks to contact certain former employees of Eisai, Eisai will advise Relator whether those persons are represented by counsel and if they are not, will provide the last known contact information for those individuals.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 4**

This Request for the full names of all persons employed by Eisai at any time from 2004 through the present, and their contact information, is clearly a reasonable request for information concerning persons who have or may have discoverable information. This Honorable Court should note that, despite Eisai's offer to produce "the current employee directory and organizational charts from 2006 to the present," that falls far short of what was requested. Moreover, Eisai nonetheless objects on several grounds, which must be overruled. These employees are very likely to have discoverable information concerning the off-label marketing, kickback, and/or "best price" schemes that are alleged in the Complaint. Eisai's objections are an attempt to cut off Keeler from sources of information to prove the Government's losses of at least tens of millions of dollars are a result of Eisai's schemes. Although the Complaint alleges schemes from September 2005 forward (beginning with Eisai's acquisition of the rights to Fragmin in September 2005), it is proper to go back to 2004 because employees working with Eisai prior to September 2005 may have known about Eisai's plans to conduct the schemes before the schemes were actually implemented. Further, an employee working for Eisai in 2004 or 2005 may have been aware of similar off-label marketing, best price, and/or kickback schemes with other drugs during those years, which also helps establish the "knowledge," "deliberate ignorance", and/or "reckless disregard standards of the FCA.

**REQUEST NO. 5**

Please produce any and all **expert reports and resume's**.

**RESPONSE TO REQUEST NO. 5**

Eisai objects to this request as it is premature and seeks expert disclosure materials prior to the date set in the Court's July 5, 2011 Scheduling Order for Pretrial Conference and Trial. Without waiving this objection or its general objections, Eisai will provide its expert disclosures, including the expert's report and resume, on or before the date set in the Court's July 5, 2011 Order for its expert disclosures.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 5**

27

This response to a request for expert reports and resume's is fine for the present, provided that Eisai produces them when they are due and updates this response as others are created, as required.

**REQUEST NO. 6**
Please produce any and all documents showing, reflecting, and/or relating in any way to **communications between you and the U.S.A., including, but not limited to the FDA, the Justice Department, and CMS (and any of their agents or employees), relating to Ontak**, **Fragmin, Aloxi and/or Dacogen**.

**RESPONSE TO REQUEST NO. 6**
Eisai objects to this request because it fails to describe with reasonable particularity the documents sought as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in both time period and scope and unduly burdensome, as it requests every document relating in any way to any communication between Eisai and the United States, irrespective of the date or subject matter, concerning Ontak, Fragmin, Aloxi, or Dacogen. For this same reason, and because of the Request's definition of "relating to," Eisai also objects to this request because it is vague and ambiguous, and it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce all correspondence from 2006 to 2009 between Eisai's regulatory affairs department and the FDA concerning (i) FDA Form 2253 regarding promotional material, (ii) applications filed with the FDA for new or expanded indications for Ontak and Dacogen, and (iii) any FDA warning letters for Ontak, Fragmin, Aloxi, or Dacogen.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 6**
Eisai should not be allowed the means to hide documents from discovery by letting these improper objections stand. This Request is for relevant or potentially relevant documents, given the Complaint's allegations of myriad violations of federal laws concerning these four drugs— the drugs at issue in this case (as opposed to the many other drugs that Eisai manufacturers). Eisai's communications with the FDA and other government agencies about approval, non-approval, marketing, use, and billing of these drugs are obviously central to this case, because this case concerns off-label marketing of Ontak and Dacogen, as well as kickback and "best price" violations concerning Fragmin, Dacogen, Ontak, and Aloxi. The dates are not open-ended in this Request because the alleged schemes took place from September 2005 forward.

**REQUEST NO. 7**
Please produce any and all documents relating to and/or reflecting **learned treatises** that you intend to introduce into evidence and/or use for rebuttal or impeachment purposes.

**RESPONSE TO REQUEST NO. 7**
Eisai objects to this request because it is premature to the extent it requests learned treatises Eisai may introduce into evidence or use for rebuttal purposes. Eisai also objects to this request to the extent it seeks learned treatises that may be used as impeachment exhibits because the request calls for information subject to the attorney-work product privilege and

violates the Court's July 5, 2011 Order and Local Rule 16.1(e)(9) and Local Rule 26.1(d)(3)(C). Without waiving these objections or its general objections, Eisai states that it will produce those learned treatises that it intends to introduce into evidence or use for rebuttal purposes at the time specified in the Court's July 5, 2011 Order, that it does not presently know what learned treatises it intends to introduce into evidence or use for rebuttal purposes, and that it does not anticipate that it will know those documents it intends to use until exhibit lists are exchanged.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 7

Eisai's objection on the basis of the attorney-work product privilege is improper because the learned treatises that a party intends to rely on at trial are not protected by that privilege. They cannot be both privileged *and* usable by Eisai as evidence, at trial or otherwise. Otherwise, this response is otherwise fine, provided that Eisai timely produces the learned treatises by the Court-mandated deadline, as promised, and supplements its production as required under the Federal Rules.

## REQUEST NO. 8

Please produce any and all documents relating to your **research, development, marketing, sales, and/or policies and/or procedures relating to Ontak**.

## RESPONSE TO REQUEST NO. 8

Eisai objects to this request because it fails to describe with reasonable particularity the documents sought as required by Fed. R. Civ. P. 34(b)(1)(A), because it is overly broad in both time period and scope, and because it is unduly burdensome, as it requests every document relating to the "research, development, marketing, sales, and/or policies and/or procedures relating to Ontak" without limitation as to time period or specific subject matter. For these same reasons, as well as the Request's definition of "relating to," Eisai objects to this request because it is both vague and ambiguous, and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce its health care provider policies, annual business plans, and its employee policies and principles of corporate conduct, for the sales, marketing, and reimbursement of Ontak from 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 8

Eisai's objections are improper because this Request is for relevant documents needed to prove the Government's case on all three schemes relating to Ontak. Relator alleges that Eisai illegally off-label marketed Ontak, gave health care providers kickbacks to induce them to prescribe the drug off-label, and committed "best price" violations with Ontak. Off-label marketing is only illegal, by definition, when the marketing is for purposes that are not FDA-approved and/or supported by proper scientific research for FDA approval. Pharmaceutical companies are required by law to produce research and other scientific data and documents in support of applications for drug approval by the FDA, as detailed above. This Request is also designed to capture documents relating to the kickback and "best price" schemes. Therefore, this Request for all documents relating to research, development, marketing, sales, and/or policies and/or

procedures relating to Ontak is one for highly relevant documents. The dates are not open-ended in this Request because the alleged Ontak schemes took place from October 2006 forward.

## REQUEST NO. 9
Please produce any and all documents relating to your **research, development, marketing, sales, and/or policies and/or procedures relating to Fragmin**.

## RESPONSE TO REQUEST NO. 9
Eisai objects to this request because it fails to describe with reasonable particularity the documents sought as required by Fed. R. Civ. P. 34(b)(1)(A), because it is overly broad in both time period and scope, and because it is unduly burdensome, as it requests every document relating to the "research, development, marketing, sales, and/or policies and/or procedures relating to Fragmin" without limitation as to time period or specific subject matter. For these same reasons, as well as the Request's definition of "relating to," Eisai objects to this request because it is both vague and ambiguous, and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce its health care provider policies, annual business plans, and its employee policies and principles of corporate conduct, for the sales, marketing, and reimbursement of Fragmin from 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 9
Eisai's objections are improper because this Request is for relevant documents needed to prove the Government's case on all three schemes. For example, Keeler alleges that Eisai committed "best price" violations with Fragmin from September 2005 forward. As detailed above, pharmaceutical companies are required to report their best price for each prescription drug to the CMS, which calculates the unit rebate amount and reports that amount to the state Medicare/Medicaid agency, which then calculates the total rebate. Failure to accurately report the best price, which is required to include any and all rebates, discounts, grants, coupons, and other incentives offered to purchasers, constitutes pharmaceutical fraud under the FCA. Keeler has alleged that there was a deliberate avoidance by Eisai of any centralized accounting to monitor whether the discounts afforded to commercial customers exceeded the best price allowed to the Government. Indeed, he alleges that the opposite was true, and that Fragmin was well known within Eisai as being a "contract drug." To Eisai sales representatives, that meant that they were given free rein in negotiating whatever discount was necessary to "make the deal", i.e., to secure the sale. Every steep discount was approved by management. Another strategy employed by Eisai in the sale of Aloxi and Fragmin was to "bundle" the two drugs together and then offer the two drugs to hospitals at far below the combined Best Price for the two drugs. In another, related discount scheme, Eisai offered U.S. Oncology, a group purchasing organization, heavily discounted or free Fragmin, Aloxi and Dacogen in return for CTCL 25 patient information. The information revealed which U.S. Oncology members were treating patients diagnosed with CTCL. Eisai then used this patient information to target physicians treating CTCL. Again, the discounted sales prices for these drugs were *not* reported to the federal government. The steep discounts on Aloxi and Fragmin, which were not reported to CMS (and hence, not reported to the Medicare and Medicaid Programs) unlawfully permitted physicians,

hospitals, and other health care providers to obtain higher profits from treating Medicaid patients, at the expense of the Medicare Rebate Program, 42 U.S.C. §1396r-8, and in violation of the False Claims Act. Therefore, this Request for all documents relating to research, development, marketing, sales, and/or policies and/or procedures relating to Fragmin is one for highly relevant documents. The dates are not open-ended in this Request because the alleged Fragmin schemes took place from September 2005 forward.

## REQUEST NO. 10
Please produce any and all documents relating to your **research, development, marketing, sales, and/or policies and/or procedures relating to Aloxi**.

## RESPONSE TO REQUEST NO. 10
Eisai objects to this request because it fails to describe with reasonable particularity the documents sought as required by Fed. R. Civ. P. 34(b)(1)(A), because it is overly broad in both time period and scope, and because it is unduly burdensome, as it requests every document relating to the "research, development, marketing, sales, and/or policies and/or procedures relating to Aloxi" without limitation as to time period or specific subject matter. For these same reasons, as well as the Request's definition of "relating to," Eisai objects to this request because it is both vague and ambiguous, and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce its health care provider policies, annual business plans, and its employee policies and principles of corporate conduct, for the sales, marketing, and reimbursement of Aloxi from 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 10
Eisai's objections are improper because this Request is for relevant documents needed to prove the Government's case. Relator alleges that Eisai committed "best price" and kickback violations with Aloxi from January 2008 forward. The dates are not open-ended in this Request because the alleged Aloxi schemes took place from January 2008 forward. For brevity's sake, Keeler incorporates by reference the arguments above, especially in RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 9. Substantially the same arguments apply with this drug.

## REQUEST NO. 11
Please produce any and all documents relating to your **research, development, marketing, sales, and/or policies and/or procedures relating to Dacogen**.

## RESPONSE TO REQUEST NO. 11
Eisai objects to this request because it fails to describe with reasonable particularity the documents sought as required by Fed. R. Civ. P. 34(b)(1)(A), because it is overly broad in both time period and scope, and because it is unduly burdensome, as it requests every document relating to the "research, development, marketing, sales, and/or policies and/or procedures relating to Dacogen" without limitation as to time period or specific subject matter. For these same reasons, as well as the Request's definition of "relating to," Eisai objects to this request because it is both vague and ambiguous, and because it seeks documents that are neither relevant

to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce its health care provider policies, annual business plans, and its employee policies and principles of corporate conduct, for the sales, marketing, and reimbursement of Dacogen from 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 11

Relator allegesoff-label marketing, kickbacks, and best price violations with respect to Dacogen from 2008 forward. Therefore, documents relating to Eisai's research, development, marketing, sales, and/or policies and/or procedures relating to Dacogen are clearly relevant, and certainly this request is reasonably calculated to lead to the discovery of admissible evidence.  The dates are not open-ended in this Request because the alleged Dacogen schemes took place from January 2008 forward. For brevity's sake, Keeler incorporates by reference the arguments above, especially in RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 9. Substantially the same arguments apply with this drug.

## REQUEST NO. 12

Please produce any and all **witness statements** (i.e., statements from one or more persons) relating in any way to the allegations in the Second Amended Complaint and/or any prior or subsequent operative complaint in the case at bar.

## RESPONSE TO REQUEST NO. 12

Eisai objects to this request because it is vague and ambiguous and seeks documents subject to the attorney-client and attorney work product privilege and because the request for a privilege log violates Local Rule 26.1(g)(3)(C).

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 12

A privilege log was required under the Federal Rules and Local Rules.  There is nothing vague about this straightforward request for "any and all **witness statements** (i.e., statements from one or more persons) relating in any way to the [Complaint's] allegations."

## REQUEST NO. 13

Please produce any and all documents relating in any way to **your agreement with Ligand Pharmaceutical in 2006 to purchase all the rights to Ontak and Targretin**, including, but not limited to, any and all documents and/or communications preceding and following that agreement.

## RESPONSE TO REQUEST NO. 13

Eisai objects to this request because it is vague and ambiguous, and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence as it seeks, without limitation as to time period or specific subject matter, all documents relating to the agreement with Ligand Pharmaceutical in 2006 to purchase all the rights to Ontak and Targretin, and because it is vague and ambiguous due to the Request's definition of "relating to." Eisai also objects to this request to the extent it calls for documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will

produce a copy of the Purchase Agreement between Eisai and Ligand Pharmaceutical (as well as the exhibits to that agreement), and due diligence materials relating to the possible off-label marketing of Ontak or the warning letter from the FDA to Ligand Pharmaceutical regarding Ontak.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 13**
It is difficult to conceive of a Request for Production that is more relevant than this one to Keeler's allegations of off-label marketing of Ontak. As set forth above, Relator has alleged that Eisai purchased the rights to Ontak from Ligand Pharmaceuticals, Inc. On October 23, 2006, the FDA issued a stern Warning Letter to Ligand after review of Ligand's use of a cutaneous T-cell lymphoma study as a promotional item for Ontak. The FDA found that Ligand had been overstating the effectiveness of Ontak, broadening its indication, and minimizing its risks. On October 25, 2006, a mere two days after the issuance of the FDA Warning Letter, Eisai finalized and closed on its agreement with Ligand to purchase all rights to Ontak (as well as the drug, Targretin) for approximately $200 million dollars. It is alleged that Eisai knew of the FDA Warning Letter to Ligand when it bought the rights to Ontak on October 25th. Despite the stern Warning Letter, Eisai began off-label marketing Ontak right away, and continued to do so thereafter, ignoring the limitations of Ontak's narrow indication and directing its sales force to off-label promote Ontak for a variety of much more commonly occurring cancers, including, but not limited to: ovarian cancer, melanoma, B-cell non-Hodgkin's lymphoma, and Graft versus Host disease. Indeed, Eisai even used many of Ligand's sales materials when conducting off-label marketing and consummating sales. The documents requested would reflect whether Eisai was aware of the FDA's Warning Letter concerning these drugs, would establish Eisai's knowledge that the off-label marketing of them was illegal, and would show whether Eisai was able to purchase the rights to the drugs at a lower price because of the FDA letter. This Request is not vague, and not open-ended as to dates because it centers around the purchase of rights to Ontak and Targretin that took place in October 2006, but were initiated well before that, of course. Hence, relevant documents will naturally precede that October 2006, reflecting the plan for and negotiations over and leading up to the purchase, encompass that date, and perhaps of course follow that date.

**REQUEST NO. 14**
Please produce any and all documents relating in any way to your **marketing and/or sales of Ontak**.

**RESPONSE TO REQUEST NO. 14**
Eisai objects to this request because it is duplicative of Request No. 8. Accordingly, Eisai incorporates herein by reference its objections and response to Request No. 8.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 14**
This Request is not duplicative of Request No. 8, but does form a subset of it. This Request was for "any and all documents relating in any way to your **marketing and/or sales of Ontak**." Request number 8 was for "any and all documents relating to your **research, development, marketing, sales, and/or policies and/or procedures relating to Ontak**." Thus, this Request is more narrow, and was made in the very unlikely event that Request No. 8 was not fully enforced

by the Court.  For the sake of brevity, Relator incorporates herein his arguments above with respect to Request No. 8. Substantially the same arguments apply with this drug.

## REQUEST NO. 15
Please produce any and all documents relating in any way to the **pricing, sale prices, sales, and/or reimbursement rates, of Aloxi to and/or for health care providers, the U.S.A., Medicare, Medicaid, and/or the 50 states of the U.S.A.**

## RESPONSE TO REQUEST NO. 15
Eisai objects to this request because it fails to describe with reasonable particularity the documents sought as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in both time period and scope, as it is unlimited in time period or specific subject matter. For these reasons, as well as the Request's definition of "relating to," Eisai also objects to this request because it is vague and ambiguous, and because it seeks documents that are neither relevant to the claims and defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce its health care provider policies, annual business plans, and summary of annual sales, as well as its employee policies and principles of corporate conduct, for sales, marketing, or reimbursement of Aloxi, from 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 15
This Request for "any and all documents relating in any way to the **pricing, sale prices, sales, and/or reimbursement rates, of Aloxi to and/or for health care providers, the U.S.A., Medicare, Medicaid, and/or the 50 states of the U.S.A.**" directly targets relevant documents needed to prove the Relator's allegations of Aloxi best price and kickback violations. This Request is not open-ended; Eisai acquired the rights to Aloxi in January 2008—which naturally limits the scope of the documents and renders empty Eisai's objection that the Request is overly broad in time period.

## REQUEST NO. 16
Please produce any and all documents relating to **conferences and/or meetings relating in any way to Ontak**.

## RESPONSE TO REQUEST NO. 16
Eisai objects to this request because it fails to describe the documents sought with reasonable particularity as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in both time period and scope and unduly burdensome, as it seeks all documents relating to *any* conference or meeting relating to Ontak, notwithstanding the time the meeting took place, the subject matter of the meeting, the attendees at the meeting, or the size of the meeting. For these reasons, and because of the Request's definition of "relating to," Eisai also objects to this request because it is vague and ambiguous, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce agendas and presentation materials that exist for national sales meetings and plan of

action meetings for 2006 to 2009.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 16**
Relator has alleged three schemes with respect to Ontak: off-label marketing, kickbacks, and best price violations. Documents from or about conferences and/or meetings relating to Ontak are, of course, likely to cast light on these schemes. These documents are needed for Relator to prove the case. This Request is reasonably calculated to lead to the discovery of admissible evidence about the schemes. Eisai acquired the rights to Ontak in October 2006—not, say, twenty years ago. Hence, the Request is inherently limited in scope as to time.

**REQUEST NO. 17**
Please produce any and all documents relating to **conferences and/or meetings relating in any way to Aloxi.**

**RESPONSE TO REQUEST NO. 17**
Eisai objects to this request because it fails to describe the documents sought with reasonable particularity as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in both time period and scope and unduly burdensome, as it seeks all documents relating to *any* conference or meeting relating to Aloxi, notwithstanding the time the meeting took place, the subject matter of the meeting, the attendees at the meeting, or the size of the meeting. For these reasons, and because of the Request's definition of "relating to," Eisai also objects to this request because it is vague and ambiguous, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce agendas and presentation materials that exist for national sales meetings and plan of action meetings for 2006 to 2009.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 17**
Relator has alleged best price and kickback schemes with respect to Aloxi. Among other things, he alleges that Eisai "bundled" together sales of Aloxi and Fragmin and then offered the two drugs to hospitals at far below the combined best price for the two drugs. Documents from or about conferences and/or meetings relating to Aloxi are, of course, likely to cast light on these schemes. These documents are needed for Relator to prove the case. This Request is reasonably calculated to lead to the discovery of admissible evidence about the scheme. Eisai acquired the rights to Aloxi in January 2008—not, say, twenty years ago. Hence, the Request is inherently limited in scope as to time.

**REQUEST NO. 18**
Please produce any and all documents relating to **conferences and/or meetings relating in any way to Fragmin.**

**RESPONSE TO REQUEST NO. 18**
Eisai objects to this request because it fails to describe the documents sought with reasonable particularity as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in both time period and scope and unduly burdensome, as it seeks all documents relating to *any*

conference or meeting relating to Fragmin, notwithstanding the time the meeting took place, the subject matter of the meeting, the attendees at the meeting, or the size of the meeting. For these reasons, and because of the Request's definition of "relating to," Eisai also objects to the request because it is vague and ambiguous, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce agendas and presentation materials that exist for national sales meetings and plan of action meetings for 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 18

Relator has alleged best price and kickback schemes with respect to Fragmin.  Among other things, he alleges that Eisai "bundled" together sales of Aloxi and Fragmin and then offered the two drugs to hospitals at far below the combined best price for the two drugs.  Documents from or about conferences and/or meetings relating to Fragmin are, of course, likely to cast light on this scheme. These documents are needed for Relator to prove the case.  This Request is reasonably calculated to lead to the discovery of admissible evidence about the scheme. Eisai acquired the rights to Fragmin in September 2005—not, say, twenty years ago.  Hence, the Request is inherently limited in scope as to time.

## REQUEST NO. 19

Please produce any and all documents relating to **conferences and/or meetings relating in any way to Dacogen.**

## RESPONSE TO REQUEST NO. 19

Eisai objects to this request because it fails to describe the documents sought with reasonable particularity as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in both time period and scope, and unduly burdensome, as it seeks all documents relating to *any* conference or meeting relating to Dacogen, notwithstanding the time the meeting took place, the subject matter of the meeting, the attendees at the meeting, or the size of the meeting. For these reasons, and because of the Request's definition of "relating to," Eisai also objects to this request because it is vague and ambiguous, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to attorney-client or attorney work product privilege.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 19

Relator has alleged three schemes with respect to Dacogen:  off-label marketing, kickbacks, and best price violations. Documents from or about conferences and/or meetings relating to Dacogen are, of course, likely to cast light on these schemes. These documents are needed for Relator to prove the case. This Request is reasonably calculated to lead to the discovery of admissible evidence about the schemes. Eisai acquired the rights to Dacogen in January 2008—not, say, twenty years ago.  Hence, the Request is inherently limited in scope as to time.

## REQUEST NO. 20

Please produce any and all documents relating to **Medicare reimbursement rates and/or codes for Ontak, as well as any and all medical services related to the administration of Ontak**.

## RESPONSE TO REQUEST NO. 20

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to specify the particular aspect of coding or reimbursement. Eisai objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and the failure to specify the aspect of coding or reimbursement. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Ontak. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses Medicare reimbursement.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 20

This Request for documents "relating to **Medicare reimbursement rates and/or codes for Ontak, as well as any and all medical services related to the administration of Ontak**" directly targets relevant or potentially relevant evidence in this case. Relator alleges three schemes regarding Ontak: off-label marketing, kickbacks and best price violations. All of these three alleged schemes directly involve both Medicare reimbursement rates (which are tied to codes for the drugs) and medical services concerning their administration. For example, Relator alleged that Eisai created training materials so that its sales force could instruct health care providers on how they could seek reimbursement for off-label uses of Ontak. Relator also alleged that Eisai sales representatives then carried out these instructions by coaching health care providers on how they could seek reimbursement for off-label uses of Ontak. This Request goes directly to these practices. Documents concerning kickbacks to health care providers may also be shown by "documents…relating to Medicare reimbursement rates and/or codes for Ontak, as well as any and all medical services related to the administration of Ontak." Relator has also alleged best price violations concerning Ontak from October 2006 forward: that Medicare and Medicaid (and thus the taxpayer) were not given the lowest available price on prescription drugs provided under those programs, as compared to pharmacies and other private health care providers. This Request seeks documents that could prove that the best price was not, in fact, provided: that can only be done by comparing prices that were provided to private health care providers with those provided to Medicaid (through Medicare/CMS). The dates are not open-ended in this Request because the alleged schemes took place from October 2006 forward.

## REQUEST NO. 21

Please produce any and all documents relating to **Medicare reimbursement rates and/or codes for Aloxi, as well as any and all medical services related to the administration of Aloxi**.

## RESPONSE TO REQUEST NO. 21

Eisai objects to this request because it is overly broad in time period, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to specify the

particular aspect of coding or reimbursement. Eisai objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and the failure to specify the particular aspect of coding or reimbursement. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Aloxi. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses Medicare reimbursement.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 21**

Relator alleges that Eisai committed "best price" and kickback violations with Aloxi from January 2008 forward. That scheme directly involves both Medicare reimbursement rates (which are tied to codes for the drugs) and medical services concerning Aloxi's administration.  Relator alleges that private health care providers were illegally allowed lower prices for Aloxi than government health programs. He alleges that Eisai sales representatives were given free rein in negotiating whatever discount was necessary to "make the deal", i.e., to secure the sale, with private providers. Another strategy employed by Eisai in the sale of Aloxi and Fragmin was to "bundle" the two drugs together and then offer the two drugs to hospitals at far below the combined best price for the two drugs. This Request is reasonably directed at documents which could prove these best price schemes and violations, by directly targeting relevant or potentially relevant evidence in this case. That is, this Request seeks documents that could prove that the best price was not, in fact, provided. That can only be done by comparing prices that were provided to offered to private providers with those that were provided to Medicaid (through Medicare/CMS).  The dates are not open-ended in this Request because the alleged schemes took place from January 2008 forward.

**REQUEST NO. 22**

Please produce any and all documents relating to **Medicare reimbursement rates and/or codes for Fragmin, as well as any and all medical services related to the administration of Fragmin**.

**RESPONSE TO REQUEST NO. 22**

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to specify the particular aspect of coding or reimbursement. Eisai objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and the failure to specify the particular aspect of coding or reimbursement. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Fragmin. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses Medicare reimbursement.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 22**

Relator alleges that Eisai committed "best price" and kickback violations with Fragmin from September 2005 forward. That scheme directly involves both Medicare reimbursement rates (which are tied to codes for the drugs) and medical services concerning Fragmin's administration.  Relator alleges that private health care providers were illegally allowed lower prices for Fragmin than government health programs. He alleges that Eisai sales representatives were given free rein in negotiating whatever discount was necessary to "make the deal", i.e., to secure the sale, with private providers. Another strategy employed by Eisai in the sale of Aloxi and Fragmin was to "bundle" the two drugs together and then offer the two drugs to hospitals at far below the combined best price for the two drugs. This Request is reasonably directed at documents which could prove these best price schemes and violations, by directly targeting relevant or potentially relevant evidence in this case. That is, this Request seeks documents that could prove that the best price was not, in fact, provided. That can only be done by comparing prices that were provided to offered to private providers with those that were provided to Medicaid (through Medicare/CMS). The dates are not open-ended in this Request because the alleged schemes took place from September 2005 forward.

## REQUEST NO. 23
Please produce any and all documents relating to **Medicare reimbursement rates and/or codes for Dacogen, as well as any and all medical services related to the administration of Dacogen**.

## RESPONSE TO REQUEST NO. 23
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to specify the particular aspect of coding or reimbursement. Eisai objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and the failure to specify the particular aspect of coding or reimbursement. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Dacogen. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses Medicare reimbursement.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 23
This Request directly targets relevant or potentially relevant evidence in this case. Relator alleges three schemes regarding Dacogen: off-label marketing, kickbacks and best price violations.  All of these three alleged schemes directly involve both Medicare reimbursement rates (which are tied to codes for the drugs) and medical services concerning their administration. The dates are not open-ended in this Request because the alleged schemes took place from January 2008 forward. For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 20. Substantially the same arguments apply with this drug.

## REQUEST NO. 24

Please produce any and all documents relating to **Medicaid reimbursement rates and/or codes for Ontak, as well as any and all medical services related to the administration of Ontak**.

## RESPONSE TO REQUEST NO. 24

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the particular aspect of coding or reimbursement. Eisai objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and the failure to specify the particular aspect of coding or reimbursement. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Ontak. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses Medicaid reimbursement.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 24

This Request directly targets relevant or potentially relevant evidence in this case. Relator alleges three schemes regarding Ontak: off-label marketing, kickbacks and best price violations. All of these three alleged schemes directly involve both Medicare reimbursement rates (which are tied to codes for the drugs) and medical services concerning their administration. For example, Relator alleged that Eisai created training materials so that its sales force could instruct health care providers on how they could seek reimbursement for off-label uses of Ontak. Relator also alleged that Eisai sales representatives then carried out these instructions by coaching health care providers on how they could seek reimbursement for off-label uses of Ontak. This Request goes directly to these practices. Documents concerning kickbacks to health care providers may also be shown by "documents…relating to Medicaid reimbursement rates and/or codes for Ontak, as well as any and all medical services related to the administration of Ontak." Relator has also alleged best price violations concerning Ontak from October 2006 forward: that Medicare and Medicaid (and thus the taxpayer) were not given the lowest available price on prescription drugs provided under those programs, as compared to pharmacies and other private health care providers. This Request seeks documents that could prove that the best price was not, in fact, provided: that can only be done by comparing prices that were provided to private health care providers with those provided to Medicaid (through Medicare/CMS). The dates are not open-ended in this Request because the alleged schemes took place from October 2006 forward.

## REQUEST NO. 25

Please produce any and all documents relating to **Medicaid reimbursement rates and/or codes for Aloxi, as well as any and all medical services related to the administration of Aloxi**.

## RESPONSE TO REQUEST NO. 25

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the particular aspect of coding or reimbursement. Eisai objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege.

Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to" and the failure to specify the particular aspect of coding or reimbursement. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Aloxi. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses Medicaid reimbursement.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 25

Relator alleges that Eisai committed "best price" and kickback violations with Aloxi from January 2008 forward. These schemes directly involves both Medicaid reimbursement rates (which are tied to codes for the drugs) and medical services concerning Aloxi's administration. Relator alleges that private health care providers were illegally allowed lower prices for Aloxi than government health programs.  He alleges that Eisai sales representatives were given free rein in negotiating whatever discount was necessary to "make the deal", i.e., to secure the sale, with private providers. Another strategy employed by Eisai in the sale of Aloxi and Fragmin was to "bundle" the two drugs together and then offer the two drugs to hospitals at far below the combined best price for the two drugs. This Request is reasonably directed at documents which could prove these best price schemes and violations, by directly targeting relevant or potentially relevant evidence in this case.  That is, this Request seeks documents that could prove that the best price was not, in fact, provided.  That can only be done by comparing prices that were provided to offered to private providers with those that were provided to Medicaid (through Medicare/CMS).  The dates are not open-ended in this Request because the alleged schemes took place from Jan. 2008 forward.

## REQUEST NO. 26

Please produce any and all documents relating to **Medicaid reimbursement rates and/or codes for Fragmin, as well as any and all medical services related to the administration of Fragmin**.

## RESPONSE TO REQUEST NO. 26

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the particular aspect of coding or reimbursement. Eisai objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to" and the failure to specify the particular aspect of coding or reimbursement. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Fragmin. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses Medicaid reimbursement.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 26

Relator alleges that Eisai committed "best price" and kickback violations with Fragmin from September 2005 forward.  That scheme directly involves both Medicaid reimbursement rates (which are tied to codes for the drugs) and medical services concerning Fragmin's

administration. The dates are not open-ended in this Request because the alleged schemes took place from September 2005 forward. For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 25. Substantially the same arguments apply with this drug.

## REQUEST NO. 27
Please produce any and all documents relating to **Medicaid reimbursement rates and/or codes for Dacogen, as well as any and all medical services related to the administration of Dacogen**.

## RESPONSE TO REQUEST NO. 27
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the particular aspect of coding or reimbursement. Eisai objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to" and the failure to specify the particular aspect of coding or reimbursement. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Dacogen. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses Medicaid reimbursement.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 27
This Request directly targets relevant or potentially relevant evidence in this case. Relator alleges three schemes regarding Dacogen: off-label marketing, kickbacks and best price violations. All of these schemes directly involve both Medicare and Medicaid reimbursement rates (which are tied to codes for the drugs) and medical services concerning their administration. The dates are not open-ended in this Request because the alleged schemes took place from Jan. 2008 forward. For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 24. Substantially the same arguments apply with this drug.

## REQUEST NO. 28
Please produce any and all documents relating to the **use of ICD-9 diagnosis codes for Ontak**.

## RESPONSE TO REQUEST NO. 28
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Ontak. Documents

responsive to this request are also available on the eisaireimbursement.com website, which addresses ICD-9 diagnosis codes.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 28

ICD-9 codes are uniform, alphanumeric designation/diagnostic codes used by health care providers, Medicare, and Medicaid to describe every diagnosis, description of symptoms, and cause of death.  ICD-9's are developed by the National Center for Health Statistics ("NCHS"), which is part of CMS.  "ICD" is an acronym for "International Statistical Classification of Diseases".  ICD-9's may reflect not only the diagnosis and description of symptoms, but also the service that was provided to the patient.  ICD-9 codes are included in health care providers' claims for reimbursement, and to describe the services and diagnoses relating to a patient's care and treatment in general.  The critical relationship between an ICD-9 code and a CPT code is that the ICD-9, or diagnosis code, must support the medical necessity of the procedure.  The Request was for "**all documents relating to the use of ICD-9 diagnosis codes for Ontak**."  Relator alleges that Eisai illegally off-label marketed Ontak, gave health care providers kickbacks to induce them to prescribe the drug off-label, and failed to provide government health programs with the best price for Ontak, as compared to other health care providers.  With respect to the off-label allegations, the ICD-9 code is particularly important because it reflects the disease for which the drug was used or marketed for use, properly or improperly.  Relator has alleged that Eisai coached providers on what type of ICD-9s to use for requests for claims reimbursement, to ensure claims reimbursement for off-label use.  With respect to kickbacks, a written communication or other documents concerning a kickback could be tied to the ICD-9 code.  Hence, this Request directly targets documents that are relevant to this case, far beyond the limited sales training materials and reimbursement manuals that Eisai has agreed to produce, for too limited a time period. The dates are not open-ended in this Request because the alleged schemes took place from October 2006 forward.

## REQUEST NO. 29

Please produce any and all documents relating to the **use of ICD-9 diagnosis codes for Aloxi.**

## RESPONSE TO REQUEST NO. 29

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Aloxi. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses ICD-9 diagnosis codes.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 29

ICD-9 codes are uniform, alphanumeric designation/diagnostic codes used by health care providers, Medicare, and Medicaid to describe every diagnosis, description of symptoms, and cause of death.  ICD-9's are developed by the National Center for Health Statistics ("NCHS"),

which is part of CMS.  "ICD" is an acronym for "International Statistical Classification of Diseases".  ICD-9's may reflect not only the diagnosis and description of symptoms, but also the service that was provided to the patient.  ICD-9 codes are included in health care providers' claims for reimbursement, and to describe the services and diagnoses relating to a patient's care and treatment in general.  The critical relationship between an ICD-9 code and a CPT code is that the ICD-9, or diagnosis code, must support the medical necessity of the procedure.  The Request was for "**all documents relating to the use of ICD-9 diagnosis codes for Aloxi**."  Relator alleges that failed to provide government health programs with the best price for Aloxi, as compared to other health care providers, and committed kickback violations. Hence, this Request directly targets documents that are relevant to the claims or this case, far beyond the limited sales training materials and reimbursement manuals that Eisai has agreed to produce, for too limited a time period. The dates are not open-ended in this Request because the alleged schemes took place from January 2008 forward.

## REQUEST NO. 30
Please produce any and all documents relating to the **use of ICD-9 diagnosis codes for Fragmin**.

## RESPONSE TO REQUEST NO. 30
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Fragmin. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses ICD-9 diagnosis codes.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 30
Relator alleges "best price" and kickback violations with respect to Fragmin. Hence, this Request directly targets documents that are relevant to this case, far beyond the limited sales training materials and reimbursement manuals that Eisai has agreed to produce, for too limited a time period.  The dates are not open-ended in this Request because the alleged schemes took place from September 2005 forward. For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 29. Substantially the same arguments apply with this drug.

## REQUEST NO. 31
Please produce any and all documents relating to the **use of ICD-9 diagnosis codes for Dacogen**.

## RESPONSE TO REQUEST NO. 31
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and

fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Dacogen. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses ICD-9 diagnosis codes.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 31

Relator alleges that Eisai illegally off-label marketed Dacogen, gave health care providers kickbacks to induce them to prescribe the drug off-label, and failed to provide government health programs with the best price for Dacogen, as compared to other health care providers. Hence, this Request directly targets documents that are relevant to this case, far beyond the limited sales training materials and reimbursement manuals that Eisai has agreed to produce, for too limited a time period.  The dates are not open-ended in this Request because the alleged Dacogen schemes took place from Jan. 2008 forward. For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 28. Substantially the same arguments apply with this drug.

## REQUEST NO. 32

Please produce any and all documents relating to the **use of CMS claim form 1450 (UB-04) for Ontak**.

## RESPONSE TO REQUEST NO. 32

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Ontak. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses CMS claim form 1450.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 32

CMS claim form 1450 (UB-04) is a health insurance claim form published by CMS for use by institutional health care providers (e.g., hospitals) and pharmacies. Health care providers enter patient treatment information into these forms, as well as codes for prescription drug administration, dosage, and related information concerning the drug's use by the patient. The Request was for "any and all documents relating to the **use of CMS claim form 1450 (UB-04) for Ontak**." Relator has alleged three schemes with respect to Ontak: off-label marketing, kickbacks, and best price violations. Claim form 1450-related documents concerning Ontak are, of course, likely to cast light on these schemes. These documents are needed for Relator to prove the case.  This Request is reasonably calculated to lead to the discovery of admissible evidence about the schemes. Eisai acquired the rights to Ontak in October 2006—not, say, twenty years ago.  Hence, the Request is inherently limited in scope as to time.

## REQUEST NO. 33
Please produce any and all documents relating to the **use of CMS claim form 1450 (UB-04) for Aloxi.**

## RESPONSE TO REQUEST NO. 33
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Aloxi. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses CMS claim form 1450.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 33
CMS claim form 1450 (UB-04) is a health insurance claim form published by CMS for use by institutional health care providers (e.g., hospitals) and pharmacies. Health care providers enter patient treatment information into these forms, as well as codes for prescription drug administration, dosage, and related information concerning the drug's use by the patient. The Request was for "any and all documents relating to the **use of CMS claim form 1450 (UB-04) for Aloxi**." Relator has alleged best price schemes with respect to Aloxi. Among other things, he alleges that Eisai "bundled" together sales of Aloxi and Fragmin and then offered the two drugs to hospitals at far below the combined best price for the two drugs. Claim form 1450-related documents concerning Aloxi are, of course, likely to cast light on this scheme. These documents are needed for Relator to prove the case. This Request is reasonably calculated to lead to the discovery of admissible evidence about the schemes. Eisai acquired the rights to Aloxi in January 2008—not, say, twenty years ago. Hence, the Request is inherently limited in scope as to time.

## REQUEST NO. 34
Please produce any and all documents relating to the **use of CMS claim form 1450 (UB-04) for Fragmin**.

## RESPONSE TO REQUEST NO. 34
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Fragmin. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses CMS claim form 1450.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 34**
CMS claim form 1450 (UB-04) is a health insurance claim form published by CMS for use by institutional health care providers (e.g., hospitals) and pharmacies.  Health care providers enter patient treatment information into these forms, as well as codes for prescription drug administration, dosage, and related information concerning the drug's use by the patient.  The Request was for "any and all documents relating to the **use of CMS claim form 1450 (UB-04) for Fragmin**."  Relator has alleged best price and kickback schemes with respect to Fragmin. Among other things, he alleges that Eisai "bundled" together sales of Aloxi and Fragmin and then offered the two drugs to hospitals at far below the combined best price for the two drugs. Claim form 1450-related documents concerning Fragmin are, of course, likely to cast light on this scheme.  These documents are needed for Relator to prove the case.  This Request is reasonably calculated to lead to the discovery of admissible evidence about the scheme.  Eisai acquired the rights to Fragmin in September 2005—not, say, twenty years ago.  Hence, the Request is inherently limited in scope as to time.

**REQUEST NO. 35**
Please produce any and all documents relating to the **use of CMS claim form 1450 (UB-04) for Dacogen**.

**RESPONSE TO REQUEST NO. 35**
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Dacogen. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses CMS claim form 1450.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 35**
CMS claim form 1450 (UB-04) is a health insurance claim form published by CMS for use by institutional health care providers (e.g., hospitals) and pharmacies.  Health care providers enter patient treatment information into these forms, as well as codes for prescription drug administration, dosage, and related information concerning the drug's use by the patient.  The Request was for "any and all documents relating to the **use of CMS claim form 1450 (UB-04) for Dacogen**."  Relator has alleged three schemes with respect to Dacogen:  off-label marketing, kickbacks, and best price violations.  Claim form 1450-related documents concerning Dacogen are, of course, likely to cast light on these schemes.  These documents are needed for Relator to prove the case.  This Request is reasonably calculated to lead to the discovery of admissible evidence about the schemes.  Eisai acquired the rights to Dacogen in January 2008—not, say, twenty years ago.  Hence, the Request is inherently limited in scope as to time.

**REQUEST NO. 36**
Please produce any and all documents relating to the **use of CPT codes for Ontak**.

**RESPONSE TO REQUEST NO. 36**

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and the failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Ontak. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses CPT codes.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 36**

CPT codes, which are published by the American Medical Association ("AMA"), are used by health care providers to designate the medical, diagnostic, and/or surgical services that were rendered, and for which reimbursement was sought. "CPT" is an abbreviation for "current procedural terminology." In the case at bar, applicable CPT codes reflect the administration of, and billing for, the cancer drugs at issue. Two-digit modifiers may be appended to clarify or modify the description of the procedure. The critical relationship between an ICD-9 code and a CPT code is that the ICD-9, or diagnosis code, must support the medical necessity of the procedure. Relator has alleged three schemes with respect to Ontak: off-label marketing, kickbacks, and best price violations. With respect to the off-label marketing of Ontak, Relator has alleged that Eisai formulated and implemented an illegal marketing scheme in which it instructed doctors and other health care providers on how to seek Medicare reimbursement for off-label uses of the drugs. This included instructions to doctors on the use of CPT codes to bill for the administration of Ontak to patients. This Request is thus reasonably calculated to lead to the discovery of admissible evidence about the scheme. It is not only Eisai sales training materials and reimbursement guides that may reflect the prices for Ontak that were offered or provided. Eisai acquired the rights to Ontak in October 2006—not, say, twenty years ago. Hence, the Request is inherently limited in scope as to time.

**REQUEST NO. 37**

Please produce any and all documents relating to the **use of CPT codes for Aloxi.**

**RESPONSE TO REQUEST NO. 37**

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Aloxi. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses CPT codes.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 37**

For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 36. Substantially the same arguments apply with this drug. Eisai acquired the rights to Aloxi in January 2008—not, say, twenty years ago.  Hence, the Request is inherently limited in scope as to time.

## REQUEST NO. 38
Please produce any and all documents relating to the **use of CPT codes for Fragmin**.

## RESPONSE TO REQUEST NO. 38
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Fragmin. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses CPT codes.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 38
For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 36. Substantially the same arguments apply with this drug. Eisai acquired the rights to Fragmin in September 2005—not, say, twenty years ago.  Hence, the Request is inherently limited in scope as to time.

## REQUEST NO. 39
Please produce any and all documents relating to the **use of CPT codes for Dacogen**.

## RESPONSE TO REQUEST NO. 39
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Dacogen. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses CPT codes.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 39
For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 36. Substantially the same arguments apply with this drug. Eisai acquired the rights to Dacogen in January 2008—not, say, twenty years ago. Hence, the Request is inherently limited in scope as to time.

## REQUEST NO. 40

Please produce any and all documents relating to the **use of revenue codes for Ontak.**

## RESPONSE TO REQUEST NO. 40

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Ontak. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses revenue codes.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 40

CMS reimbursement claim form 1450 (UB-04) is used by health care providers/facilities for submitting institutional claims for both inpatient and outpatient services.  Revenue codes capture health care facility costs data by department, which the facility uses for cost reporting purposes. Accurate and precise CMS-1450 revenue code reporting can have a significant impact on hospital revenues—whether the coding is used to identify drugs for payment purposes, for coverage, or for cost reporting.  (Medicare and many other third-party payors use specific CMS-1450 revenue codes to identify high-cost drugs eligible for carve-out payments or increased reimbursement rates.)  Providers are required to include revenue codes and other codes (e.g., CPT codes) when submitting CMS-1450's for reimbursement.  CPT codes have to be linked to the revenue codes, when required.  Medicare generally requires hospital outpatient departments to use revenue code 0636 ("drugs requiring detail coding") when reporting a drug billed separately with a HCPCS code.  Providers generally report revenue code 0250 ("pharmacy") for drugs provided in the inpatient setting.  Relator has alleged three schemes regarding Ontak: off-label marketing, kickbacks and best price violations.  Relator's request for production by Eisai of "any and all documents relating to the **use of revenue codes for Ontak**" is proper because all three schemes involve drug revenues and Medicare claims reimbursement.  One page of Eisai's reimbursement website—to which Eisai directs Relator—merely states that, for Ontak, revenue code  0250 ("general pharmacy") is to be used, as well as 0636 (drugs requiring detailed coding").  That obviously barely scratches the surface of relevant documents.  Eisai acquired the rights to Ontak in October 2006—not, say, twenty years ago.  Hence, the Request is inherently limited in scope as to time.

## REQUEST NO. 41

Please produce any and all documents relating to the **use of revenue codes for Aloxi.**

## RESPONSE TO REQUEST NO. 41

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general

objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Aloxi. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses revenue codes.

### RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 41

For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 40. Substantially the same arguments apply with this drug. Eisai acquired the rights to Aloxi in January 2008—not, say, twenty years ago. Hence, the Request is inherently limited in scope as to time.

### REQUEST NO. 42

Please produce any and all documents relating to the **use of revenue codes for Fragmin**.

### RESPONSE TO REQUEST NO. 42

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Fragmin. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses revenue codes.

### RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 42

For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 40. Substantially the same arguments apply with this drug.  Eisai acquired the rights to Fragmin in Sept. 2005—not, say, twenty years ago.  Hence, the Request is inherently limited in scope as to time.

### REQUEST NO. 43

Please produce any and all documents relating to the **use of revenue codes for Dacogen**.

### RESPONSE TO REQUEST NO. 43

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Dacogen. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses revenue codes.

### RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 43

For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 40. Substantially the same

arguments apply with this drug.  Eisai acquired the rights to Dacogen in Jan. 2008—not, say, twenty years ago.  Hence, the Request is inherently limited in scope as to time.

## REQUEST NO. 44
Please produce any and all documents relating to the **use of HCPCS codes for Ontak.**

## RESPONSE TO REQUEST NO. 44
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Ontak. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses HCPCS codes.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 44
HCPCS stands for "Healthcare Common Procedure Coding System."  HCPCS codes, which are five-digit alphanumeric codes (the first is a letter and the next four are numeric), are known as Level II codes, because they are additional codes created to supplement and help further define CPT codes.  HCPCS codes cover some procedures that are not defined exclusively by CPT coding, but that are, like CPT codes, included in CMS-1500 requests for reimbursement by health care providers.  For example, HCPCS codes cover pharmaceuticals that are not considered procedures, yet are an integral part of health care billing.  CMS assigns these codes to drugs.  As stated on Eisai's website (eisaireimbursment.com), "[w]hen billing for a drug, payors require physicians to indicate on the claim form the quantity of [drug] product administered to the patient, expressed in  the number of units described by the HCPCS code."  Relator has alleged three Eisai schemes with respect to Ontak:  off-label marketing, kickbacks, and best price violations. This Request for "any and all documents relating to the **use of HCPCS codes for Ontak**" is proper, at the very least, because such documents may show how Eisai instructed providers to bill for Ontak through the use of HCPCS codes.

## REQUEST NO. 45
Please produce any and all documents relating to the **use of HCPCS codes for Aloxi.**

## RESPONSE TO REQUEST NO. 45
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Aloxi. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses HCPCS codes.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 45**

For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 44. Substantially the same arguments apply with this drug. Eisai acquired the rights to Aloxi in Jan. 2008—not, say, twenty years ago. Hence, the Request is inherently limited in scope as to time.

**REQUEST NO. 46**

Please produce any and all documents relating to the **use of HCPCS code**s **for Fragmin**.

**RESPONSE TO REQUEST NO. 46**

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Fragmin. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses HCPCS codes.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 46**

For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 44. Substantially the same arguments apply with this drug. Eisai acquired the rights to Fragmin in Sept. 2005—not, say, twenty years ago. Hence, the Request is inherently limited in scope as to time.

**REQUEST NO. 47**

Please produce any and all documents relating to the **use of HCPCS codes for Dacogen**.

**RESPONSE TO REQUEST NO. 47**

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Dacogen. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses HCPCS codes.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 47**

For the sake of brevity, Keeler incorporates by reference all arguments above, especially RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 44. Substantially the same arguments apply with this drug. Eisai acquired the rights to Dacogen in Jan. 2008—not, say, twenty years ago. Hence, the Request is inherently limited in scope as to time.

**REQUEST NO. 48**

Please produce any and all documents relating to the **use of CMS claim form 1500 (Medicare Part B) for Ontak.**

## RESPONSE TO REQUEST NO. 48

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Ontak. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses CMS claim form 1500.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 48

CMS-1500's (aka "HCFA-1500s") are the standard form used by doctors and other health care providers when submitting claims for reimbursement to Medicare and Medicaid for health services. CMS-1500's contains CPT and HCPCS codes, diagnostic codes, and other information about the health services that were rendered, and for which reimbursement is sought. In the case at bar, applicable CMS-1500's reflect the administration of, and billing for, the cancer drugs at issue. Relator has alleged three schemes with respect to Ontak: off-label marketing, kickbacks, and best price violations. With respect to the off-label marketing of Ontak, Relator has alleged that Eisai formulated and implemented an illegal marketing scheme in which it instructed doctors and other health care providers on how to seek Medicare reimbursement for off-label uses of the drugs. This included instructions to doctors on the use of CMS-1500's to bill for the administration of Ontak to patients. This Request is thus reasonably calculated to lead to the discovery of admissible evidence about the scheme. It is not only Eisai sales training materials and reimbursement guides that may reflect the prices for Ontak that were offered or provided. Eisai acquired the rights to Ontak in October 2006—not, say, twenty years ago. Hence, the Request is inherently limited in scope as to time.

## REQUEST NO. 49

Please produce any and all documents relating to the **use of CMS claim form 1500 (Medicare Part B) for Aloxi.**

## RESPONSE TO REQUEST NO. 49

Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Aloxi. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses CMS claim form 1500.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 49

CMS-1500's (aka "HCFA-1500s") are the standard form used by doctors and other health care providers when submitting claims for reimbursement to Medicare and Medicaid for health services.  CMS-1500's contains CPT and HCPCS codes, diagnostic codes, and other information about the health services that were rendered, and for which reimbursement is sought.  In the case at bar, applicable CMS-1500's reflect the administration of, and billing for, the cancer drugs at issue.  Relator has alleged a best price and kickback scheme with respect to Aloxi:  that Eisai knowingly allowed government health care programs to pay higher than the best price for Aloxi.  Eisai documents concerning CMS-1500s may reflect or cast light on the prices that Eisai sold Aloxi for.   Hence, this Request is thus reasonably calculated to lead to the discovery of admissible evidence about the scheme.  Eisai acquired the rights to Aloxi in January 2008—not, say, twenty years ago.  Hence, the Request is inherently limited in scope as to time.

**REQUEST NO. 50**
Please produce any and all documents and records relating to the **use of CMS claim form 1500 (Medicare Part B) for Fragmin**.

**RESPONSE TO REQUEST NO. 50**
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Fragmin. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses CMS claim form 1500.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 50**
CMS-1500's (aka "HCFA-1500s") are the standard form used by doctors and other health care providers when submitting claims for reimbursement to Medicare and Medicaid for health services.  CMS-1500's contains CPT and HCPCS codes, diagnostic codes, and other information about the health services that were rendered, and for which reimbursement is sought.  In the case at bar, applicable CMS-1500's reflect the administration of, and billing for, the cancer drugs at issue.  Relator has alleged best price and kickback schemes with respect to Fragmin. Eisai documents concerning CMS-1500s may reflect or cast light on the prices that Eisai sold Fragmin for.   Hence, this Request is thus reasonably calculated to lead to the discovery of admissible evidence about the scheme.  Eisai acquired the rights to Fragmin in September 2005—not, say, twenty years ago.  Hence, the Request is inherently limited in scope as to time.

**REQUEST NO. 51**
Please produce any and all documents relating to the **use of CMS claim form 1500 (Medicare Part B) for Dacogen**.

**RESPONSE TO REQUEST NO. 51**
Eisai objects to this request because it is overly broad in time period and scope, and seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it is unlimited in time period and

fails to identify the type of use that is the subject of the request. Eisai also objects to this request because it is vague and ambiguous because of the Request's definition of "relating to," and failure to identify the specific type of use. Without waiving these objections or its general objections, Eisai will produce sales training materials from 2006 to 2009 and reimbursement guides for 2009 for Dacogen. Documents responsive to this request are also available on the eisaireimbursement.com website, which addresses CMS claim form 1500.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 51**
CMS-1500's (aka "HCFA-1500s") are the standard form used by doctors and other health care providers when submitting claims for reimbursement to Medicare and Medicaid for health services. CMS-1500's contains CPT and HCPCS codes, diagnostic codes, and other information about the health services that were rendered, and for which reimbursement is sought. In the case at bar, applicable CMS-1500's reflect the administration of, and billing for, the cancer drugs at issue. Relator has alleged three schemes with respect to Dacogen: off-label marketing, kickbacks, and best price violations. With respect to the off-label marketing of Dacogen, Relator has alleged that Eisai formulated and implemented an illegal marketing scheme in which it instructed doctors and other health care providers on how to seek Medicare reimbursement for off-label uses of the drugs. This included instructions to doctors on the use of CMS-1500's to bill for the administration of Dacogen to patients. This Request is thus reasonably calculated to lead to the discovery of admissible evidence about the scheme. It is not only Eisai sales training materials and reimbursement guides that may reflect the prices for Dacogen that were offered or provided. Eisai acquired the rights to Dacogen in January 2008—not, say, twenty years ago. Hence, the Request is inherently limited in scope as to time.

**REQUEST NO. 52**
Please produce any and all documents, including, but not limited to, invoices, bills, sales reports, and sales history summaries, relating to your **sales of Ontak from 2006 through the present**.

**RESPONSE TO REQUEST NO. 52**
Eisai objects to this request because it fails to state with reasonable particularity the documents sought as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in time period and scope and unduly burdensome, as it requests all documents relating to sales of Ontak. For these same reasons, as well as the Request's definition of "relating to," Eisai also objects to this request because it is vague and ambiguous, and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections and the general objections, Eisai will produce annual sales reports for Ontak from 2006 to 2009.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 52**
It is difficult to imagine a clearer and more relevant Request than this one for "any and all documents, including, but not limited to, invoices, bills, sales reports, and sales history summaries, relating to your **sales of Ontak from 2006 through the present**." Relator has alleged off-label marketing, kickback, and best price violations with respect to Ontak, on nationwide basis. All sales-related documents relating to Ontak are obviously relevant to this case, considering the many allegations which focus on sales of Ontak. Sales of Ontak reflect, among other things, which providers bought Ontak—information that goes to the heart of all

three schemes.  Documents concerning promotion of the drug are obviously relevant because of the kickback and off-label marketing allegations. The fact that Eisai agrees to produce one sliver of relevant documents is not, of course, justification, for the withholding of all other requested documents that are not privileged and discoverable. The dates are not open-ended in this Request because the alleged Ontak schemes took place from October 2006 forward.

## REQUEST NO. 53
Please produce any and all documents, including, but not limited to, invoices, bills, sales reports, and sales history summaries, relating to your **sales of Aloxi from 2006 through the present**.

## RESPONSE TO REQUEST NO. 53
Eisai objects to this request because it fails to state with reasonable particularity the documents sought as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in time period and scope and unduly burdensome, as it requests all documents relating to sales of Aloxi. For these same reasons, as well as the Request's definition of "relating to," Eisai also objects to this request because it is vague and ambiguous, and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections and the general objections, Eisai will produce annual sales reports for Aloxi from 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 53
Again, it is difficult to imagine a clearer and more relevant Request than this one for "any and all documents, including, but not limited to, invoices, bills, sales reports, and sales history summaries, relating to your **sales of Aloxi from 2006 through the present**."  Relator has alleged best price and kickback violations with respect to Aloxi, on a nationwide basis.  All sales-related documents relating to Aloxi are obviously relevant to this case:  they would show whether or not Eisai was providing the best price to government health programs as compared to what was being provided to others.  The fact that Eisai agrees to produce one sliver of relevant documents is not, of course, justification, for the withholding of all other requested documents that are not privileged and discoverable. The dates are not open-ended in this Request because the alleged Aloxi schemes took place from Jan. 2008 forward.

## REQUEST NO. 54
Please produce any and all documents, including, but not limited to, invoices, bills, sales reports, and sales history summaries, relating to your **sales of Dacogen from 2006 through the present**.

## RESPONSE TO REQUEST NO. 54
Eisai objects to this request because it fails to state with reasonable particularity the documents sought as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in time period and scope and unduly burdensome, as it requests all documents relating to sales of Dacogen. For these same reasons, as well as the Request's definition of "relating to," Eisai also objects to this request because it is vague and ambiguous, and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections and the general objections, Eisai will produce annual sales reports for Dacogen from 2006 to 2009.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 54**

Again, it is difficult to imagine a clearer and more relevant Request than this one for "any and all documents, including, but not limited to, invoices, bills, sales reports, and sales history summaries, relating to your **sales of Dacogen from 2006 through the present**." Relator has alleged off-label, kickback, and best price violations with respect to Dacogen, on a nationwide basis. All sales-related documents relating to Dacogen are obviously relevant to this case, considering the many allegations which focus on sales of Dacogen. Sales of Dacogen reflect, among other things, which providers bought Dacogen—information that goes to the heart of all three schemes. Documents concerning promotion of the drug are obviously relevant because of the kickback and off-label marketing allegations. The fact that Eisai agrees to produce one sliver of relevant documents is not, of course, justification, for the withholding of all other requested documents that are not privileged and discoverable. The dates are not open-ended in this Request because the alleged Dacogen schemes took place from Jan. 2008 forward.

**REQUEST NO. 55**

Please produce any and all documents, including, but not limited to, invoices, bills, sales reports, and sales history summaries, relating to your **sales of Fragmin from 2006 through the present**.

**RESPONSE TO REQUEST NO. 55**

Eisai objects to this request because it fails to state with reasonable particularity the documents sought as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in time period and scope and unduly burdensome, as it requests all documents relating to sales of Fragmin. For these same reasons, as well as the Request's definition of "relating to," Eisai also objects to this request because it is vague and ambiguous, and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai also objects to this request to the extent it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections and the general objections, Eisai will produce annual sales reports for Fragmin from 2006 to 2009.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 55**

Again, it is difficult to imagine a clearer and more relevant Request than this one for "any and all documents, including, but not limited to, invoices, bills, sales reports, and sales history summaries, relating to your **sales of Fragmin from 2006 through the present**." Relator has alleged best price and kickback violations with respect to Fragmin, on a nationwide basis. All sales-related documents relating to Fragmin are obviously relevant to this case: they would show whether or not Eisai was providing the best price to government health programs as compared to what was being provided to others. The fact that Eisai agrees to produce one sliver of relevant documents is not, of course, justification, for the withholding of all other requested documents that are not privileged and discoverable. The dates are not open-ended in this Request because the alleged Fragmin schemes took place from Sept. 2005 forward.

**REQUEST NO. 56**

Please produce any and all **COERS reports relating to Ontak sales from 2006 through the present**.

**RESPONSE TO REQUEST NO. 56**

Eisai objects to this request because it is overly broad in time period, its reference to "COERS" reports is vague and ambiguous, and because of the Request's definition of "relating to." Without waiving these objections and the general objections, Eisai will produce what it believes Relator has identified as COERS reports (Oncology Field Force Reports) that exist for Ontak sales that are responsive to this request for 2006 to 2009.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 56**
In his Complaint, Keeler alleged that Eisai caused approximately 2,000 hospitals, oncology offices, oncologists, and pharmacies to submit false claims through Eisai's acts and omissions. He alleges that Eisai maintained a sales report, known as a "COERS" report, which reflects Ontak sales broken down by Account. These COERS reports were available to Defendant's sales representatives, including Keeler, and showed purchasers and the amounts they purchased. Keeler attached to his Complaint a COERS report, for the period of April 2008 through April 2009, that reflects the identities and addresses of 188 health care providers—active accounts during that period—that were purchasing Eisai's drug products and billing Medicare and Medicaid for administration of the drugs and related services. Hence, these COERS reports show Ontak accounts and sales. Since Keeler alleges that Eisai caused health care providers to submit false claims for reimbursement to government health programs, and these reports identify the specific providers that billed the government health programs, these documents are obviously germane and central to this case. The dates are not open-ended in this Request because the alleged Ontak schemes took place from Oct. 2006 forward.

**REQUEST NO. 57**
Please produce any and all **COERS reports relating to Aloxi sales from 2006 through the present**.

**RESPONSE TO REQUEST NO. 57**
Eisai objects to this request because it is overly broad in time period, its reference to "COERS" reports is vague and ambiguous, and because of the Request's definition of "relating to." Without waiving these objections and the general objections, Eisai will produce what it believes Relator has identified as COERS reports (Oncology Field Force Reports) that exist for Aloxi sales that are responsive to this request for 2006 to 2009.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 57**
Since Keeler alleges that Eisai caused health care providers to submit false claims for reimbursement to government health programs, and these sales reports, whether called "COERS reports" or something else, identify the specific providers that billed the government health programs for Aloxi, these documents are obviously germane and central to this case. The dates are not open-ended in this Request because the alleged Aloxi schemes took place from Jan. 2008 forward.

**REQUEST NO. 58**
Please produce any and all **COERS reports relating to Dacogen sales from 2006 through the present**.

**RESPONSE TO REQUEST NO. 58**
Eisai objects to this request because it is overly broad in time period, its reference to "COERS"

reports is vague and ambiguous, and because of the Request's definition of "relating to." Without waiving these objections and the general objections, Eisai will produce what it believes Relator has identified as COERS reports (Oncology Field Force Reports) that exist for Dacogen sales that are responsive to this request for 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 58

Since Keeler alleges that Eisai caused health care providers to submit false claims for reimbursement to government health programs, and these reports identify the specific providers that billed the government health programs for Dacogen, these documents are obviously germane and central to this case. The dates are not open-ended in this Request because the alleged Dacogen schemes took place from Jan. 2008 forward.

## REQUEST NO. 59

Please produce any and all **COERS reports relating to Fragmin sales from 2006 through the present**.

## RESPONSE TO REQUEST NO. 59

Eisai objects to this request because it is overly broad in time period, its reference to "COERS" reports is vague and ambiguous, and because of the Request's definition of "relating to." Without waiving these objections and the general objections, Eisai will produce what it believes Relator has identified as COERS reports (known as Oncology Field Force Reports) that exist for Fragmin sales that are responsive to this request for 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 59

Since Keeler alleges that Eisai caused health care providers to submit false claims for reimbursement to government health programs, and these reports identify the specific providers that billed the government health programs for Fragmin, these documents are obviously germane and central to this case. The dates are not open-ended in this Request because the alleged Fragmin schemes took place from Sept. 2005 forward.

## REQUEST NO. 60

Please produce any and all documents relating in any way to the **percentage(s), fraction(s), and/or number of sales of Ontak**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicare beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**.

## RESPONSE TO REQUEST NO. 60

Eisai objects to this request because it is overly broad in time period and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it seeks documents covering a ten year period, including years that have not yet occurred.  Eisai also objects to this request because it is vague and ambiguous, including due to the Request's definition of "relating to". Without waiving these objections or its general objections, Eisai will produce summary reports of Medicaid sales for Ontak, to the extent they exist, for the years 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 60

Eisai's sales of the drug Ontak were not all destined for Medicare beneficiaries and reimbursed by Medicare.  Some were for private pay or otherwise non-Medicare.  Counts I and II only involve Medicare fraud.  Hence, it is proper and relevant that Relator and the Government seek out "…the **percentage(s), fraction(s), and/or number of sales of Ontak**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicare beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**."  Relator has alleged that the three Ontak schemes took place from October 2006 forward. Hence, this Request has implicit time limits from that date forward. However, since it bought the rights to Ontak from Ligand in October 2006, and may have documents in which it or Ligand addressed this issue prior to Oct. 2006, this Request is also pertinent prior to Oct. 2006.

## REQUEST NO. 61

Please produce any and all documents relating in any way to the **percentage(s), fraction(s), and/or number of sales of Ontak**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicaid beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**.

## RESPONSE TO REQUEST NO. 61

Eisai objects to this request because it is overly broad in time period and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it seeks documents covering a ten year period, including years that have not yet occurred.  Eisai also objects to this request because it is vague and ambiguous, including due to the Request's definition of "relating to". Without waiving these objections or its general objections, Eisai will produce summary reports of Medicaid sales for Ontak, to the extent they exist, for the years 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 61

Eisai's sales of the drug Ontak were not all destined for Medicaid beneficiaries and reimbursed by Medicaid.  Some were for private pay or otherwise non-Medicaid.  The numerous state law (Counts III onward) mostly involve Medicaid fraud.  Hence, it is proper and relevant that Relator and the Government seek out "…the **percentage(s), fraction(s), and/or number of sales of Ontak**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicaid beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**."  Relator has alleged that the three Ontak schemes took place from October 2006 forward. Hence, this Request has implicit time limits from that date forward. However, since it bought the rights to Ontak from Ligand in October 2006, and may have documents in which it or Ligand addressed this issue prior to Oct. 2006, this Request is also pertinent prior to Oct. 2006.

## REQUEST NO. 62

Please produce any and all documents relating in any way to the **percentage(s), fraction(s), and/or number of sales of Aloxi**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicare beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**.

**RESPONSE TO REQUEST NO.  62**

Eisai objects to this request because it is overly broad in time period and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it seeks documents covering a ten year period, including years that have not yet occurred. Eisai also objects to this request because it is vague and ambiguous, including due to the Request's definition of "relating to". Without waiving these objections or its general objections, Eisai will produce summary reports of Medicare sales for Aloxi, to the extent they exist, for the years 2006 to 2009. Without waiving these objections or its general objections, Eisai will produce summary reports of Medicaid sales for Aloxi, to the extent they exist, for 2006 to 2009.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 62**

Eisai's sales of the drug Aloxi were not all destined for Medicare beneficiaries and reimbursed by Medicare.  Some were for private pay or otherwise non-Medicare.  Counts I and II only involve Medicare fraud.  Hence, it is proper and relevant that Relator and the Government seek out "…the **percentage(s), fraction(s), and/or number of sales of Aloxi**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicare beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**." Relator has alleged that the three Aloxi schemes took place from Jan. 2008 forward. Hence, this Request has implicit time limits from that date forward. However, since it bought the rights to Aloxi in Jan. 2008, and may have documents in which it addressed this issue prior to that date, this Request is also pertinent prior to Jan. 2008.

**REQUEST NO. 63**

Please produce any and all documents relating in any way to the **percentage(s), fraction(s), and/or number of sales of Aloxi**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicaid beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**.

**RESPONSE TO REQUEST NO. 63**

Eisai objects to this request because it is overly broad in time period and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it seeks documents covering a ten year period, including years that have not yet occurred. Eisai also objects to this request because it is vague and ambiguous, including due to the Request's definition of "relating to".

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 63**

Eisai's sales of the drug Aloxi were not all destined for Medicaid beneficiaries and reimbursed by Medicaid.  Some were for private pay or otherwise non-Medicaid.  The numerous state law (Counts III onward) mostly involve Medicaid fraud.  Hence, it is proper and relevant that Relator and the Government seek out "…the **percentage(s), fraction(s), and/or number of sales of Aloxi**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicaid beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or**

**2013**.”  Relator has alleged that the Aloxi best price scheme took place from January 2008 forward.  However, since it bought the rights to Aloxi in early 2008, and may have documents in which it or the seller addressed this issue prior to 2008, this Request is also pertinent prior to 2008.

## REQUEST NO. 64

Please produce any and all documents relating in any way to the **percentage(s), fraction(s), and/or number of sales of Dacogen**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicare beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**.

## RESPONSE TO REQUEST NO. 64

Eisai objects to this request because it is overly broad in time period and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it seeks documents covering a ten year period, including years that have not yet occurred.  Eisai also objects to this request because it is vague and ambiguous, including due to the Request's definition of "relating to".  Without waiving these objections or its general objections, Eisai will produce
Summary reports of Medicare sales for Dacogen, to the extent they exist, for 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 64

Eisai's sales of the drug Dacogen were not all destined for Medicare beneficiaries and reimbursed by Medicare.  Some were for private pay or otherwise non-Medicare.  Counts I and II only involve Medicare fraud.  Hence, it is proper and relevant that Relator and the Government seek out "…the **percentage(s), fraction(s), and/or number of sales of Dacogen**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicare beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**.”  Relator has alleged that the three Dacogen schemes took place from January 2008 forward.  However, since it bought the rights to Dacogen in early 2008, and may have documents in which it or the seller addressed this issue prior to 2008, this Request is also pertinent prior to 2006.

## REQUEST NO. 65

Please produce any and all documents relating in any way to the **percentage(s), fraction(s), and/or number of sales of Dacogen**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicaid beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**.

## RESPONSE TO REQUEST NO. 65

Eisai objects to this request because it is overly broad in time period and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it seeks documents covering a ten year period, including years that have not yet occurred. Eisai also objects to this request because it is vague and ambiguous, including due to the Request's definition of "relating to". Without waiving these objections or its general objections, Eisai will produce summary reports of

Medicaid sales of Dacogen, to the extent they exist, for 2006 to 2009.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 65**
Eisai's sales of the drug Dacogen were not all destined for Medicaid beneficiaries and reimbursed by Medicaid.  Some were for private pay or otherwise non-Medicaid.  The numerous state law counts (Counts III onward) mostly involve Medicaid fraud. Hence, it is proper and relevant that Relator and the Government seek out "…the **percentage(s), fraction(s), and/or number of sales of Dacogen-**-actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicare beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**." Relator has alleged that the three Dacogen schemes took place from January 2008 forward.  However, since it bought the rights to Dacogen in early 2008, and may have documents in which it or the seller addressed this issue prior to 2008, this Request is also pertinent prior to 2008.

**REQUEST NO. 66**
Please produce any and all documents relating in any way to the **percentage(s), fraction(s), and/or number of sales of Fragmin**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicare beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**.

**RESPONSE TO REQUEST NO. 66**
Eisai objects to this request because it is overly broad in time period and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it seeks documents covering a ten year period, including years that have not yet occurred.  Eisai also objects to this request because it is vague and ambiguous, including due to the Request's definition of "relating to". Without waiving these objections or its general objections, Eisai will produce Summary reports of Medicare sales for Fragmin, to the extent they exist, for 2006 to 2009.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 66**
Eisai's sales of the drug Fragmin were not all destined for Medicare beneficiaries and reimbursed by Medicare.  Some were for private pay or otherwise non-Medicare.  Counts I and II only involve Medicare fraud.  Hence, it is proper and relevant that Relator and the Government seek out "…the **percentage(s), fraction(s), and/or number of sales of Fragmin**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicare beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**." Relator has alleged that the Fragmin best price scheme took place from September 2005 forward.  However, since it bought the rights to Fragmin in September 2005, and may have documents in which it or the seller addressed this issue prior to that date, this Request is also pertinent prior to September 2005.

**REQUEST NO. 67**
Please produce any and all documents relating in any way to the **percentage(s), fraction(s), and/or number of sales of Fragmin**—actual, estimated, and/or otherwise--that are, were, have

been, and/or will be for use by **Medicaid beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**.

## RESPONSE TO REQUEST NO. 67

Eisai objects to this request because it is overly broad in time period and because it seeks documents that are neither relevant to the claims or defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence, as it seeks documents covering a ten year period, including years that have not yet occurred. Eisai also objects to this request because it is vague and ambiguous, including due to the Request's definition of "relating to." Without waiving these objections or its general objections, Eisai will produce summary reports of Medicaid sales for Fragmin, to the extent they exist, for 2006 to 2009.

## RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 67

Eisai's sales of the drug Fragmin were not all destined for Medicare beneficiaries and reimbursed by Medicaid. Some were for private pay or otherwise non-Medicaid. The numerous state law counts (Counts III onward) mostly involve Medicaid fraud. Hence, it is proper and relevant that Relator and the Government seek out "…the **percentage(s), fraction(s), and/or number of sales of Fragmin**—actual, estimated, and/or otherwise--that are, were, have been, and/or will be for use by **Medicaid beneficiaries**, relating in any way to any and all periods of time that touch upon, to any extent, the years **2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and/or 2013**." Relator has alleged that the Fragmin best price scheme took place from September 2005 forward. However, since it bought the rights to Fragmin in September 2005, and may have documents in which it or the seller addressed this issue prior to that date, this Request is also pertinent prior to September 2005.

## REQUEST NO. 68

Please produce any and all documents relating in any way to your **deliveries, provisions, distributions, marketing, revenues, profits, and/or sales of Ontak, Aloxi, Fragmin, and/or Dacogen, directly and/or through third parties, to the following health care providers:**

 [DELETION OF LONG LIST FOR THE SAKE OF BREVITY.  LIST BEGAN WITH "ALTA BATES MED CENTER PHCY" AND ENDED WITH "WILFORD HALL MED CNTR/HSL"].

## RESPONSE TO REQUEST NO. 68

Eisai objects to this request because it fails to describe with reasonable particularity the documents requested as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in both time period and scope, and unduly burdensome, as the request demands the production of multiple categories of documents for approximately 300 healthcare providers. For these same reasons, as well as the Request's definition of "relating to," Eisai also objects to this request because it is vague and ambiguous, and because it seeks documents that are neither relevant to the claims and defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai also objects to this request to the extent that it seeks documents subject to the attorney-client or attorney work product privilege.

Without waiving these objections or its general objections, Eisai will produce
Oncology Field Force Reports that exist for 2006 to 2009 for these health care providers.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 68**
Relator alleged that the 188 providers listed were customers of Eisai's—specifically that they had purchased the drugs at issue: Ontak, Fragmin, Aloxi and Dacogen. The three Medicare and Medicaid fraud schemes involve those four drugs. These schemes were off-label marketing, kickback and best price schemes. Hence, "any and all documents relating in any way to your **deliveries, provisions, distributions, marketing, revenues, profits, and/or sales of Ontak, Aloxi, Fragmin, and/or Dacogen, directly and/or through third parties, to the [] health care providers [listed]"** directly involve Relator's allegations, and are at the heart of this lawsuit. The Request is proper and the objections are meritless.

**REQUEST NO. 69**
Please produce any and all documents relating in any way to your **deliveries, provisions, distributions, marketing, revenues, profits, and/or sales of Ontak, Aloxi, Fragmin, and/or Dacogen, directly and/or through third parties, to the following health care providers:**

[DELETION OF LONG LIST FOR THE
SAKE OF BREVITY. LIST BEGAN
WITH "Yale-New Haven Hospital
Connecticut" AND ENDED WITH
"Nevada Cancer Institute"].

**RESPONSE TO REQUEST NO. 69**
Eisai objects to this request because it fails to describe with reasonable particularity the documents requested as required by Fed. R. Civ. P. 34(b)(1)(A), and because it is overly broad in both time period and scope, and unduly burdensome, as the request demands the production of multiple categories of documents for approximately 55 healthcare providers. For these same reasons, as well as the Request's definition of "relating to," Eisai also objects to this request because it is vague and ambiguous, and because it seeks documents that are neither relevant to the claims and defenses in this case nor reasonably calculated to lead to the discovery of admissible evidence. Eisai also objects to this request to the extent that it seeks documents subject to the attorney-client or attorney work product privilege. Without waiving these objections or its general objections, Eisai will produce Oncology Field Force Reports that exist for 2006 to 2009 for these health care providers.

**RELATOR'S REPLY TO RESPONSE TO REQUEST NO. 69**
Relator alleged that the listed providers listed were customers of Eisai's—specifically that they had purchased Ontak and/or Dacogen and had been the subjects of off-label marketing. Hence, the Request directly involves Relator's allegations, and the documents are at the heart of this lawsuit. The Request is proper and the objections are meritless.

**CONCLUSION**

For the above reasons, this Honorable Court should grant Keeler's Motion to Compel, find that Eisai has waived its objections, overrule all of its objections, and/or order Eisai to fully comply within ten (10) days.

Respectfully submitted:

s/ Steven F. Grover
----------------------------------------
Steven F. Grover, Esq. (131296)             Gary Michael Farmer, Jr., Esq.
Steven F. Grover, PA                        Steven R. Jaffe, Esq.
One East Broward Blvd., Suite 700           Seth Michael Lehrman, Esq.
Fort Lauderdale, FL 33301                   Farmer Jaffe Weissing Edwards
Tel.: 954-356-0005 / Fax : 954-356-0010     Fistos & Lehrman PL
E-mail: lawhelp@earthlink.net               425 N. Andrews Ave., Suite 2
                                            Ft. Lauderdale, FL 33301
James Paul Gitkin, Esq.
Salpeter Gitkin LLP
Museum Plaza, Suite 503
200 S. Andrews Ave.
Ft. Lauderdale, FL 33301
954-467-8622 / 954-467-8623 (fax)

Keeler.MtntoCompel.100311